**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE, <br> *Plaintiff*, <br><br> v. <br><br> ENGINE MANUFACTURERS ASSOCIATION, D/B/A TRUCK & ENGINE MANUFACTURERS ASSOCIATION, <br><br> CUMMINS INC., <br><br> DAIMLER TRUCK NORTH AMERICA LLC, <br><br> FORD MOTOR CO., <br><br> GENERAL MOTORS CO., <br><br> HINO MOTORS LIMITED, INC., <br><br> ISUZU TECHNICAL CENTER OF AMERICA, INC., <br><br> NAVISTAR, INC., <br><br> PACCAR INC., <br><br> STELLANTIS N.V., <br><br> VOLVO GROUP NORTH AMERICA, INC. D/B/A VOLVO TRUCKS NORTH AMERICA, and <br><br> STEVEN S. CLIFF, in his official capacity as the executive officer of the California Air Resources Board, <br><br> *Defendants*. | CA No. 3:24-cv-50504. |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

The above-captioned plaintiff, by and through its undersigned attorneys, alleges as follows:

## INTRODUCTION

1.      Internal-combustion engines powered by energy-dense liquid fuels are the beating hearts of interstate commerce. They power cars, locomotives, long-haul freight trucks, delivery vehicles, construction equipment, garbage trucks, buses, and more. They keep grocery shelves stocked, manufacturing going, crops growing, and commerce flowing. Internal-combustion engines have also improved for more than a century. Today, these engines continue to provide unmatched convenience and performance, but they are also extraordinarily safe and clean. Emissions have declined by roughly 99 percent since the 1970s.

2.      This case arises out of an extraordinary attempt to phase out the internal-combustion engine across the heavy-duty vehicle sector. The scheme involves a "Partnership Agreement" between (1) Steven S. Cliff, the Executive Director of the California Air Resources Board (CARB) and (2) the Truck & Engine Manufacturers Association and *all* major manufacturers of gasoline and diesel heavy-duty vehicles and engines: Cummins Inc., Daimler Truck North America LLC, Ford Motor Co., General Motors Co., Hino Motors Limited, Inc., Isuzu Technical Center of America, Inc., Navistar, Inc., PACCAR Inc., Stellantis N.V., and Volvo Group North America, Inc. (collectively, the "truck manufacturers").

3.      The Agreement purportedly allows truck manufacturers limited relief from California's intrusive and unlawful regulations for heavy-duty vehicles. *See* Ex. A, Agreement, https://perma.cc/BH9Z-Y7MN. In return, however, the truck manufacturers have sold out their customers and those that depend on them: They have agreed to

2

phase out sales of internal-combustion vehicles in lockstep with California's dictates, regardless of what the law says or what their customers want.

4.      Like all agreements to reduce supply or output, this Agreement will allow truck manufacturers to steadily raise internal-combustion heavy-duty vehicle prices, harming dealers, fleets, and other consumers who do not want to pay higher prices or purchase technologically inferior battery-electric or fuel-cell-electric powertrains. Dealers, fleets, and purchasers on the receiving end of this collusive "Partnership" will have their business models upended.

5.      Indeed, the Agreement's harms are already being felt.

6.      Since the Agreement, heavy-duty vehicle prices have increased, outpacing inflation, as output has fallen, precisely what you would expect from an output cartel.

7.      Truck manufacturers have also begun implementing tying agreements that require dealers and fleet customers to buy electric vehicles in order to continue purchasing internal-combustion vehicles.

8.      States have accordingly begun to investigate and to prosecute the Agreement and related tying practices on antitrust grounds. *See State of Nebraska v. Daimler Truck N. Am.*, No. D15CI240000570 (Neb. Dist. Ct. filed Nov. 19, 2024).

9.      Plaintiff's members are among those economically injured by this Agreement, which aims to restrict consumer choice and increases costs across the Nation.

10.     As explained in detail below, regardless of whether the Agreement violates state or federal antitrust law, the Agreement is independently prohibited by the Clean Air Act because it is an "attempt to enforce" prohibited state standards. 42 U.S.C. § 7543(a). The Agreement must accordingly be declared null and void in its entirety, and

Defendants must be enjoined from proceeding with this unprecedented collusive stratagem to evade the law of the land and harm truck fleets and other consumers in the process.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

12.    The preemption claims asserted herein arise, *inter alia*, under 42 U.S.C. §§ 1983, 1985(3), and 7543(a). *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983); *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 104 (1989).

13.    This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

14.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in the Northern District of Illinois. Specifically, Defendant Engine Manufacturers Association, an association of nearly all truck manufacturers, which took the lead in negotiating the Agreement and executed the Agreement, is headquartered in this District. In addition, the Association is currently overseeing execution of the Agreement from Illinois and is performing the contract in Illinois.

15.    Venue is also proper in this Division: because "this District has no rule requiring divisional venue, either the Eastern or Western Division is appropriate." *Sky Jet M.G. Inc. v. Elliott Aviation, Inc.*, No. 15 C 8113, 2016 WL 362385, at *2 (N.D. Ill. Jan. 29, 2016).

16.    The Court has personal jurisdiction over Engine Manufacturers Association because it is an Illinois trade association organized under the laws of Illinois and headquartered in Illinois.

17.    The Court has personal jurisdiction over Navistar because it is headquartered in Illinois.

18.    The Court has specific personal jurisdiction over the remaining Defendants because they purposefully availed themselves of the forum by becoming members of the Association, directing the Association to negotiate the Agreement on their behalf, and/or by negotiating and entering into an agreement with the Association that the truck manufacturers agree to perform nationwide in any state covered by 42 U.S. Code § 7507, including Illinois. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985); *Viktron Ltd. P'ship v. Program Data Inc.*, 326 Ill. App. 3d 111 (2001); *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) ("Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons."); Fed. R. Civ. P. 4(k)(1)(A).

19.    Further, Engine Manufacturers Association, at its members' direction, and pursuant to the Agreement, is overseeing, coordinating, and performing the Agreement in Illinois.

20.    In 2024, for instance, the Association submitted comments to the Illinois Pollution Control Board in response to the Board's ongoing rulemaking to adopt regulations covered by the Agreement. In those comments, the Association acknowledged entering into the Agreement and stated that it was "submitting these comments consistent with the relevant terms of the" Agreement.[1]

---

[1] Comments and Questions of Engine Manufacturers Association *In the Matter of: Proposed Clean Car and Truck Standards* R.2024-017 at 1 (Oct. 24, 2024),
*(footnoted continued on next page)*

5

21.     Ford is similarly performing the Agreement in Illinois by carrying out its obligations under the Agreement with respect to the ongoing rulemaking initiated by the Illinois Pollution Control Board, as well as legislation considered by the Illinois state legislature.

22.     All truck manufacturers who signed the Agreement also do substantial business in Illinois, manufacturing or producing and delivering for sale vehicles and/or engines in Illinois, either directly or through subsidiaries subject to their direction and control.

23.     The truck manufacturers' decisions of what mix of vehicles to distribute for sale in Illinois, and at what prices, is influenced by their need to carry out their obligations under the Agreement.

24.     On information and belief, in negotiating the agreement and overseeing its execution, Ford's agents sent emails or other communications to Illinois residents subject to the Agreement, participated in meetings in Illinois, or held phone calls or online calls with residents of Illinois.

25.     On information and belief, in negotiating the agreement and overseeing its execution, Cliff and/or his agents sent emails or other communications to Illinois residents subject to the Agreement, participated in meetings in Illinois, and/or held phone calls or online calls with residents of Illinois.

---

https://pcb.illinois.gov/documents/dsweb/Get/Document-111079 (October EMA Comment to IPCB); *see also* Engine Manufacturers Association's Response to Petitioner's Answers *In the Matter of: Proposed Clean Car and Truck Standards* R.2024-017 (Nov. 21, 2024), https://pcb.illinois.gov/documents/dsweb/Get/Document-111253 (November EMA Comment to IPCB).

## PARTIES

### I. Plaintiff

26.     Plaintiff American Free Enterprise Chamber of Commerce (AmFree) is a 501(c)(6) membership organization founded in 2022 that represents entrepreneurs and businesses across many economic sectors. AmFree's members are vitally interested in the preservation of free markets, free innovation, and the continued economic viability of the internal-combustion engine in our transportation sector, along with the economic growth and opportunities it enables. AmFree's members include fleet owners and operators that are affected by the Agreement and will suffer economic harm from its execution. *See* Ex. B (Declaration of Zach Meiborg); Ex. C (Declaration of Michael Riggan).

### II. Defendants

27.     Defendant Engine Manufacturers Association (EMA), d/b/a Truck & Engine Manufacturers Association, is an association organized under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois.

28.     Defendant Cummins Inc. (Cummins) is a corporation organized and existing under the laws of the State of Indiana, with its principal place of business in Columbus, Indiana.

29.     Defendant Daimler Truck North America LLC (Daimler) is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Portland, Oregon. Its sole member is Daimler Trucks & Buses US Holding, which is a Delaware limited liability company in Oregon. Daimler Trucks & Buses US Holding, LLC is a wholly owned subsidiary of Daimler Truck AG, which is a corporation organized and existing under the laws of the Federal Republic of Germany.

30.    Defendant Ford Motor Co. (Ford) is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Dearborn, Michigan.

31.    Defendant General Motors Co. (GM) is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Detroit, Michigan.

32.    Defendant Hino Motors Limited, Inc. (Hino) is a corporation organized and existing under the laws of Japan, with its principal place of business in Tokyo, Japan.

33.    Defendant Navistar, Inc. (Navistar) is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Lisle, Illinois.

34.    Defendant PACCAR, Inc. (PACCAR) is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Bellevue, Washington.

35.    Defendant Stellantis N.V. (Stellantis) is a corporation organized and existing under the laws of the Netherlands, with its principal place of business in Lijnden, The Netherlands.

36.    Defendant Isuzu Technical Center of America, Inc. (Isuzu) is a corporation organized and existing under the laws of the State of California, with its principal place of business in Plymouth, Michigan.

37.    Defendant Volvo Group North America, Inc., d/b/a Volvo Trucks North America (Volvo) is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Greensboro, North Carolina.

38.    Defendants Cummins, Daimler, GM, Hino, Isuzu, Navistar, PACCAR, Stellantis, and Volvo are members of EMA. Defendant Ford is not a member.

39.    Defendant Steven S. Cliff is the Executive Officer of the California Air Resources Board and its highest-ranking administrative officer. Cliff is sued in his official capacity.

## STATEMENT OF FACTS

### I.    The Clean Air Act

40.    Under Title II of the Clean Air Act, the Administrator of the U.S. Environmental Protection Agency (EPA) comprehensively controls emissions from new motor vehicles. "Before a manufacturer may introduce a new motor vehicle into commerce, it must obtain an EPA certificate indicating compliance with the requirements of the Act and applicable regulations." *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1146 (D.C. Cir. 2002); 42 U.S.C. § 7522(a)(1).

41.    Under § 202(a) of the Clean Air Act, the EPA Administrator must "prescribe ... standards applicable to the emission of any air pollutant from ... new motor vehicles or new motor vehicle engines which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a)(1). The Supreme Court has explained that, "[b]ecause greenhouse gases fit well within the Clean Air Act's capacious definition of 'air pollutant,' ... EPA has the statutory authority to regulate the emission of such gases from new motor vehicles." *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007). EPA, however, must set standards by "giving appropriate consideration to the cost of compliance within such period." 42 U.S.C. § 7521(a)(2).

42.    Pursuant to § 202, EPA sets national emission standards for motor vehicles. That includes standards for emissions that contribute to soot and smog (i.e., ground-level ozone) in the ambient air, such as nitrogen oxides, as well as greenhouse gases such as carbon dioxide. EPA has set comprehensive emission standards for heavy-duty vehicles. *See* 40 C.F.R. pt. 1037.

43.    "The cornerstone of Title II is Congress' continued express preemption of state regulation of automobile emissions." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. N.Y. Dep't of Env't Conservation*, 17 F.3d 521, 526 (2d Cir. 1994). Specifically, § 209(a) of the Clean Air Act provides:

> No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a).

44.    Title II thus vests the federal government with authority over new motor vehicle emission, preventing "an anarchic patchwork of federal and state regulatory programs." *Motor Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979). By eliminating overlapping state regulations, § 209(a) prevents a balkanized product market, lowers the cost of reducing emissions, and protects the "productive capacity of [the U.S.] population." 42 U.S.C. § 7401(b)(1).

45.    Congress authorized one exception to the preemptive scope of § 209(a). Section 209(b) of the Clean Air Act authorizes EPA to "waive application of" § 209(a)

for the state of California under certain, defined conditions. *See* 42 U.S.C. § 7543(b). To receive a waiver, California must first "determine[] that [its own] State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards." *Id.* § 7543(b)(1).

46.    EPA "shall" then grant a waiver—but "[n]o such waiver shall be granted" if EPA "finds that" (A) California's "determination … is arbitrary and capricious"; (B) California "does not need such … standards to meet compelling and extraordinary conditions"; or (C) California's "standards and accompanying enforcement procedures are not consistent with section 7521(a) [202(a)] of this title," *id.* § 7543(b)(1), which among other things requires sufficient lead time "to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period," *id.* § 7521(a)(2).

47.    Congress granted California this exemption because that state faced uniquely severe problems with "smog," or ground-level ozone, compared to other states. H.R. Rep. No. 90-728, at 22 (1967). California's "geography and prevailing wind patterns," combined with ample sunlight, made smog a persistent problem in the state. 49 Fed. Reg. 18,887, 18,890 (May 3, 1984) (citing 113 Cong. Reg. 30,948 (Nov. 2, 1967)); *see also* H.R. Rep. No. 90-728, at 22.

48.    In the 1977 amendments, Congress further amended the Clean Air Act—adding what is commonly known as § 177—to permit "any State" to "adopt and enforce" standards "identical to the California standards for which a waiver has been granted," if the State "has plan provisions approved under" Title I of the Clean Air Act. 42 U.S.C. §

7507. The "plan provisions" are state programs designed to attain EPA's national ambient air quality standards, which target regional "criteria" pollutants such as particulate matter and smog.

49.    For many years, California acted more-or-less consistently with § 209(b) and sought waivers for performance standards that addressed its regional air quality. Over this period, smog-forming pollutants and particulate matter emissions from trucks and vans declined by roughly 99%, as federal standards tightened. EPA projects that its most recent standards will cut new truck and van nitrogen-oxide emissions by another "80 to 90 percent, or more," and reduce direct particulate-matter emissions by 50%. 88 Fed. Reg. 4296, 4333 (Jan. 24, 2023).

50.    Trucks are now so clean that, according to CARB, 260 freight trucks are cleaner than a single train carrying the same cargo. CARB, *Draft Truck v. Train Emission Analysis*, https://perma.cc/G2M9-9VK2.

51.    As vehicles have become cleaner and local air quality has improved, however, California has expanded its regulatory aims: it now seeks to confront "the climate change crisis." *See* Off. of Gov. Gavin Newson, Exec. Order N-79-20 (Sept. 23, 2020), https://perma.cc/AXH9-V2CE. In a professed but misguided attempt to do so, California seeks to dictate the type of powertrains manufacturers must build, and that fleet operators must buy. In particular, California aims to ban internal-combustion vehicles such as those with compression-ignition diesel engines and spark-ignition gasoline engines, and to replace them with technologically inferior battery-electric or fuel-cell-electric powertrains. *Id.*

52.    CARB misleadingly labels these alternative powertrains "zero emission," and the vehicles "ZEVs," for short. Cal. Code Regs. tit. 13, § 2015(b). Battery-electric

vehicles, of course, don't have tailpipes, while fuel-cell-electric vehicles emit water vapor.

53.    But that doesn't mean that manufacturing or driving them produces zero emissions. Producing the electricity or hydrogen these vehicles use for propulsion still results in significant emissions, and these vehicles also directly emit significant particles from tire wear and resuspended road dust, as they are far heavier than comparable internal-combustion vehicles.

54.    Although California first focused on light-duty vehicles, such as passenger sedans, hatchbacks, and light-duty trucks, it has now set its sights on the market for "heavy-duty" vehicles.

55.    Several other states have followed California's lead, and Illinois is in the process of joining this coalition. *See* Multi-State Medium- and Heavy-Duty Zero Emission Vehicle Memorandum of Understanding (2020), https://www.nescaum.org/documents/mhdv-zev-mou-20220329.pdf.

## II. The State Assault on Internal-Combustion Trucks

56.    Heavy-duty vehicles are vehicles with a gross vehicle weight rating (GVWR) of more than 8,500 lbs.[2] 40 C.F.R. § 1037.801. They are usually divided by weight, with class 2b vehicles the lightest, and class 8 vehicles the heaviest, weighing some 80,000 lbs. when fully loaded. California usually refers to heavy-duty vehicles weighing less than 14,000 lbs. as "medium-duty" vehicles.

57.    Heavy-duty vehicles include heavy-duty pickup trucks, vans, box trucks, city buses, long-haul trucks, refuse trucks, cement trucks, and more. Except for buses

---

[2] GVWR means the weight specified by the manufacturer as the loaded weight of a single vehicle. 40 C.F.R. § 1037.801.

and large passenger shuttles, heavy-duty vehicles are overwhelmingly vans and trucks designed to do work such as carrying freight or towing heavy loads. There are more than 14 million heavy-duty trucks on the road today. Heavy-duty trucks moved over 12 billion tons of freight worth an estimated $11 trillion in 2021, far more than all other modes of transportation put together.

58.    According to the Department of Energy's 2022 Annual Energy Outlook, compression-ignition and spark-ignition engines account for practically all new sales across all heavy-duty vehicle classes in the United States. The 2022 Annual Energy Outlook predicted almost no increase in the market share of electric and fuel-cell-electric vehicles in the decades to come.

59.    Despite these realities, in 2020, California's Governor Gavin Newsom set a "goal of the State that 100 percent of … heavy-duty vehicles in the State be zero-emission by 2045 for all operations where feasible and by 2035 for drayage trucks." Exec. Order N-79-20 (Sept. 23, 2020). Governor Newsom also ordered CARB to promulgate rules for "heavy-duty vehicle regulations requiring increasing volumes of new zero-emission trucks and buses sold and operated in the State towards the target of 100 percent of the fleet transitioning to zero-emission vehicles by 2045 everywhere feasible and for all drayage trucks to be zero-emission by 2035." *Id.*

60.    As explained below, other states are following California's lead.

**A.    The "Advanced Clean Trucks" Rule**

61.    Soon after Governor Newsom's executive order, CARB adopted the "Advanced Clean Trucks" (ACT) rule. *See* CARB, Exec. Order R-20-004 (Jan. 26, 2021), https://perma.cc/UH4C-SPBA. Under the ACT rule, vehicle manufacturers must meet increasingly stringent annual market shares of "zero-emission" vehicles, calculated as a

14

percentage of their total heavy-duty vehicle deliveries in the state of California, or else buy "credits" from competitors that overcomply with their own percentage obligations. *See* Cal. Code Regs. tit. 13, §§ 1963.1, 1963.2.

62.    CARB requested a waiver of Clean Air Act preemption for the ACT rule, and in 2023, EPA granted the requested Clean Air Act waiver. 88 Fed. Reg. 20,688 (Apr. 6, 2023).

63.    EPA's waiver of Clean Air Act preemption for the ACT rule is currently being challenged in the U.S. Court of Appeals for the D.C. Circuit, where the challenge has been stayed pending the resolution of challenges to different waivers and other EPA regulations. *See Western States Trucking Ass'n, Inc. v. EPA*, No. 23-1143 (D.C. Cir.) and consolidated cases.

64.    In the meantime, the ACT rule has been adopted by Colorado, Maryland, Massachusetts, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington pursuant to § 177 of the Clean Air Act. California and these states account for roughly 25% of U.S. sales, so these state market-share restrictions will ripple throughout the U.S. market.

65.    Illinois is currently considering adopting the ACT rule. Illinois Pollution Control Board, *Proposed Clean Car and Truck Standards: Proposed Section 35 Ill. Admin. Code 242*, Docket R2024-17, https://pcb.illinois.gov/Cases/GetCaseDetailsById?caseId=17520.

66.    After and pursuant to the Partnership Agreement that is described in more detail below, CARB recently voted to amend the ACT rule through resolution 24-5.

67.    The amendment to the ACT rule modifies the enforcement requirements and flexibilities and also purports to incorporate by reference a ban on internal-combustion vehicles by 2036 that has never been approved by EPA.

68.    As amended by CARB, the ACT rule has not received a waiver from EPA, nor has EPA determined that the ACT rule is within the scope of the prior waiver granted by EPA.

69.    According to EMA, the "ACT amendment most definitely and most significantly impacts the stringency of the ACT regulations." November EMA Comment to IPCB at 1.

70.    As amended by CARB, the ACT rule is not "identical" to the rules adopted by Colorado, Maryland, Massachusetts, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington. 42 U.S.C. § 7507.

**B.    The "Omnibus" Rule**

71.    On December 22, 2021, California adopted the so-called "Omnibus" rule as state law. Among other things, the Omnibus rule required manufacturers to slash heavy-duty vehicle nitrogen-oxide and particulate emissions by model year 2024, and make many other changes to state regulations too, with only two years of lead time. *See* Cal. Code Regs., tit. 13, § 1956.8(a)(2)(C).

72.    Manufacturers would have no time to comply, given their lengthy redesign cycles.

73.    CARB nevertheless submitted a request for a Clean Air Act preemption waiver for the Omnibus rule on January 31, 2022, Omnibus Rule Waiver Request Support Document, https://perma.cc/FR6M-XGGH.

74.    On May 27, 2022, EMA sued CARB in district court, explaining that the Omnibus rule is preempted by the Clean Air Act and ineligible for a waiver as a matter of law because it failed to give enough lead time for manufacturers to comply. EMA Complaint, https://perma.cc/B2QE-36V4.

75.    EPA noticed the waiver request for comment on June 13, 2022. 87 Fed. Reg. 35,765.

76.    Later that summer, EMA withdrew its district court lawsuit against CARB. EMA Press Release (Aug. 11, 2022), https://tinyurl.com/5b2ut3xs.

77.    The following year, on January 24, 2023, EPA announced new emissions regulations, test procedures, and warranty requirements to control nitrogen-oxide and other emissions from heavy-duty vehicles that contribute to regional and local air pollution. 88 Fed. Reg. 4296 (Jan. 24, 2023). These regulations would overlap and conflict with the Omnibus rule.

78.    Although the EPA regulations are extraordinarily ambitious and costly, they provide more lead time for manufacturers than the Omnibus rule, consistent with the Clean Air Act's requirement of four years of lead time. *See* 42 U.S.C. § 7521(a)(3)(C).

79.    Through March of 2023, EMA continued opposing a Clean Air Act preemption waiver for the California Omnibus rule, arguing that the Omnibus regulation did not allow sufficient lead time and was not technologically feasible.

80.    That same month, however, CARB asked EPA to "defer" the waiver decision while CARB worked to address EMA's objections about feasibility and lead time.

81.    After and pursuant to the Partnership Agreement that is described in more detail below, CARB amended the Omnibus rule on December 28, 2023, Exec. Order R-

23-006, and the amended Omnibus rule became effective as California state law on May 31, 2024.

82.    California then resubmitted a waiver request to EPA for the amended Omnibus rule on July 8, 2024. Amended Omnibus Rule Waiver Request Letter (July 8, 2024), https://perma.cc/U2ZQ-RSUP; Amended Omnibus Rule Waiver Request Support Document (July 8, 2024), https://perma.cc/4FAE-ECJ7.

83.    To date, EPA has not granted a waiver for the original or amended California Omnibus rules.

84.    EPA has not sought comment on the resubmitted waiver request either.

85.    Despite the absence of a waiver, Colorado, Massachusetts, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington have adopted the Omnibus rule.

86.    Illinois is currently considering adopting the Omnibus rule. Illinois Pollution Control Board, *Proposed Clean Car and Truck Standards: Proposed Section 35 Ill. Admin. Code 242*, Docket R2024-17, https://pcb.illinois.gov/Cases/GetCaseDetailsById?caseId=17520.

**C.    The "Advanced Clean Fleets" Rule**

87.    On August 28, 2023, CARB adopted the "Advanced Clean Fleets" rule (ACF). Exec. Order R-23-003, https://perma.cc/47QS-NUGY.

88.    ACF has several components phasing out internal-combustion vehicles in fleets performing drayage operations, fleets owned by State, local, and federal government agencies, and so-called "high-priority" fleets. These requirements are purchase mandates: compelling private fleets, even fleets operating largely outside of California,

including some of Plaintiff's members, to replace their trucks and purchase new heavy-duty trucks that comply with the Omnibus rule or else buy electric.

89.    Of particular relevance here, ACF also includes a rule that bans sales of internal-combustion heavy-duty vehicles by model year 2036. Cal. Code Regs., tit. 13, § 2016(c).

90.    On November 15, 2023, less than two months before the first compliance deadline, CARB sought a waiver under the Clean Air Act for Advanced Clean Fleets. ACF Waiver Request, https://perma.cc/4YCF-GLWA.

91.    On June 12, 2024, EPA sought comment on California's requested waiver.

92.    EPA has not yet granted (or denied) a waiver for ACF.

### III.    The "Partnership Agreement"

93.    CARB's typhoon of coercive and disruptive regulations had its intended effect: manufacturers bent the knee. In return for recognizing CARB's suzerainty, however, manufacturers have obtained a cozy cartel arrangement that ensures them a steady stream of supra-competitive profits, subsidies, and tax credits. By acting in lockstep as an industry, this arrangement ensures that the costs will not be borne by the manufacturers, but will be passed downstream to their customers and then to the rest of the country.

94.    In July of 2023, CARB and the manufacturers announced the "Clean Truck Partnership Agreement." CARB. Press Release No. 23-18 (July 6, 2023), https://perma.cc/ZRC2-452X. The Agreement is aimed at "promoting the transition" to alternative powertrains. Ex. A.

95.    Under the Agreement, truck manufacturers receive some temporary flexibilities that allow them to comply with the Omnibus rule and a promise that CARB will

initiate rulemaking proceedings to largely align the regulation with EPA's 2023 heavy-duty regulations from 2027 onward. Ex. A ¶ 1. CARB also promised to initiate a rule-making to make minor changes to the ACT rule (lengthening the time to make up a def-icit from one to three years) and its emissions warranty program. Ex. A ¶ 1. These com-mitments are further detailed in Appendices A, B, and C of the Agreement. Ex. A, App'x A, B, C. As described above, CARB has already carried out amendments to the Omnibus rule pursuant to the Agreement.

96.    In exchange for these promises, the Agreement purports to bind truck manufacturers "to meet" several CARB regulations "irrespective of the outcome of any litigation challenging the waivers or authorizations for those regulations or of CARB's overall authority to implement those regulations." Ex. A ¶ 2. As detailed in Appendix B, that includes the Omnibus regulation, as amended, the ACT regulation, and the ACF "100 percent ZEV sales requirement" forbidding internal-combustion heavy-duty vehi-cles by 2036. Ex. A, App'x B.

97.    The Agreement also provides that "EMA and the OEMs [truck manufac-turers] will not (i) challenge CARB's issuance of the regulations set forth in Appendix B; (ii) file a Petition for Review or otherwise challenge any U.S. EPA waiver or authoriza-tion granted for such regulations; (iii) file amicus briefs supporting challenges to such waivers or authorizations, or such regulations; or (iv) support stay motions or similar motions practice challenging such waiver or authorization decisions, or such regula-tions." Ex. A ¶ 4.

98.    The Agreement thus precludes the manufacturers from participating in litigation brought in the U.S. Court of Appeals for the D.C. Circuit (where waiver chal-lenges are usually filed given their nationwide scope and effect), the U.S. Supreme

Court, or any other federal and state court proceedings involving a challenge the California regulations covered by the Agreement.

99.    The Agreement also purports to dictate how truck manufacturers will behave in other "Section 177 States" that are considering whether to adopt, or that have adopted, California's regulations, requiring CARB and truck manufacturers to "work cooperatively" to resolve issues in those jurisdictions. Ex. A ¶ 3.

100.    The details are spelled out in Appendix D of the Agreement.

101.    The truck manufacturers also agree "to limit their advocacy" in states that adopt the Omnibus or ACT rules.

102.    In particular, they promise that they "will not legally challenge or support others' legal challenges to any state's adoption of the regulations set forth in Appendices A and B." Ex. A, App'x D.

103.    Beginning in model year 2027, the truck manufacturers also agree to comply with the Omnibus rule adopted by any state "irrespective of the outcome of any litigation that has been filed or may be filed challenging the waivers or authorizations for those regulations or CARB's or any state's overall authority to implement those regulations." Ex. A, App'x D ¶ B. They also "will not support or oppose adoption" of the Omnibus rule in those states "for model year 2027 and later years." Ex. A, App'x D ¶ C.

104.    The truck manufacturers also "commit to put forth their best efforts to sell as many zero emission trucks as reasonably possible in every state that has or will adopt CARB's ACT regulations, ..., irrespective of the outcome of any litigation that has been filed or may be filed challenging the waivers or authorizations for those regulations or CARB's or any state's overall authority to implement those regulations." Ex. A, App'x D ¶ F. The manufacturers therefore collectively agree to invest in electric vehicles across

the Nation even in states that have not even yet adopted CARB's regulations, even if the rules are preempted or otherwise illegal.

## IV.    Plaintiff's Injuries

105.    Plaintiff's members include fleet owners and operators that are affected by the Agreement and will suffer economic harm from its performance.

106.    AmFree Member Meiborg Brothers Inc. (Meiborg Bros.) is a family-owned Illinois corporation headquartered in Rockford, Illinois that provides freight and logistics services across the United States, Mexico, and Canada. Meiborg Bros. owns a fleet including more than 200 heavy-duty vehicles. Meiborg Bros. regularly purchases heavy-duty internal-combustion trucks to maintain and upgrade its fleet, including trucks manufactured by Defendants. Meiborg Bros. plans to continue purchasing internal-combustion trucks for the foreseeable future, and looks nationwide for the best price when making purchasing decisions. *See* Ex. B (Declaration of Zach Meiborg).

107.    AmFree Member TanTara Transportation Corp. (TanTara) is a family-owned Iowa corporation headquartered in Muscatine, Iowa that provides freight shipping and transportation services across the United States. TanTara operates a fleet including more than 125 heavy-duty class 8 vehicles. TanTara regularly purchases and then leases heavy-duty internal-combustion vehicles to maintain and upgrade its fleet, including vehicles manufactured by Defendants. TanTara plans to continue purchasing internal-combustion trucks for the foreseeable future, and looks nationwide for the best price when making purchasing decisions. *See* Ex. C (Declaration of Michael Riggan).

108.    AmFree's members include other fleets and fleet operators that regularly purchase medium and heavy-duty internal-combustion vehicles in all classes, including

vehicles manufactured by Defendants, and who look nationwide for the best price when making purchasing decisions.

109.   The Agreement will harm AmFree's members by reducing truck manufacturers' output of internal-combustion heavy-duty vehicles, increasing heavy-duty vehicle prices, and/or forcing them to buy electric trucks of inferior quality.

110.   AmFree's purpose is germane to protecting these interests because AmFree was created to help defeat anti-competitive restraints such as the Agreement that impede the ordinary working of the free market.

111.   Although California likes to refer to its regulatory efforts as promoting "advanced" vehicles, this is false: if electric vehicles were so advanced, California would not need to mandate them.

112.   Heavy-duty battery-electric and fuel-cell-electric vehicles are generally less desirable to consumers than compression-ignition or spark-ignition vehicles because of their higher upfront costs, lesser payload capacity, lower and uncertain ranges, higher insurance costs, uncertain depreciation and residual values, long charging times, long downtimes, unproven and lower durability, and because they also pose unique safety hazards.

113.   In addition, charging and refueling infrastructure capable of quickly charging or refueling these vehicles is sparse or non-existent in many states and will take many years to develop.

114.    Heavy-duty battery-electric and fuel-cell-electric vehicles are therefore often inadequate substitutes for the compression-ignition and spark-ignition vehicles they aim to replace, and there is little cross-elasticity of demand between these types of vehicles.

115.    Despite very generous tax credits under the Inflation Reduction Act, fleets and owner-operators continue to prefer heavy-duty internal-combustion vehicles over inferior electric or fuel-cell-electric vehicles, particularly in categories that have higher performance demands and are thus harder to electrify, such as the market for long-haul tractors.

116.    In order to give electric vehicles a comparative advantage to increase their market share, therefore, California and Section 177 States also seek to gradually increase the prices of competing new internal-combustion vehicles by ordering manufacturers to reduce the market share of internal-combustion vehicles to zero in 2036.

117.    No truck manufacturer could do that independently. Any manufacturer that, alone, transitions to selling solely electric vehicles would be offering a more costly and less desirable product and would thus be unable to compete with rival manufacturers.

118.    The only way to transition the heavy-duty vehicle market to electric vehicles is to create a cartel that allows manufacturers to reduce output in lockstep.

119.    That is what the Agreement effectively does. The Agreement amounts to an industry-wide promise to reduce the output of internal-combustion vehicles in California to zero, and to make similar efforts to increase the share of electric vehicles and reduce the share of internal-combustion vehicles across the Nation in other Section 177 states.

120.    The promise to reduce the share of internal-combustion vehicles will injure Plaintiff's members.

121.    "An agreement on output . . . equates to a price-fixing agreement." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594 (7th Cir. 1984) (Posner,

J.). "If firms raise price, the market's demand for their product will fall, so the amount supplied will fall too—in other words, output will be restricted. If instead the firms restrict output directly, prices will as mentioned rise in order to limit demand to the reduced supply. Thus, with exceptions not relevant here, raising price, reducing output, and dividing markets have the same anticompetitive effects." *Id.* at 594–95.

122.   Defendants' agreement to reduce output of internal-combustion vehicles will increase prices of those vehicles because falling output increases price in markets with downward-sloping demand curves, such as the market for heavy-duty vehicles. 11 Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1901 (3d ed. 2011).

123.   The Agreement will predictably raise internal-combustion vehicle prices. As CARB concedes, the ACT rule and the Omnibus rule will raise the price of internal-combustion vehicles. The Agreement to follow these mandates and then cease selling these vehicles 2036 will thus raise the price of new internal-combustion vehicles.

124.   This anticompetitive restraint will harm Plaintiff's members because manufacturers will pass through the increased costs to dealers and their purchasers across the Nation. As CARB and federal agencies have explained, manufacturers pass through the higher cost of complying with technology mandates by raising the price of internal-combustion vehicles, and also reduce investment in improving internal-combustion vehicles, reducing quality. Plaintiff's members will therefore be injured by the Agreement because it will predictably lead to fewer internal-combustion vehicle offerings, lower quality internal-combustion products, and higher prices.

125.   That effect is predictable and consistent with basic economics. Economic theory teaches that the only situations in which precisely zero passthrough would be expected are if an industry faced a perfectly elastic demand for its product (*i.e.*, the price

was fixed, with demand dropping to zero with an infinitesimal price increase, and expanding infinitely with an infinitesimal price decrease), or if supply was perfectly inelastic (*i.e.*, if even a very large increase in price for a product was incapable of stimulating additional supply). Either scenario is at odds with the nature of the heavy-duty vehicle manufacturing industry. Thus, Plaintiff's members and other consumers are now, and in the future will be, forced to pay supra-competitive prices for heavy-duty vehicles as a result of the Agreement.

126.    The Agreement will also harm truck dealers. Because electric and fuel-cell-electric vehicles are less desirable, they will be harder to sell, and therefore dealers will have to hold them in inventory for a longer time, reducing their profitability and requiring discounts.

127.    Indeed, the Agreement and the rules it embodies are already having ripple effects on dealers and fleets across the Nation.

128.    On information and belief, following the Agreement, and because of it, new heavy-duty truck prices across several classes have increased across the United States, particularly in heavier vehicle classes, while sales of new vehicles in heavier heavy-duty vehicle classes have decreased leading to shortages—the classic and predictable effect of an output cartel.

129.    Protected from the competitive process by the Agreement's cartel arrangement, truck manufacturers have implemented tying arrangements that require dealers and fleets to purchase inferior heavy-duty electric vehicles as a requirement for purchasing the internal-combustion vehicles fleets want. For example, for every seven conventional vehicles a fleet owner wishes to purchase, the manufacturer requires the fleet

owner to also purchase an electric vehicle. In a competitive market, these tying arrangements would not be possible.

130.    The anti-competitive effect of this Agreement is all the more evident because the truck manufacturers already operate in concentrated markets with high barriers to entry, which enable anti-competitive behavior.

131.    For example, the market for new class 8 diesel long-haul tractors is one of the product markets covered by the Agreement. These vehicles use durable high torque and low RPM compression-ignition engines powered by energy-dense liquid fuels to carry heavy loads of 80,000 lbs. or more for long distances, sometimes over 1,000 miles. There is little or no cross-elasticity of demand between these new motor vehicles and other new motor vehicles, or between compression-ignition vehicles and electric vehicles.

132.    The market for new class 8 diesel long-haul tractors is concentrated in a few manufacturers, and has substantial barriers to entry, giving vehicle manufacturers considerable market power in the United States.

133.    Daimler, PACCAR, Volvo, and Navistar—all parties to the Agreement—dominate the U.S. product markets for class 8 diesel vehicles. There are no current or future viable competitors.

134.    Cummins sells engines for heavy-duty Class 8 vehicles through brands owned by other Defendants. Cummins is unique in this respect because it manufactures diesel engines but does not sell motor vehicles. Because Cummins engines must be sold to consumers through other vehicle manufacturers that act as a bottleneck, the presence of Cummins upstream does not lower market concentration in this motor-vehicle product market.

135.    On information and belief, other markets subject to or affected by the Agreement have concentrated market structures.

136.    There are substantial barriers to entry into the heavy-truck manufacturing market. A new entrant faces high sunk and fixed costs to bring competitive products to market. The lead times needed to design new engines and vehicles that comply with regulations are measured in years. New entrants have no ability to license the intellectual property needed for engine design and development and have to spend substantial amounts of money to validate the reliability and other attributes of their products, which takes years. They would have to make intensive and sustained investments in marketing, warranty programs, demonstrations, sales, and service if they hope to persuade customers to purchase or switch to their vehicles. Substantial regulatory barriers also make it nearly impossible for new entrants to enter the market for spark-ignition or compression-ignition heavy-duty vehicles. Indeed, there have been no successful entrants in the heavy-duty internal-combustion-vehicle market for decades. Moreover, manufacturers would need to sell a considerable number of vehicles just to recover fixed costs, but federal and state regulations seek to discourage these products, making new entry all but impossible.

137.    Given the lack of effective competition, absent judicial intervention, the Agreement will ensure an anti-consumer cartel that will lessen competition among truck manufacturers and harm dealers, fleets, and consumers for decades to come.

138.    The Agreement's restraint on the competitive process and consequent effect on internal-combustion-vehicle prices is harming and will harm Plaintiff's members.

139.    AmFree members Meiborg Bros. and TanTara will suffer economic harm from performance of the Agreement. Meiborg Bros. and TanTara intend to purchase internal-combustion trucks and consider nationwide prices and availability to select the best option when making purchasing decisions. The Agreement's predictable effects on the supply and thus the price of new internal-combustion trucks will increase Meiborg Bros.' and TanTara's costs. These cost increases cannot realistically be passed entirely onto their customers, and so will harm Meiborg Bros.' and TanTara's profit margins, causing them economic harm. *See* Exs. B, C. AmFree has other members who will suffer similar harm.

### CLAIM FOR RELIEF

**Clean Air Act Preemption of the Agreement
(Against All Defendants)**

140.    Plaintiff realleges paragraphs 1 through 139 as if fully stated herein.

141.    The Supremacy Clause provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

142.    The Supremacy Clause "creates a rule of decision": judges "must not give effect to state laws that conflict with federal laws." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015). When a state law or regulation conflicts with a federal law, it is preempted and void.

143.    The Supremacy Clause does not permit a "presumption against preemption." The text of the Supremacy Clause "suggests that courts should not strain to find

29

ways to reconcile federal law with seemingly conflicting state law." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 622 (2011) (plurality); *see also* Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 290–303 (2000).

144.    In any event, where a federal "statute 'contains an express pre-emption clause,' [courts] do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016) (quoting *Chamber of Com. v. Whiting*, 563 U.S. 582, 594 (2011)).

145.    Section 209(a) of the Clean Air Act provides that "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part." 42 U.S.C. § 7543(a). The only exception to § 209(a)'s broad preemption is § 209(b), which allows EPA to "waive application of" § 209(a) for California under certain, defined conditions. *Id.* § 7543(b).

146.    The ACF rule banning internal-combustion engines by 2036 has not received a waiver under § 209(b). Therefore, it is preempted by § 209(a).

147.    The Omnibus rule has not received a waiver under § 209(b). Therefore, it is preempted by § 209(a).

148.    The ACT rule as amended hasn't received a waiver under § 209(b) or a determination from EPA that it is within the scope of the waiver previously granted for the original ACT rule. Therefore, it is preempted.

149.    The ACF rule banning internal-combustion engines by 2036 is preempted. "Today, as in 1967 when § 209(a) became law, 'standard' is defined as that which 'is established by authority, custom, or general consent, as a model or example; criterion; test.'" *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252–53 (2004) (quoting *Webster's New International Dictionary* 2455 (2d ed.1945)). The ACF

rule sets a "criterion" for new motor vehicles: new vehicles must have "zero exhaust emission of any criteria pollutant (or precursor pollutant) or greenhouse gas under any possible operational modes or conditions." Cal. Code Regs., tit. 13, § 2016. This criterion is self-evidently one "relating to the control of emissions from new motor vehicles." 42 U.S.C. § 7543(a). On its face, the rule sets "numerical emission levels with which vehicles or engines must comply" (zero tailpipe emissions), and therefore falls within the core of the Clean Air Act's prohibition on state standards. *Engine Mfrs. Ass'n*, 541 U.S. at 253. Indeed, two courts of appeals have already concluded that similar requirements are preempted by § 209(a). *Am. Auto. Mfrs. Ass'n v. Cahill,* 152 F.3d 196, 200 (2d Cir.1998); *Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot.*, 208 F.3d 1, 6–7 (1st Cir. 2000).

150.    The Omnibus rule is similarly plainly preempted. It sets emissions standards for criteria pollutants applicable to new motor vehicles. *See* Cal. Code Regs., tit. 13, § 1956.8(a)(2)(C).

151.    The ACT rule as amended is similarly preempted. It sets a zero exhaust emission standard for greenhouse gases and criteria pollutants and then requires increasing shares of vehicles that meet the standard. It also incorporates ACF's ban on internal-combustion engines by 2036.[3]

152.    The Agreement is an "attempt to enforce" these preempted standards.

153.    The ordinary meaning of "enforce" is "to compel obedience to." *Enforce*, Black's Law Dictionary (4th rev. ed. 1968); *see also* American Heritage Dictionary of the English Language (2nd ed. 1985) ("to compel observance or obedience to").

---

[3] https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2024/actzepcert/2nd15daya1.pdf.

154.    Section 209(a) prohibits any "attempt" to enforce a standard, which includes preliminary acts "falling short" of enforcement. *Engine Mfrs. Ass'n*, 541 U.S. at 257. The Supreme Court has reasoned "that the term 'attempt to enforce' is not limited to the actual imposition of penalties for violation but includes steps preliminary to that action." *Id.* The Agreement on its own terms seeks to "compel obedience to the standards," regardless of their legality, in anticipation of Clean Air Act waiver litigation and any California actions to enforce its standards. The Agreement is therefore null and void because enforcing the Agreement's promise of compliance through state contract law would conflict with federal law.

155.    Furthermore, the Agreement on its face attempts to preserve CARB's role in certifying vehicles for compliance with state standards preempted by the Clean Air Act, which is also "an attempt to enforce" a state standard that is "categorically prohibit[ed]" without a waiver. *Id.* The Agreement thus "attempts to enforce" ACF's internal-combustion-vehicle ban and the Omnibus rule, each of which is independently preempted by the Clean Air Act. The Agreement is therefore null and void because enforcing the Agreement's promise of certification through state contract law would conflict with federal law.

156.    Furthermore, through the "best-efforts" clause, the Agreement adopts a new standard relating to the control of emissions by requiring manufacturers to produce and deliver as many new electric vehicles as "reasonably possible." Ex. A, App'x D ¶ F.

157.    The Agreement's "reasonably possible" standard has not received a waiver from EPA—indeed, CARB has not even proposed enacting such a regulation. The Agreement is therefore null and void because enforcing the Agreement's promise of compliance through state contract law would conflict with federal law.

**WHEREFORE**, Plaintiff prays for relief as follows:

1.      A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, that the Agreement is unlawful in the manner alleged above and is therefore null and void;

2.      A permanent injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants from enforcing the Agreement; and

3.      Such other relief available under federal, state, and local law as this Court may deem just and proper, including attorneys' fees and costs of this action to the extent allowed by federal, state, or local law.

Dated: December 16, 2024

/s/ Nicholas Cordova
MICHAEL BUSCHBACHER*
JAMES R. CONDE*
NICHOLAS CORDOVA*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW,
   Suite 900
Washington, DC 20006
(202) 955-0620
mbuschbacher@boydengray.com
jconde@boydengray.com
ncordova@boydengray.com
*Pro hac vice admission pending.

*Counsel for Plaintiff*
