ROB BONTA
Attorney General of California
MYUNG J. PARK, State Bar No. 210866
Supervising Deputy Attorney General
BENJAMIN P. LEMPERT, State Bar No. 344239
M. ELAINE MECKENSTOCK, State Bar No. 268861
DAVID M. MEEKER, State Bar No. 273814
JONATHAN A. WIENER, State Bar No. 265006
CECILIA D. SEGAL, State Bar No. 310935
Deputy Attorney General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 510-3545
 Fax: (415) 703-1107
 E-mail: cecilia.segal@doj.ca.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE**,<br><br>Plaintiff,<br><br>v.<br><br>**STEVEN S. CLIFF,** in his official capacity as the Executive Officer of the California Air Resources Board,<br><br>Defendant. | 2:25-cv-03255-DC-AC<br><br>**DEFENDANT'S NOTICE OF CROSS-MOTION AND CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, SUMMARY JUDGMENT**<br><br>Judge:   Hon. Dena Coggins<br>Courtroom: 10, 13th Floor<br>Date:   None Set<br>Action Filed: December 16, 2024 |

**TO ALL PARTIES AND ATTORNEYS OF RECORD:**

YOU ARE HEREBY GIVEN NOTICE that Defendant Steven S. Cliff, in his official capacity as Executive Officer of the California Air Resources Board (Defendant Cliff), will and hereby does cross-move for judgment on the pleadings, or, in the alternative, summary judgment in his favor and against Plaintiff American Free Enterprise Chamber of Commerce (AmFree). Consistent with this Court's minute orders of April 16, 2026, and April 27, 2026, Defendant Cliff has not noticed this cross-motion for hearing. ECF No. 168 (vacating hearing set for AmFree's motion, to be reset at a later date if the Court determines that oral argument is needed); ECF No. 171 (declining to set hearing on motion and cross-motion).

This Cross-Motion is brought under Federal Rules of Civil Procedure 12(c) and 56 and Local Rule 230, and is based on this Notice of Cross-Motion and Cross-Motion; the accompanying Memorandum in Opposition to Plaintiff's Motion for Judgment on the Pleadings or, in the Alternative, Summary Judgment and in Support of Defendant's Cross-Motion for Judgment on the Pleadings or, in the Alternative, Summary Judgment; the concurrently filed Request for Judicial Notice and attached papers; the declarations of Kim Heroy-Rogalski and Paul Arneja; Defendant's Statement of Undisputed Facts; Defendant's Response to Plaintiff's Statement of Undisputed Facts; Defendant's Objections to Plaintiff's Evidence; any reply brief that Defendant may file; all documents in the Court's file; and other such written and oral argument as may be presented to the Court.

Consistent with this Court's Standing Order in Civil Cases, Defendant Cliff certifies that all meet and confer efforts have been exhausted. On April 8, 2026, and April 17, 2026, counsel for the parties met and conferred via videoconference to discuss the substance of the Cross-Motion and were unable to reach a resolution. The parties subsequently proposed a briefing schedule and page limits for Plaintiff's Motion and Defendant's Cross-Motion, which this Court entered on April 27, 2026. ECF No. 171.

Def.'s Notice of Cross-Mot. & Cross-Mot. for J. on the Pleadings or Summ. J. (2:25-cv-03255-DC-AC)

Dated:  May 27, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General


/s/ Cecilia D. Segal
CECILIA D. SEGAL
Deputy Attorney General
Attorneys for Defendant

1

ROB BONTA
Attorney General of California
MYUNG J. PARK, State Bar No. 210866
Supervising Deputy Attorney General
BENJAMIN P. LEMPERT, State Bar No. 344239
M. ELAINE MECKENSTOCK, State Bar No. 268861
DAVID M. MEEKER, State Bar No. 273814
JONATHAN A. WIENER, State Bar No. 265006
CECILIA D. SEGAL, State Bar No. 310935
Deputy Attorney General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3545
 Fax:  (415) 703-1107
 E-mail:  cecilia.segal@doj.ca.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE**,<br><br>Plaintiff,<br><br>v.<br><br>**STEVEN S. CLIFF,** in his official capacity as the Executive Officer of the California Air Resources Board,<br><br>Defendant. | 2:25-cv-03255-DC-AC<br><br>**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, SUMMARY JUDGMENT**<br><br>Judge:       Hon. Dena Coggins<br>Courtroom:  10, 13th Floor<br>Date:         None Set<br>Action Filed:  December 16, 2024 |

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................................................... 1

Factual Background ......................................................................................................... 2

    I.     Consistent with the Clean Air Act, California Regulates Heavy-Duty
           Vehicle Emissions to Protect Public Health and Welfare ...................................... 2

    II.    California and Several Heavy-Duty Truck Manufacturers Sign the CTP.............. 4

    III.   Subsequent Developments Create Uncertainty and California Responds ............. 5

    IV.   Four Signatory manufacturers Disavow the CTP .................................................. 6

Procedural History ......................................................................................................... 7

Standard of Review ......................................................................................................... 8

Argument ........................................................................................................................ 8

    I.     AmFree Lacks Standing to Challenge the Clean Truck Partnership...................... 8

         A.    Law of the Case is No Barrier to Concluding AmFree Lacks
             Standing ...................................................................................................... 9

         B.    AmFree's Declarants Do Not Establish Its Standing............................... 11

             1.    AmFree's Out-of-State Declarants Fail to Demonstrate
                  Standing ......................................................................................... 11

             2.    AmFree's In-State Declarant Fails to Demonstrate Standing....... 13

         C.    AmFree Lacks Standing for the Relief It Seeks....................................... 16

    II.    AmFree's Preemption Challenge to the Clean Truck Partnership Fails ............... 17

         A.    Section 209(a) Does Not Preempt Voluntary Agreements ....................... 18

         B.    The Clean Truck Partnership Is a Voluntary Agreement, not a State
             Law.......................................................................................................... 23

    III.   Even if the CTP Were an Attempt to Enforce Preempted Standards, the
          Omnibus and ACT Rules Are Not Preempted and the CTP is Severable............. 26

         A.    The Allegedly Preempting Resolutions Are Unconstitutional.................. 26

             1.    The Congressional Review Act does not bar this Court's
                  review.......................................................................................... 27

             2.    The Resolutions are impermissible legislative adjudications ....... 28

i

**TABLE OF CONTENTS**
(continued)

Page

3.    The Resolutions violate the Tenth Amendment and structural federalism ...................................................................... 29

4.    The Senate impermissibly delegated the power to set its internal rules ........................................................................... 33

B.    The Clean Truck Partnership Is Severable ................................................. 34

IV.    Should AmFree Prevail, Any Relief Must Be Appropriately Tailored ................ 35

Conclusion ........................................................................................................... 35

ii

# TABLE OF AUTHORITIES

**Page**

CASES

*Airlines for Am. v. City & County of San Francisco*
    78 F.4th 1146 (9th Cir. 2023)............................................................................*passim*

*Am. Airlines, Inc. v. Wolens*
    513 U.S. 219 (1995)..........................................................................................*passim*

*Am. States Ins. Co. v. Kearns*
    15 F.3d 142 (9th Cir. 1994)................................................................................. 17

*Am. Trucking Ass'n, Inc. v. City of Los Angeles*
    569 U.S. 641 (2013)..........................................................................................*passim*

*Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot.*
    208 F.3d 1 (1st Cir. 2000) ............................................................................. 19, 20

*Bank Markazi v. Peterson*
    578 U.S. 212 (2016) .............................................................................................. 29

*Barnes-Wallace v. City of San Diego*
    704 F.3d 1067 (9th Cir. 2012)............................................................................. 10

*Black Diamond Asphalt, Inc. v. Superior Ct.*
    109 Cal. App. 4th 166 (2003)............................................................................. 25

*Boumediene v. Bush*
    553 U.S. 723 (2008)............................................................................................. 29

*Bowsher v. Synar*
    478 U.S. 714 (1986).............................................................................................. 28

*Cal. Tow Truck Assoc. v. City & County of San Francisco*
    693 F.3d 847 (9th Cir. 2012)............................................................................... 34

*Carrico v. City & County of San Francisco*
    656 F.3d 1002 (9th Cir. 2011)............................................................................. 14

*Chadha v. INS*
    634 F.2d 408 (9th Cir. 1980)............................................................................... 29

*Chavez v. United States*
    683 F.3d 1102 (9th Cir. 2012)............................................................................... 8

*Christianson v. Colt Indus. Operating Corp.*
    486 U.S. 800 (1988)............................................................................................. 10

**TABLE OF AUTHORITIES**
(continued)

Page

*City of Arlington v. FCC*
  569 U.S. 290 (2013)................................................................................................ 28

*City of Hugo v. Nichols*
  656 F.3d 1251 (10th Cir. 2011)............................................................................. 18

*City of Los Angeles v. Santa Monica Baykeeper*
  254 F.3d 882 (9th Cir. 2001)................................................................................. 10

*Clapper v. Amnesty Int'l USA*
  568 U.S. 398 (2013)...................................................................................... 9, 12, 16

*Ctr. for Biological Diversity v. Bernhardt*
  946 F.3d 553 (9th Cir. 2019)................................................................................. 27

*Daniels-Hall v. Nat'l Educ. Ass'n*
  629 F.3d 992 (9th Cir. 2010)................................................................................... 8

*Diamond Alternative Energy, LLC v. EPA*
  606 U.S. 100 (2025)................................................................................................ 28

*E. Bay Sanctuary Covenant v. Trump*
  932 F.3d 742 (9th Cir. 2018)................................................................................. 35

*EEOC v. Peabody W. Coal Co.*
  610 F.3d 1070 (9th Cir. 2010)............................................................................... 16

*Engine Mfrs. Ass'n v. EPA*
  88 F.3d 1075 (D.C. Cir. 1996) ................................................................................ 3

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*
  498 F.3d 1031 (9th Cir. 2007)............................................................................... 22

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*
  541 U.S. 246 (2004)......................................................................................... 19, 21

*Exxon Corp. v. Governor of Maryland*
  437 U.S. 117 (1978)............................................................................................... 15

*Fletcher v. Peck*
  10 U.S. 87 (1810).................................................................................................... 28

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*
  561 U.S. 477 (2010)............................................................................................... 33

iv

**TABLE OF AUTHORITIES**
(continued)

Page

*Garcia v. San Antonio Metro. Transit Auth.*
    469 U.S. 528 (1985)........................................................................................29-30, 33

*Gonzalez v. United States Immigr. & Customs Enf't*
    975 F.3d 788 (9th Cir. 2020)........................................................................................ 9

*Grand Canyon Trust v. Provencio*
    26 F.4th 815 (9th Cir. 2022)........................................................................................ 10

*Griffin & Griffin Expl., LCC v. United States*
    116 Fed. Cl. 163 (2014) ........................................................................................ 25

*Hamilton Materials, Inc. v. Dow Chem. Corp.*
    494 F.3d 1203 (9th Cir. 2007).................................................................................... 8

*INS v. Chadha*
    462 U.S. 919 (1983)........................................................................................ 34

*Koala v. Khosla*
    931 F.3d 887 (9th Cir. 2019)........................................................................................ 13

*KRL v. Moore*
    384 F.3d 1105 (9th Cir. 2004)........................................................................................ 8

*Lujan v. Defs. of Wildlife*
    504 U.S. 555 (1992)........................................................................................ 8, 10

*Lujan v. Nat'l Wildlife Fed'n*
    497 U.S. 871 (1990)........................................................................................ 8, 11

*Marathon Ent., Inc. v. Blasi*
    70 Cal.Rptr.3d 727 (Cal. 2008)........................................................................................ 34

*Mashiri v. Dep't of Educ.*
    724 F.3d 1028 (9th Cir. 2013)........................................................................................ 9

*Missouri ex rel. Koster v. Harris*
    847 F.3d 646 (9th Cir. 2017)........................................................................................ 12

*Mobil Oil Expl. & Producing Se., Inc. v. United States*
    530 U.S. 604 (2000)........................................................................................ 25, 26

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*
    627 F.2d 1095 (D.C. Cir. 1979) ........................................................................................ 2, 3, 20

Def.'s Memo. in Opp'n to Pl.'s Mot. for J. on the Pleadings & in Supp. Def.'s Cross-Mot. (2:25-cv-03255-DC-AC)

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Murphy v. Nat'l Collegiate Athletic Ass'n*
  584 U.S. 453 (2018) ................................................................................................ 18, 22

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*
  583 U.S. 109 (2018) ...................................................................................................... 27

*Nat'l Soc'y of Pro. Eng'rs v. United States*
  435 U.S. 679 (1978) ...................................................................................................... 12

*Nevada v. Watkins*
  914 F.2d 1545 (9th Cir. 1990) ...................................................................................... 32

*Nutt v. United States*
  12 Cl. Ct. 345 (1987) .................................................................................................... 25

*Ohio House, LLC v. City of Costa Mesa*
  135 F.4th 645 (9th Cir. 2025) ....................................................................................... 34

*Olympic Pipe Line Co. v. City of Seattle*
  437 F.3d 872 (9th Cir. 2006) ............................................................................. 21, 22, 26

*Papasan v. Allain*
  478 U.S. 265 (1986) ...................................................................................................... 16

*Peralta v. Dillard*
  744 F.3d 1076 (9th Cir. 2014) ........................................................................................ 9

*Plaut v. Spendthrift Farm*
  514 U.S. 211 (1995) ...................................................................................................... 28

*Poublon v. C.H. Robinson Co.*
  846 F.3d 1251 (9th Cir. 2017) ...................................................................................... 35

*Powell v. SEC*
  149 F.4th 1029 (9th Cir. 2025) ..................................................................................... 24

*Robertson v. Seattle Audubon Soc'y*
  503 U.S. 429 (1992) ...................................................................................................... 29

*Scott v. Harris*
  550 U.S. 372 (2007) ........................................................................................................ 8

*South Carolina v. Baker*
  485 U.S. 505 (1988) ............................................................................................. 30, 32, 33

**TABLE OF AUTHORITIES**
(continued)

Page

*Steffel v. Thompson*
415 U.S. 452 (1974)............................................................................................... 35

*United States v. Arthrex, Inc.*
594 U.S. 1 (2021)................................................................................................... 28

*United States v. City & County of San Francisco*
979 F.2d 169 (9th Cir. 1992)................................................................................. 13

*United States v. Duquesne Light Co.*
423 F.Supp. 507 (W.D. Pa. 1976).......................................................................... 25

*United States v. Hayat*
No. 05-cr-0240-GEB-DB, 2018 WL 558819 (E.D. Cal. Jan. 24, 2018)................. 10

*Warth v. Seldin*
422 U.S. 490 (1975)............................................................................................... 17

*Wyoming v. Oklahoma*
502 U.S. 437 (1992)............................................................................................... 10

CONSTITUTIONAL PROVISIONS

U.S. Const. Article I, § 5, cl. 2............................................................................... 33

U.S. Const. Article III, § 1...................................................................................... 28

STATUTES AND REGULATIONS

5 U.S.C.
§ 551(6) ............................................................................................................ 28
§ 551(7) ............................................................................................................ 28
§ 551(9) ............................................................................................................ 27
§ 553(b) ............................................................................................................ 31
§ 801(a)(1)(A) .............................................................................................. 27, 30
§ 801(a)(1)(D) ................................................................................................... 27
§ 802.............................................................................................................. 30, 32
§ 802(a) ......................................................................................................... 27, 30
§ 804(3) ............................................................................................................ 27
§ 805.................................................................................................................. 27

Def.'s Memo. in Opp'n to Pl.'s Mot. for J. on the Pleadings & in Supp. Def.'s Cross-Mot. (2:25-cv-03255-DC-AC)

**TABLE OF AUTHORITIES**
(continued)

Page

42 U.S.C.
  § 7416...................................................................................................................... 20
  § 7507.................................................................................................................. 3, 20
  § 7521(a).................................................................................................................. 29
  § 7543(a)............................................................................................................ 19, 20
  § 7543(b)................................................................................................................. 19
  § 7543(b)(1)................................................................................................. 20, 27, 29
  § 7602................................................................................................................ 20, 21

69 Fed. Reg. 59,920 (Oct. 6, 2004)............................................................................ 27, 30

84 Fed. Reg. 51,310 (Sept. 27, 2019).......................................................................... 27, 31

88 Fed. Reg. 20,688 (Apr. 6, 2023) .............................................................................. 4, 31

90 Fed. Reg. 643 (Jan. 6, 2025) .................................................................................... 4, 31

Cal. Gov't Code
  § 11346.1(e) .............................................................................................................. 6
  § 11346.1(h) .............................................................................................................. 6

Cal. Health & Saf. Code
  § 38550.................................................................................................................... 3
  § 38566.................................................................................................................... 3
  § 43000(a)................................................................................................................. 3
  § 43000(b)................................................................................................................. 3
  § 43013(a)................................................................................................................. 3
  § 43016(a)............................................................................................................... 24
  § 43017.................................................................................................................... 3
  § 43105.................................................................................................................... 3

Cal. Code Regs., Title 13
  § 1900...................................................................................................................... 6
  § 1956.8(a)(2)(C) ...................................................................................................... 3
  § 1956.8(a)(2)(D) ...................................................................................................... 3
  § 1963.1(b) ............................................................................................................... 3
  § 2016.................................................................................................................. 4, 34

OTHER AUTHORITIES

171 Cong. Rec. S3018 (daily ed. May 21, 2025)........................................................... 31, 32

171 Cong. Rec. S3140 (daily ed. May 22, 2025).............................................................. 32

**TABLE OF AUTHORITIES**
(continued)

**Page**

Federal Rule of Civil Procedure
    5.1 ................................................................................................................................ 7
    5.1(a) ......................................................................................................................... 26
    12(b)(6) ...................................................................................................................... 8
    12(c) ........................................................................................................................... 8

H.R.J. Res. 87, 89, 119th Cong. (2025) (enacted) ....................................................... 5, 29

Local Rule 123(a) .............................................................................................................. 8

Local Rule 230(j) ............................................................................................................. 10

Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965) ............................................................... 3

Pub. L. No. 90-148, § 208(a), (b), 81 Stat. 485, 501 (1967) ........................................... 3

Pub. L. No. 119-15, 139 Stat. 65 (2025) .......................................................................... 5

Pub. L. No. 119-17, 139 Stat. 67 (2025) .......................................................................... 5

11 Williston on Contracts § 30:19 (4th ed. 2025) ........................................................... 25

Def.'s Memo. in Opp'n to Pl.'s Mot. for J. on the Pleadings & in Supp. Def.'s Cross-Mot. (2:25-cv-03255-DC-AC)

## INTRODUCTION

Plaintiff American Free Enterprise Chamber of Commerce (AmFree) is not a party to the Clean Truck Partnership (CTP), an agreement signed between Steven S. Cliff, in his official capacity as Executive Officer of the California Air Resources Board, and several medium- and heavy-duty vehicle manufacturers and their trade association nearly three years ago. AmFree nonetheless brings this suit against Defendant Cliff—and only Defendant Cliff—with the goal of declaring the CTP preempted and invalidating it in its entirety. AmFree's bid to do so fails.

First, AmFree lacks standing. It attempts to evade that conclusion by relying on the Northern District of Illinois' order at the motion to dismiss stage and the law-of-the-case doctrine. But that doctrine does not apply to jurisdictional rulings, does not alleviate AmFree of its evidentiary burden at successive stages of the litigation, and does not interfere with this Court's broad authority to revisit interlocutory orders. And, it is now evident that AmFree cannot establish a certainly impending injury that is fairly traceable to the CTP and redressable by this Court. AmFree identifies two out-of-state declarants who contend the agreement will decrease supply of combustion-engine vehicles and increase their prices *nationwide*. Yet it fails to cogently explain why the CTP would have that effect, when the relevant part of the agreement applies *only in California*. AmFree's sole in-state declarant offers nothing more than speculative assertions about the CTP's impact on the recreation vehicle (RV) market, which rely on the unpredictable decisions of both signatory and non-signatory manufacturers and are belied by facts on the ground in any event. Moreover, AmFree identifies no remedy available in this case that would provide redress, and, indeed, no authority that permits it to collaterally attack the CTP, name only one signatory as a defendant, and inequitably alter the terms bargained for and benefits received.

Second, AmFree cannot succeed on its sole claim that the CTP is preempted by Section 209(a) of the Clean Air Act. That provision only preempts government-imposed emission standards that have the force and effect of law, and the CTP does not qualify. The preemptive scope of Section 209(a) is clear from statutory text; precedent confirms; and AmFree fails to distinguish those cases. And the evidence, including the CTP itself, indisputably establishes that the signatories entered into the CTP willingly and that any enforcement of a signatory's breach

1

would be by means available to private and government parties alike—i.e., a suit for breach of contract. The CTP reflects a negotiated exchange of promises among sophisticated parties; those voluntarily assumed obligations do not have the force and effect of law and do not fall within the scope of Section 209(a).

AmFree seeks to use its preemption challenge to the CTP to also attack emission standards AmFree claims are themselves preempted. That effort fails because the parties to the CTP agreed to use those emission standards to define the *terms of their agreement.* Thus, whether the standards can be enforced (as state laws applicable to *all* manufacturers) has no bearing on AmFree's challenge to certain manufacturers' decisions to voluntarily commit to sell clean vehicles consistent with those standards. Even if the Court disagreed, two of the standards at issue are not preempted as the allegedly preempting congressional resolutions are unconstitutional. Finally, any relief awarded—should the Court rule in AmFree's favor—must account for the CTP's severability and avoid unjustly prejudicing Defendant Cliff. The Court need not reach these issues, however; AmFree has not met its standing burden under Article III and fails to persuade on the merits. Defendant Cliff is entitled to judgment in his favor.

## FACTUAL BACKGROUND

**I.    CONSISTENT WITH THE CLEAN AIR ACT, CALIFORNIA REGULATES HEAVY-DUTY VEHICLE EMISSIONS TO PROTECT PUBLIC HEALTH AND WELFARE**

California has been setting emission standards for new motor vehicles since the 1950s. *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA (MEMA I)*, 627 F.2d 1095, 1109 (D.C. Cir. 1979). The State has long faced severe air quality challenges, including ozone (or smog) pollution—which increases incidences of respiratory ailments—and particulate matter pollution—which can lead to heart attacks and premature deaths. *See* Req. for Judicial Notice (RJN) (filed concurrently), Ex. 1 at p. 1. Although the State has made significant progress in improving its air quality, it continues to suffer from the highest smog and particulate matter levels in the country. *Id.* Motor vehicles, and particularly heavy-duty vehicles, are substantial sources of this pollution. *Id.* Heavy-duty vehicles are also significant sources of California's contributions to climate-changing greenhouse gases, with additional adverse effects on public health and welfare. *See id.* As such, California's

2

Legislature has declared the "control and elimination" of motor vehicle emissions in California to be of "prime importance for the protection and preservation of the public health and well-being." Cal. Health & Saf. Code § 43000(a), (b); *see also id.* §§ 38550, 38566.

When Congress began requiring federal vehicle emission standards in 1965, it did not initially preempt State standards. Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965). But in response to concerns from manufacturers that they might face a "patchwork of federal and state regulatory programs," *MEMA I*, 627 F.2d at 1109, Congress in 1967 generally preempted States from setting emission standards for new motor vehicles while requiring that the U.S. Environmental Protection Agency (EPA) waive preemption for California upon request, subject to certain limited conditions, Pub. L. No. 90-148, § 208(a), (b), 81 Stat. 485, 501 (1967). Congress also provided other qualifying States ("Section 177 States") the option to adopt and enforce standards identical to California's as their own. 42 U.S.C. § 7507. By congressional design, then, manufacturers must comply with two, but only two, sets of emission standards, producing "either 'federal cars' designed to meet the EPA's standards or 'California cars' designed to meet California's standards." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1080 (D.C. Cir. 1996). Since the waiver provision's enactment, California has continued to "act as a kind of laboratory for innovation" for vehicle standards and emission control technologies, *MEMA I*, 627 F.2d at 1111, expanding and strengthening its program and receiving more than 75 preemption waivers, *see* RJN, Ex. 2.

The California Air Resources Board (CARB) is the California agency tasked with designing, promulgating, and enforcing the State's motor vehicle pollution control program. *E.g.*, Cal. Health & Saf. Code §§ 43013(a), 43017. It must certify that particular vehicles and engines meet the applicable emission standards before they can be sold in the State. *Id.* § 43105.

CARB's most recent standards regulating emissions of new heavy-duty vehicles sold in California are: Advanced Clean Trucks (ACT), Omnibus, and Advanced Clean Fleets (ACF). *See* Mot. 3:11-4:6. The ACT rule requires gradual increases in sales of medium- and heavy-duty zero-emission vehicles beginning with model year 2024. Cal. Code Regs., tit. 13, § 1963.1(b). Omnibus primarily requires substantial reductions in exhaust emissions of oxides of nitrogen from medium- and heavy-duty internal-combustion engines. *Id.* § 1956.8(a)(2)(C), (a)(2)(D).

3

Among other things, ACF requires that all medium- and heavy-duty vehicles sold in the State be zero emission beginning with model year 2036. *Id.* § 2016. EPA granted a preemption waiver for the ACT rule in 2023, 88 Fed. Reg. 20,688, 20,726 (Apr. 6, 2023), and for the Omnibus rule in 2024, 90 Fed. Reg. 643, 644 (Jan. 6, 2025). CARB withdrew its request for a waiver for the ACF rule in 2025. ECF No. 142 (hereafter TAC), ¶ 97; ECF No. 162 (hereafter Answer), ¶ 97. In court orders in other cases, CARB stipulated that it will not enforce ACF's 2036 sales requirement unless and until it obtains a preemption waiver. *E.g.*, RJN, Ex. 3, ¶ 3.

**II.    CALIFORNIA AND SEVERAL HEAVY-DUTY TRUCK MANUFACTURERS SIGN THE CTP**

In 2023, several manufacturers of medium- or heavy-duty engines and vehicles and the Engine Manufacturers Association (EMA) negotiated and signed an agreement with CARB: the CTP. ECF No. 142-2 (hereafter CTP) at 4-6. The parties agreed to take (or not take) certain actions in exchange for certain benefits. *Id.* at 1-2; *see also* Heroy-Rogalski Decl., ¶¶ 16, 21. Among other things, the manufacturers obtained a commitment from CARB that it would recommend that the Board adopt four years of lead time before certain future emissions regulations for heavy-duty vehicles would take effect. CTP at 2. The manufacturers also obtained a commitment from CARB to consider certain amendments to the Omnibus and ACT regulations. *Id.* at App'x B. In exchange, the manufacturers agreed, *inter alia*, to sell vehicles in California consistent with the ACT and Omnibus regulations and with ACF's 2036 requirement, regardless of CARB's authority to enforce them. *Id.* at App'x D, ¶ B. The manufacturers and EMA also promised to forego legal challenges to ACT, Omnibus, or ACF (in relevant part), and to refrain from similar challenges brought by non-signatories. *Id.* at 2, App'x D, ¶ A.

After signing the CTP, EMA issued a press release describing the CTP as "demonstrat[ing] how EMA and CARB can work together to achieve shared clean air goals" and highlighting the bargained-for benefits for EMA's members. RJN, Ex. 4 at 1. Several manufacturers also lauded the agreement as reflecting a "cooperative effort[]," providing "regulatory certainty," and allowing for the "continued supply of product into California" and other States. *Id.* at 2, 3.

4

Def.'s Mem. in Opp'n to Pl.'s Mot. for J. on the Pleadings & in Supp. Def.'s Cross-Mot. (2:25-cv-03255-DC-AC)

**III.   SUBSEQUENT DEVELOPMENTS CREATE UNCERTAINTY AND CALIFORNIA RESPONDS**

In 2025, Congress took the unprecedented and unlawful step of adopting resolutions purporting to invoke the Congressional Review Act (CRA) and disapprove the ACT and Omnibus waivers. H.R.J. Res. 87, 89, 119th Cong. (2025) (enacted) (the Resolutions). The Resolutions hinged on EPA's mistaken view—contrary to the agency's own longstanding interpretation, which the Government Accountability Office (GAO) still holds—that the preemption waivers are "rules" within the meaning of the CRA. *See* RJN, Ex. 5 at 6-9. The President signed the Resolutions on June 12, 2025. Pub. L. No. 119-15, 139 Stat. 65 (2025); Pub. L. No. 119-17, 139 Stat. 67 (2025). California and ten other States promptly sued the United States, seeking, *inter alia*, to have the Resolutions declared unconstitutional for violation of separation of powers and federalism principles. *California v. United States*, No. 3:25-cv-04966-HSG (N.D. Cal. filed June 12, 2025) (hereafter *California*), ECF No. 1 at 27-40. The Federal Government subsequently moved to dismiss for lack of jurisdiction and failure to state a claim, with AmFree filing an amicus brief in support. *California*, ECF Nos. 172, 186-1. The *California* court heard the motion and deemed it submitted on February 19, 2026. *California*, ECF No. 234.

Following the Resolutions' enactment, Governor Newsom issued Executive Order N-27-25, which among other things, directed CARB to "continue to work with manufacturers consistent with the commitments made" in the CTP. RJN, Ex. 6, ¶ 4.

On August 25, 2025, CARB issued a Manufacturers Advisory Correspondence ("August MAC") that superseded an earlier MAC and sought to address the "unprecedented uncertainty" the Resolutions had created in California's vehicle market. RJN, Ex. 7 at 1-2. The August MAC indicated manufacturers could obtain approval from CARB to sell medium- and heavy-duty vehicles or engines in the State through any one of three pathways: (1) voluntary certification to the Omnibus standards (combustion engines) or the zero-emission standards covered by the ACT waiver; (2) certification to the prior iteration of CARB regulations for which EPA had previously waived preemption; or (3) demonstration of certification to EPA's standards as codified at the time the August MAC issued. *Id.* at 1-3. CARB later completed an emergency rulemaking to confirm that the prior iteration of its regulations remains operative, as described in the August

5

MAC, "until a court resolves the uncertainty created by the federal government's actions." RJN, Ex. 8 at 1; *see also* Cal. Code Regs., tit. 13, § 1900. CARB also began a non-emergency rulemaking to codify these same clarifying regulations on a permanent basis. RJN, Ex. 9 at 1; *see also* Cal. Gov't Code § 11346.1(e) (emergency regulations remain in effect for only 180 days). Because the non-emergency rulemaking is not yet complete, CARB readopted the emergency regulations for an additional 90 days. RJN, Ex. 10 at 1; *see also* Cal. Gov't Code § 11346.1(h).[1]

## IV.   FOUR SIGNATORY MANUFACTURERS DISAVOW THE CTP

Also in August, four manufacturers who had signed the CTP, including Daimler Truck North America (Daimler), took various actions to disavow their commitments thereunder. First, each manufacturer submitted a letter to the Federal Trade Commission "affirm[ing] and commit[ting]" that it would "independently make decisions about the type and quantity of vehicles it sells without regard to whether those decisions are compliant with any restrictive terms of the CTP." *E.g.*, RJN, Ex. 11 at 2-3; *see also* RJN, Ex. 12 at 2.

Second, these manufacturers stipulated to dismiss a lawsuit brought by the State of Nebraska and others alleging that the CTP violated that State's antitrust laws. *See* RJN, Ex. 13; *see also* TAC ¶ 8 & Answer ¶ 8. In the stipulation, they conveyed their view that the CTP had been rendered void, and that even prior to that, it "had no impact on product availability, price, or the markets for engines or medium- and heavy-duty trucks at any time." RJN, Ex. 13 at 3.

Third, the manufacturers brought suit against Defendant Cliff, CARB, and the Governor of California in this Court, alleging, among other things, that the CTP is preempted. *Daimler Truck N. Am. LLC v. CARB*, No. 2:25-cv-02255-DC (E.D. Cal. filed Aug. 11, 2025) (hereafter *Daimler*), ECF No. 1, ¶¶ 87-94. The United States is also a party to that case and raised preemption claims, including against the CTP. *Daimler*, ECF No. 56, ¶¶ 110-14. The manufacturers moved for a preliminary injunction, which the United States joined in relevant part. *Daimler*, ECF Nos. 23, 57. On October 31, 2025, the Court granted the motion only as to the plaintiffs' claim against the

---

[1] On April 30, 2026, CARB reissued the August MAC, with the added clarifications that the three compliance pathways remain available despite more recent changes to EPA's standards and that CARB "is not currently implementing or enforcing the [CTP]" due to a preliminary injunction issued in another case, *infra* at 6:23-7:5. RJN, Ex. 14 at 1.

6

CTP, and otherwise denied it. *Daimler*, ECF No. 94 at 34. The defendants are thus preliminary enjoined from "implementing, enforcing, attempting to enforce, or threatening to enforce" the CTP, including by seeking specific performance as a remedy in a separate breach-of-contract lawsuit filed by CARB against the same four manufacturers in California state court. *Id.* at 34 & n.22. The defendants subsequently moved to dismiss some of the claims and defendants from the operative complaints. *Daimler*, ECF Nos. 120, 122. The parties are also briefing cross-motions for summary judgment, with a hearing set for August 7, 2026. *Daimler*, ECF No. 143.

## PROCEDURAL HISTORY

AmFree filed this suit in the U.S. District Court for the Northern District of Illinois in December 2024, challenging the CTP as preempted. ECF No. 1, ¶¶ 140-57. In addition to Defendant Cliff, AmFree also named as defendants the manufacturers and trade association who signed the CTP. *Id.* AmFree later amended its complaint to remove the private-party defendants, following an undisclosed out-of-court settlement. ECF No. 142-1 at 2.

In August 2025, Defendant Cliff moved to dismiss AmFree's suit for lack of personal jurisdiction and lack of proper venue or, in the alternative, to transfer. ECF No. 126. The United States and EPA also moved to intervene as plaintiffs, seeking to join AmFree's preemption claim against the CTP and to add claims against the ACT, Omnibus, and ACF rules. ECF Nos. 121 & Ex. A, ¶¶ 98-114. Defendant Cliff opposed, arguing, *inter alia*, that the United States could protect its claimed interests in other litigation, including as a plaintiff-intervenor raising identical claims in the *Daimler* case. ECF No. 132 at 4-6, 6-9. The motion to intervene remains pending.[2]

On November 7, 2025, the Northern District of Illinois resolved Defendant Cliff's motion to dismiss. ECF No. 145. After "briefly" and *sua sponte* discussing standing, *id*. at 3, the court concluded that it had personal jurisdiction over Defendant Cliff; that venue would be proper in that forum; but that transfer to this Court was nonetheless appropriate, *id.* at 12-15. Following

---

[2] The United States has since filed a motion for leave to move for summary judgment and a motion for expedited rulings on its pending motions. ECF Nos. 169, 173. Defendant Cliff continues to oppose such participation on the grounds that it would disrupt the present briefing schedule and unduly burden both himself and the Court, while, conversely, denial of such participation would not prejudice the United States given its existing participation in *Daimler*. *E.g.*, ECF No. 172 at 3-5; *but see infra* at 26 n.13 (referencing notice under Fed. R. Civ. P. 5.1).

Def.'s Mem. in Opp'n to Pl.'s Mot. for J. on the Pleadings & in Supp. Def.'s Cross-Mot. (2:25-cv-03255-DC-AC)

transfer, this Court deemed the case related to *Daimler* under Local Rule 123(a). ECF No. 160.

## STANDARD OF REVIEW

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) operates much the same as a motion to dismiss under Rule 12(b)(6). *See Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012). Thus, a court must "assess whether the complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (cleaned up). Although the court must construe all well-pleaded allegations in the light most favorable to the non-moving party, it need not accept as true allegations "that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

On a motion for summary judgment, a court "no longer construe[s] the allegations in the complaint as true." *KRL v. Moore*, 384 F.3d 1105, 1110 (9th Cir. 2004). Rather, it must look to the parties' asserted facts and supporting evidence, viewing the facts and drawing reasonable inferences in the non-moving party's favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (cautioning that the "object" is not to "replace conclusory allegations of the complaint" with "conclusory allegations of an affidavit").

Under both standards, judgment is properly granted when there is no issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. *Chavez*, 638 F.3d at 1108; *Hamilton Materials, Inc. v. Dow Chem. Corp.*, 494 F.3d 1203, 1207 (9th Cir. 2007)

## ARGUMENT

### I.    AMFREE LACKS STANDING TO CHALLENGE THE CLEAN TRUCK PARTNERSHIP

AmFree has not met its burden of establishing that its members would suffer an injury-in-fact that is traceable to the CTP and redressable by its requested relief. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). First, AmFree's assertion that this Court cannot even consider the issue of standing due to the law-of-the-case doctrine is incorrect. That doctrine does not apply to jurisdictional rulings, would not bar—or even counsel against—reconsideration in any event, and cannot satisfy AmFree's burden at this stage in the litigation.

Second, AmFree contends that its members would be harmed by the CTP because it will "reduce sales" of combustion-engine vehicles and "increase their price." Mot. 11:17-18. But AmFree pleads no facts and identifies no evidence that could establish that the CTP will reduce such sales or that prices will rise if it does, much less that those effects will be felt by its members. Specifically, AmFree's out-of-state declarants cannot show harm because the CTP's zero-emission vehicle sales obligations do not apply outside of California (where the declarants claim to buy vehicles). AmFree's sole in-state declarant offers only speculative assertions that cannot be reconciled with economic realities or the CTP's terms. That is inadequate to establish standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409-10 (2013).

Third, even if AmFree could establish that the CTP would harm its members in some way, AmFree fails to identify a remedy available here that would provide redress.

A.    **Law of the Case is No Barrier to Concluding AmFree Lacks Standing**

AmFree claims that the law-of-the-case doctrine precludes this Court from even considering its standing based on a prior decision made—*sua sponte* and without argument from either side—by the Northern District of Illinois in resolving Defendant Cliff's motion to dismiss for lack of personal jurisdiction and venue. Mot. 9:7-10:4. That argument is misplaced.

The law-of-the-case doctrine "does not apply to the fundamental question of subject matter jurisdiction," which includes "standing." *Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788, 805 n.10 (9th Cir. 2020). That holding comports with the basic principle that courts "have a continuing, independent obligation to determine whether subject matter jurisdiction exists." *Mashiri v. Dep't of Educ.*, 724 F.3d 1028, 1031 (9th Cir. 2013). This Court need only apply that holding here to evaluate standing on the present record.

All the more so because the prior district court ruling occurred at the motion to dismiss stage, for which AmFree need only have *alleged* the facts necessary for standing—not shown them to be *established* by the pleadings (i.e., admitted in the answer) or by the evidence. Law of the case does not bar a court from revisiting pretrial rulings where "factual development" is "still ongoing"—with a corresponding shift in a plaintiff's burden of proof as the case progresses. *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) (en banc); *see also id.* (that plaintiff

9

"could hypothetically prove some set of facts" initially does not prevent court from later finding that he had "not, in fact, proven those facts"). AmFree must support each standing element "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. at 561. Neither the admitted facts nor the evidence allows AmFree to carry that burden. *See infra* Arg. Sec. I.B; *contra* Mot. 9:24-27.

Regardless, while the law-of-the-case doctrine can apply to decisions made before transfer, *see Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 & n.5 (1988), it "simply does not impinge upon a district court's power to reconsider" interlocutory orders made by itself or a coordinate court, *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 888 (9th Cir. 2001). A trial court may not "reconsider a question decided by an appellate court," but all of its *own* rulings are subject to revision "*at any time before the entry of judgment*." *Id*. Thus, if the Court concludes the prior ruling concerning only the Complaint's allegations is relevant at this stage, the Court indisputably has the power to reconsider it. *See* L.R. 230(j); *United States v. Hayat*, No. 05-cr-0240-GEB-DB, 2018 WL 558819, at *2 (E.D. Cal. Jan. 24, 2018).

The cases AmFree cites are not to the contrary. Mot. 10:1-4. In *Grand Canyon Trust v. Provencio*, the Ninth Circuit concluded that a prior *appellate* opinion from that court could establish the law of the case governing future proceedings in district court. 26 F.4th 815, 821 (9th Cir. 2022). In *Barnes-Wallace v. City of San Diego*, the Ninth Circuit similarly found that a prior decision of that court became law of the case (and circuit), and that an intervening Supreme Court decision did not merit reconsideration. 704 F.3d 1067, 1077 (9th Cir. 2012). And *Wyoming v. Oklahoma* involved a dispute where the Supreme Court, rather than a district court, had original jurisdiction. 502 U.S. 437, 440 (1992). In that context, the Court explained that although prior rulings should be "subject to the general principles of finality and repose," it was "reluctant to import wholesale law-of-the-case principles into original actions" and "would not hesitate to depart" from jurisdictional rulings as warranted. *Id.* at 446.

In short, this Court is free to depart from the Northern District of Illinois' ruling on standing and should in fact reach the opposite conclusion, for the reasons below.

### B.    AmFree's Declarants Do Not Establish Its Standing

#### 1.    AmFree's Out-of-State Declarants Fail to Demonstrate Standing

AmFree's complaint—but not its pending motion—relies on Illinois- and Iowa-based declarants who speculate that the CTP will purportedly reduce the supply of combustion-engine trucks and thus "predictably increase the price" the declarants will pay for such trucks. ECF No. 142-3 (Meiborg Decl.), ¶ 7; ECF No. 142-4 (Riggan Decl.), ¶ 7. These declarants, however, own and operate trucking businesses *outside California*, where the CTP's obligations to sell specified percentages of zero-emission vehicles do not apply. Neither declarant states that his company has *ever* purchased a single truck in California or plans to do so in the future. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. at 889 (courts will not "'presume' the missing facts").

These declarations thus rely on a nationwide-price-increase theory, but no facts support it. Indeed, nowhere does AmFree or its declarants establish that truck prices are set on a nationwide basis, preventing prices from differing state to state. Nor do they show that anything in the CTP or elsewhere prevents signatory manufacturers, much less non-signatories, from adopting such a pricing strategy. To the contrary, these declarants admit that they always "look nationwide for the best prices," Meiborg Decl., ¶ 5; Riggan Decl., ¶ 5—a statement that only makes sense if prices vary. AmFree further concedes that the CTP only requires its signatory manufacturers to meet particular zero-emission vehicle sales targets (and thus, under AmFree's theory, decrease combustion-engine vehicle sales) *in California. See* ECF No. 142-6 (Collins Decl.), ¶ 6; Mot. 10:27-28. Even accepting AmFree's argument that this would cause manufacturers to provide fewer combustion-engine vehicles in California, that would tend to make *more* combustion-engine vehicles available *in other States* (including where the declarants make their purchases). That outcome, under AmFree's own supply-and-demand theory, would drive prices in those States *down*, not up. Moreover, despite speculating that "there is little to no demand for electric trucks," Meiborg Decl., ¶ 7, Mr. Meiborg's own website concedes that "[e]lectric trucks are on the rise" in part because of their "lower operating costs," RJN, Ex. 15 at 3. As supply and demand for electric trucks increase, there is no reason to speculate that demand for diesel trucks will stay constant when consumers can choose between the two. The "unavoidable uncertainty" of

11

AmFree's alleged future price changes renders these declarants' alleged injury "insufficient" to establish standing. *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 653 (9th Cir. 2017).

Absent facts, both declarants resort to what they call a "basic economic principle" to allege that the CTP will cause a nationwide decline in the supply of combustion-engine vehicles, purportedly driving truck prices up everywhere. Meiborg Decl., ¶ 7; Riggan Decl., ¶ 7. But they identify no "principle" that would explain why manufacturers would decline to meet whatever demand for combustion-engine vehicles exists outside California, given that the CTP would not constrain them from doing so. Heroy-Rogalski Decl. ¶¶ 28-29, 31. And without that counter-intuitive assumption, AmFree has no basis for its nationwide-price-increase theory.[3]

That AmFree's economic theory "require[s] guesswork as to how independent decisionmakers"—manufacturers—"will exercise their judgment," *Clapper*, 568 U.S. at 413, is further evinced by AmFree's implicit assumption that increased competition will lead to increased prices. The opposite is just as likely, if not more so. For example, if Tesla offers a heavy-duty zero-emission truck at an affordable price, other manufacturers are unlikely to sit idly by and allow Tesla to capture that segment of the market. *See, e.g.*, RJN, Ex. 17 at 1 (announcing delivery of fully electric semi truck in 2026). Increased competition among manufacturers of zero-emission trucks would induce innovation in electric powertrain technology, battery manufacturing, and vehicle design, putting downward pressure on the cost of those vehicles *and* of the diesel trucks that must compete with them. *See, e.g.*, *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 695 (1978) (recognizing that "competition will produce not only lower prices, but also better goods and services"); RJN, Ex. 15 at 2 (recognizing "[e]lectric trucks are on the rise" and thus competing with diesel trucks). AmFree cannot disregard those obvious economic effects while still meeting its burden to establish standing.

[3]AmFree's errant reliance on "basic economic principles" permeates its motion. For example, AmFree states that, from model year 2023 to 2024, non-electric tractor sales in California fell by 82%, and implies the CTP is the cause. Mot. 11:19-21. Setting aside that AmFree identifies no member affected by *California* sales of such vehicles, that figure does not account for industry-wide factors that led to decreased sales of non-electric and electric heavy-weight trucks *nationwide*. *See* RJN, Ex. 16; RJN, Ex. 18 at 1-2. It also does not establish that any decline in sales indicates a decline in supply versus a decrease in demand. Nor does it grapple with the manufacturers' pronouncement that the CTP has "had no impact on product availability, price, or the markets" for these trucks "at any time." RJN, Ex. 13 at 3; *see also* RJN, Ex. 11 at 2.

Def.'s Mem. in Opp'n to Pl.'s Mot. for J. on the Pleadings & in Supp. Def.'s Cross-Mot. (2:25-cv-03255-DC-AC)

**2.    AmFree's In-State Declarant Fails to Demonstrate Standing**

In contrast to its complaint, AmFree's brief relies only on the declaration of Tim DeMartini, an AmFree member who is a recreational vehicle (RV) dealer in California. Mot. 11:3-16. But Mr. DeMartini also fails to establish any past, current, or certainly impending injury-in-fact.[4]

Mr. DeMartini speculated, on January 4, 2025, that his company's RV sales in 2025 would be affected based primarily on a single, unidentified manufacturer's alleged response to the ACT and Omnibus *regulations*. ECF No. 142-5 (DeMartini Decl.), ¶ 14. On its face, that speculation fails to establish an injury caused *by the CTP*. And Mr. DeMartini has notably not provided an updated declaration concerning his actual sales in 2025—perhaps because industry-wide statistics show that manufacturers shipped significant volumes of RVs to California in January 2025 and *thousands* more throughout the year. RJN, 19 at 7; RJN, 20 at 8; *see also* RJN, Exs. 56-58 (DeMartini RV website listing at least 13 new Super C models and at least 8 new Class A models for model years 2025 and 2026 as available for sale). Speculation never suffices for standing, and certainly cannot do so when real-world facts belie it. *See United States v. City & County of San Francisco*, 979 F.2d 169, 172 (9th Cir. 1992).

Mr. DeMartini's speculation in January 2025 that his company's RV sales for that year would be affected by manufacturers' alleged responses to the ACT and Omnibus regulations fails for another reason: after Mr. DeMartini signed his declaration, several CTP signatories, including Daimler—the parent company of an RV chassis manufacturer, DeMartini Decl., ¶ 4—represented in court that the CTP has "had *no impact* on product availability, price, or the markets for engines or medium- and heavy-duty trucks *at any time*." RJN, Ex. 13 at 3 (emphasis added). These same signatories committed to the Federal Trade Commission that they would "independently make decisions about the type and quantity of vehicles [they] sell[] without regard to whether those decisions are compliant with any restrictive terms of the CTP." *E.g.*, RJN, Ex. 11 at 2-3. These

---

[4] Past injuries would be nonredressable here in any event both because any alleged monetary injuries to Mr. DeMartini's business would require individualized proof (and could not support associational standing for AmFree) and because such injuries are not recoverable under *Ex parte Young*, *see Koala v. Khosla*, 931 F.3d 887, 895 (9th Cir. 2019). Defendant Cliff nonetheless addresses Mr. DeMartini's claims about 2025 in case AmFree seeks to rely on them in support of alleged future injuries.

13

representations—which AmFree's operative complaint and motion both ignore—further undermine Mr. DeMartini's speculation that RV sales would decrease in 2025 due to the CTP.[5]

The DeMartini declaration also fails to credibly assert a future injury. Here, DeMartini's chain of causation depends on several unsupported assumptions: that the signatory manufacturers will reduce production of combustion-engine RV chassis instead of increasing production of other (non-RV) zero-emission vehicles (as the CTP would allow through 2035); that zero-emission RVs will not be developed on a timeline that would allow for the signatories to use those vehicles to meet their CTP commitments; that non-signatory manufacturers would decline to fill future alleged gaps between supply and demand for combustion-engine RVs and leave profits on the table; that new entrants will refuse to develop products to fill those same, alleged gaps between future supply and demand; and that CTP signatories will stop investing in electric vehicle technology and their own electrification targets if the CTP is not in effect.

Critically, Mr. DeMartini fails to account for the fact that, for the next *eight years*, signatory manufacturers could continue to sell combustion-engine RV chassis while meeting their zero-emission vehicle sales commitments. Arneja Decl., ¶¶ 15-18. These sales commitments apply not to particular vehicle models, but to broad *groups* of vehicles. *Id.* ¶ 13. For example, a "Class Super C" RV is in the "Class 4-8" group. *Id.* ¶ 11.a. The "Class 4-8" group also includes several vehicle types for which zero-emission models already exist in the marketplace, such as school buses and garbage trucks. *Id.* ¶¶ 19-22. A signatory could therefore meet its 2027 obligation to sell 20% zero-emission vehicles for the Class 4-8 group by producing sufficient quantities of those other vehicle types, while continuing to produce and sell the same number of combustion-engine Class Super C RV chassis. *Id.* ¶¶ 13-14. That result holds true through 2035. *Id.* ¶ 15 (analyzing sales targets at their highest level across relevant groups). Mr. DeMartini fails to allege that RVs constitute so high a percentage of the California RV market (or of a signatory

_____

[5] AmFree's "conclusory allegation[s]" in its Complaint are likewise "insufficient to establish standing." *Carrico v. City & County of San Francisco*, 656 F.3d 1002, 1006 (9th Cir. 2011). See, e.g., TAC ¶¶ 24 ("The truck manufacturers' decisions of what mix of vehicles to distribute for sale in Illinois, and at what prices, is influenced by their need to carry out their obligations under the Agreement."), 162 (alleging that cost increases will occur and that "[t]hese cost increases cannot realistically be passed entirely onto ... customers").

14

manufacturer's overall sales in the State) so as to make this flexible approach impossible (or even difficult), and he cannot explain why signatories could not, or would not, adopt it.

Moreover, despite its own member acknowledging that the CTP does not cover all RV chassis manufacturers, AmFree fails to explain why—even if the signatory manufacturers were to reduce their combustion-engine RV output for California—other *non*-signatory manufacturers (existing or new) would decline to fill any gap between supply and demand. *See, e.g.*, DeMartini Decl., ¶ 4 (identifying non-signatory Spartan as an RV chassis manufacturer); RJN, Ex. 22 at 1 (DeMartini RV listing model for sale with Spartan chassis). That is particularly so given the extended timelines on which signatories' zero-emission-vehicle sales targets ramp up. *See* Arneja Decl., ¶ 12; *cf. Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125-27 (1978) (where a requirement does not apply to all competitors, "there is no reason to assume that" the covered entities' share of the entire supply "will not be promptly replaced by" non-covered entities).

The declaration is flawed in other ways, too. Mr. DeMartini states that "[t]here are presently no electric powertrain options for RV chassis," DeMartini Decl., ¶ 13, but ignores new entrants and new technologies. *See, e.g.*, RJN, Ex. 23 at 1-2 (THOR Industries announcing hybrid Class A RV utilizing electric chassis); RJN, Ex. 24 at 1 (Winnebago announcing fully electric Class B RV); *see also* Arneja Decl., ¶ 7 (expecting that zero-emission RVs across all classes will be commercially available in California by 2036, if not sooner). And CTP signatories, including those who manufacture RV chassis and engines such as Daimler and Cummins, have already made substantial investments in electric vehicle technology while publicly committing to electrification, independent of the CTP's terms. *E.g.*, RJN, Ex. 4 at 2 (Daimler goal to offer "only carbon-neutral vehicles by 2039"); RJN, Ex. 25 at 35 (Daimler deployment of all-electric Class 4 and 5 trucks in California designed for "a diverse range of customer use cases" and reflecting its "commitment to decarbonize the company-wide product portfolio"); RJN, Ex. 26 at 36 (Daimler, Cummins, and PACCAR collaborating to "accelerate and localize battery cell production and the battery supply chain" in the U.S.).

Put simply, the DeMartini declaration is long on conjecture but short on facts. It does not satisfy AmFree's burden of showing a "certainly impending" injury caused by the CTP and

15

redressable by this Court. *Clapper*, 568 U.S. at 410.

### C.   AmFree Lacks Standing for the Relief It Seeks

Even if AmFree's declarations could establish injury-in-fact, AmFree's standing would still fail. As a non-party to the CTP, AmFree asks this Court to declare the signatory manufacturers' sales commitments to be preempted and unenforceable. Yet it seeks that relief not against the manufacturers who would perform those commitments—and thereby allegedly harm AmFree's members—but against the party who accepted the commitments as consideration. In other words, AmFree asks this Court to prevent the signatory manufacturers from honoring the promises they made to CARB while suing CARB's Executive Officer to obtain that relief. AmFree cites no case that recognizes a non-party's standing to bring a preemption suit in this posture. Indeed, all of the preemption cases involving purported agreements (including the cases cited by both sides here) involved only parties to those purported agreements. *E.g.*, *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 222 (1995) (brought by parties to frequent flyer program agreement against the airline with whom agreement was made); *Airlines for Am. v. City & County of San Francisco*, 78 F.4th 1146, 1147 (9th Cir. 2023) (brought by "airlines that contract with the City" against the City). AmFree is not entitled to any of the relief it seeks here, and thus lacks standing.

Specifically, AmFree cannot obtain relief that would void the CTP. TAC at 35, ¶ 1 (Prayer). Such relief is not available in a preemption suit against one, but not all, an agreement's signatories, and AmFree chose to dismiss the others. *See EEOC v. Peabody W. Coal Co.*, 610 F.3d 1070, 1082 (9th Cir. 2010) (citing "deeply imbedded" principle "that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable."). To the extent that voiding the CTP would prevent CARB from seeking damages against signatory manufacturers who breach, *Ex parte Young* also bars that relief. Far from "hold[ing] state officials responsible" for allegedly unlawful conduct concerning vehicle sales, *Papasan v. Allain*, 478 U.S. 265, 277 (1986), any such remedy would reward the manufacturers with cost-free but valuable consideration. That is well outside the "tailored" confines of this exception to sovereign immunity. *Id.* Moreover, to establish standing, a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or

16

interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). AmFree, however, seeks to vindicate the alleged rights of the manufacturers—who are no longer parties to this suit—to be free from liability for any contract remedies. And in doing so, AmFree requests one-sided relief, tying the hands of the party who performed nearly all its obligations. Heroy-Rogalski Decl., ¶¶ 40-42. That is inequitable. *See Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 144 (9th Cir. 1994) (discretionary decision to award declaratory relief must balance "concerns of judicial administration, comity, and fairness to the litigants").

Nor can AmFree obtain less extensive relief—i.e., an injunction (or equivalent declaratory relief) that would prevent CARB from obtaining specific performance of the CTP's sales commitment terms . TAC at 35, ¶ 2 (Prayer). That relief likewise involves vindicating the manufacturers' rights. Indeed, it would only remedy AmFree's alleged injury if it operated as a defense *for the manufacturers* in a breach-of-contract suit brought by CARB. AmFree has not established that it should be permitted to assert other parties' rights in this way. *See Warth*, 422 U.S. at 499. Further, AmFree cannot obtain this relief as to CARB's existing lawsuit against four of the signatory manufacturers due to the Anti-Injunction Act. *E.g.*, *Cal. Chamber of Com. v. Becerra*, No. 2:19-cv-02019-KJM-EFB, 2020 WL 1030980, at *3 (E.D. Cal. Mar. 3, 2020). And it has not even attempted to meet its burden to show that injunctive (or equivalent) relief as to the *other* signatories (those not named as defendants in the existing breach suit) would prevent (or even reduce) its members' alleged injuries. *See supra* at 15:3-12.

## II.    AMFREE'S PREEMPTION CHALLENGE TO THE CLEAN TRUCK PARTNERSHIP FAILS

Even if AmFree could establish standing, it cannot succeed on its preemption claim against this voluntary agreement. Federal preemption "generally [applies to] state or local government action that has the force and effect of law"—not to voluntary agreements. *Airlines for Am*, 78 F.4th at 1150 (cleaned up). AmFree appears to agree. Mot. 12:17 (describing preemption as arising when "federal law" and "*state law*" potentially conflict (emphasis added)). Yet AmFree does not challenge a state law. AmFree challenges a bargained-for agreement: specifically, a provision in which certain manufacturers agreed (in exchange for consideration) to sell cleaner vehicles in California *in the event state law did not require them to do so*. *E.g.*, TAC at 31; *id.*,

17

¶ 177. Accordingly, AmFree can only prevail if it establishes: (1) that Clean Air Act Section 209(a) extends beyond state-imposed regulation to cover voluntary agreements like the CTP, or (2) that the CTP is *not* a voluntary agreement but, rather, effectively a regulation or other state law. AmFree cannot make either showing, and so Defendant Cliff is entitled to judgment.

### A.    Section 209(a) Does Not Preempt Voluntary Agreements

Preemption "concerns a clash between a constitutional exercise of Congress's legislative power and conflicting *state law*." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 479 (2018) (emphasis added). Where, as here, a plaintiff alleges that an agreement (rather than a statute or regulation) is preempted, courts therefore look to whether the agreement is effectively a law and therefore subject to preemption. In doing so, courts consistently distinguish "between what the State dictates and what [a party] itself undertakes," *Wolens*, 513 U.S. at 233, and have held that preemption reaches only "'official, *government-imposed* policies prescribing binding standards of conduct," not "'contractual commitments voluntarily undertaken,'" *Airlines for Am.*, 78 F.4th at 1152 (quoting *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 569 U.S. 641, 649 (2013)). The latter obligations only bind parties that opt in, whereas state law applies to "any" and "every" entity within the field. *Am. Trucking*, 569 U.S. at 645.

That preemption focuses on state law, not voluntary agreements, makes sense as a matter of "constitutional logic." Mot. 16:21. Preemption provisions "confer[] on private entities … a federal right to engage in certain conduct subject only to certain (federal) constraints." *Murphy*, 584 U.S. at 478-79. The Supremacy Clause functions to "secure [these] federal rights by according them priority." *City of Hugo v. Nichols*, 656 F.3d 1251, 1256 (10th Cir. 2011) (quoting *Chapman v. Hous. Welfare Rights Org.*, 441 U.S. 600, 613 (1979)) (cited at Mot. 17:15-16). But these rights can be waived. Mot. 17:13-14 ("A party may waive a … statutory provision made for his benefit." (emphasis omitted)); *see also id.* at 17:5-12. If this were not the case, the Supreme Court could have quickly dispensed with past preemption challenges to agreements on that ground. In *Wolens*, for example, the airline's contractual obligations directly concerned airline rates and services, and were thus within the preempted domain. 513 U.S. at 226. Nonetheless, enforcement of those obligations was not preempted because the obligations were "self-imposed,"

18

rather than "state-imposed." *Id.* at 228. In other words, the airline could waive—and had waived—its statutory preemption rights through contract.

Section 209(a) reflects this same divide between state-imposed and self-imposed requirements and preempts only the former—i.e., "standard[s] relating to the control of emissions from new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a). The provision gives a "manufacturer [a] right to sell federally approved vehicles," *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist. (EMA)*, 541 U.S. 246, 255 (2004), in the absence of a preemption waiver under Section 209(b), 42 U.S.C. § 7543(b).[6] Thus, as the only Court of Appeals to reach this issue has explained, Section 209(a) is meant to govern "formal regulations adopted by the states, rather than voluntary and cooperative agreements between the states and automakers." *Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot. (AIAM)*, 208 F.3d 1, 7 (1st Cir. 2000). It does not preempt—or even speak to—bargained-for exchanges like one in which "manufacturers agreed to … develop [zero-emission vehicle] technology" and to sell specified numbers of such vehicles in California during particular years, and in which CARB "agreed to provide infrastructural support" for those zero-emission vehicles. *Id.* at 3. It likewise does not preempt the CTP—*also* a "voluntary and cooperative agreement." *Id.* at 7.

AmFree's efforts to establish the opposite— that Section 209(a) departs from the norm and goes beyond preempting standards with the force and effect of law—fail. AmFree points to the absence of the phrase "the force and effect of law' from Section 209(a)'s text. Mot. 18:7-19:16 (citing *Wolens*, 513 U.S. at 228-29). But that absence does nothing to establish an unusually broad scope. Indeed, AmFree's contention fails to engage the actual language of comparable preemption provisions and of the Clean Air Act itself. The *Wolens* provision read: "no State ... shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier." 513 U.S. at 222-23 (quoting 49 U.S.C. § 1305(a)(1)); *see also* Mot. 18:8-9 (quoting similar text from another provision). The phrase "force and effect of law" modified "other provision," clarifying that this otherwise

_____

[6] This right is conferred on *manufacturers*, whose conduct is governed by the state or federal laws at issue, not AmFree's members, who purchase vehicles. *Contra* Mot. 17:23-28.

19

ambiguous term encompassed only state actions, like regulations and rules, with the force and effect of law. The preceding terms—including "standard"—required no such modifier.[7] Far from "sweep[ing] more broadly," Mot. 19:2, Section 209(a) refers only to "standards," which, as in the *Wolens* provision, needs no further clarification. 42 U.S.C. § 7543(a).

Were there any doubt that "standards" in Section 209(a) refers exclusively to state actions with the force and effect of law, other provisions of the Clean Air Act remove it. The Act defines an "emission standard" as a "requirement *established by the State* or the Administrator"—i.e., state laws enacted unilaterally, not commitments offered and accepted as consideration in a bargained-for exchange. *Id.* § 7602 (emphasis added). Elsewhere, the Act expressly describes Section 209(a) as "preempting certain State *regulation* of moving sources." *Id.* § 7416 (emphasis added). Agreements are not "regulation," and Section 209(a) simply does not reach them.[8]

AmFree's attempt to distinguish *AIAM* is similarly unpersuasive. AmFree acknowledges that the First Circuit correctly interpreted the word "standards" to mean "formal state laws and regulations," yet argues that interpretation only applies to Section 177, 42 U.S.C. § 7507, not Section 209(a). Mot. 22:1-12. This argument is hard to follow, as it apparently rests on Section 209(a) containing two verbs (adopt and enforce) that are *also* found in Section 177. *Compare* Mot. 22:10-12, *with* 42 U.S.C. § 7507 ("any State … may adopt and enforce"). AmFree further suggests that "standards" refers to "formal regulations" in Section 177, but not Section 209(a), because in the former it refers to "standards for which a waiver" under Section 209(b) "has been granted." Mot. 22:7-9. But a waiver is available for *any* standard covered by Section 209(a) preemption. 42 U.S.C. § 7543(b)(1) (authorizing waiver of "application" of Section 209(a)); *MEMA I*, 627 F.2d at 1107 ("The plain meaning of the statute indicates that Congress intended to make the waiver power coextensive with the preemption provision."). So, if Section 209(a) reaches agreements (it does not), so, too, must Section 209(b) waivers and thus Section 177's

---

[7] While Congress later omitted "standard" from this list (among other changes to this text), doing so effectuated "no substantive change" to the provision. *Wolens*, 513 U.S. at 223 n.1.

[8] Consulting the "purpose" of Section 209(a) does not help AmFree, either. Mot. 18:17. The provision helps "manufacturers" avoid a "patchwork of federal and state *regulatory* programs." *MEMA I*, 627 F.2d at 1109 (emphasis added). That concern has no bite for manufacturers' own production decisions, whether made in voluntary agreements or otherwise.

20

reference to them. In other words, and as the single statutory definition indicates, an "emission standard" has the same meaning across all three sections. 42 U.S.C. § 7602.

AmFree's argument that *EMA v. South Coast* adopted "a very broad" interpretation of "standards" in Section 209(a)—one that preempts voluntary agreements—fares no better. Mot. 19:4-7, 22:12-16. That case involved rules "enacted" by the government, not an agreement, 541 U.S. at 248, so the Court had no occasion to decide whether Section 209(a) reaches agreements. Rather, the Court held that rules that *compel demand* for vehicles are "standards" every bit as much as rules that *compel production*. *Id.* at 256; *contra* Mot. 15:25-27 (claiming case involved "non-coercive standards"). By contrast, no one is *compelled* to enter into a voluntary agreement, and such agreements fall outside *EMA*'s holding. Moreover, the language AmFree quotes is from the dictionary definition of "standard," which naturally covers the multiple meanings that word can carry, not from the Court's holding as to which meaning applies under Section 209(a). Mot. 12:24-26. And, in fact, the Supreme Court did not embrace the entirety of that definition. To the contrary, even though the dictionary definition indicated a "standard" could be a "model or example; criterion; [or] test," 541 U.S. at 253, the Court recognized that Section 209(a) "standards" are "*criteria*" that "relate to the emission characteristics of a vehicle or engine," *id.* (emphasis added)—not a model or example that can be followed, or not. Certainly, "standards" that serve as "model[s]" or "example[s]" might be "established by … custom or general consent." Mot. 12:24-26. But that does not mean that "standards" that serve as "criteria … the vehicle or engine may not" exceed are so established. *EMA*, 541 U.S. at 246. Indeed, the Court made clear multiple times that it understood "standards" to be "mandates"—which are simply not established by "general consent." *See id.* at 253-57.

AmFree also incorrectly tries to extract a broader reading of Section 209(a) from *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872 (9th Cir. 2006). Mot. 16:20-17:2. But the case is inapposite, for one, because there a city's own conduct—attempting to enforce the "agreement" through "its police and regulatory powers"—indicated an action with at least some force and effect of law. 437 F.3d at 882. CARB has never invoked such powers for CTP enforcement, and in fact has done the opposite: it sued for breach of contract, *supra* at 7:1-4, underscoring that the

21

CTP cannot be enforced as a state regulation. Supreme Court precedent also confirms that *Olympic Pipe Line* depended on an erroneous premise. While it assumed that "[p]reemption is a power of the federal government, not an individual right of a third party that the party can 'waive,'" 437 F.3d at 883, the Supreme Court has since explained that preemption provisions "confer[] on private entities … a federal right to engage in certain conduct subject only to certain (federal) constraints," *Murphy*, 584 U.S. at 478-79.[9] And AmFree's reading of *Olympic Pipe Line* cannot be squared with the Supreme Court's disposition in *Wolens*. That is, if voluntariness were irrelevant, the contractual obligations in that case should have been preempted because they directly affected the preempted domain. *See supra* at 18:26-19:2. Instead, the Court deemed them "self-" rather than "state-imposed" and so not preempted. *Wolens*, 513 U.S. at 228; *see also Am. Trucking*, 569 U.S. at 649 (contrasting preempted regulatory obligations with "contractual commitments voluntarily undertaken").

Finally, AmFree claims Defendant Cliff cannot invoke the "market participant" exception to preemption, Mot. 1:19-20, 8:27-9:1, and that the CTP seeks to do "*indirectly*" what Congress says States "can't do *directly*," *id.* 12:20-21, 14:7-8. Both arguments founder on the definition of "standards," since neither provides a basis to expand the meaning of that term to encompass voluntarily undertaken obligations. Specifically, the market participant *exception* need only be invoked when preemption applies; preemption does not apply here because the CTP is not a state law. *E.g.*, *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1040 (9th Cir. 2007) (applying "market participant" exception to "rules").[10] Similarly, because Section 209(a) speaks to state laws—i.e, "standards"—an agreement that imposes no state laws does nothing (directly or indirectly) within the preemptive scope.

---

[9] This may explain why no relevant Ninth Circuit decision after *Olympic Pipe Line* has relied on that decision. *See Am. Trucking,* 559 F.3d 1046; *Airlines for Am.*, 78 F.4th 1146.

[10] Certainly, some courts that have considered whether agreements have the force and effect of law have referred to market participation, but AmFree's efforts to capitalize on that language miss the point of the line drawn repeatedly by those same cases. *See* Mot. 19:20-22, 20:16, 21:4-5. When the government engages in "contract-based" activity involving "commitments voluntarily undertaken," it is making "everyday contractual arrangements." *Airlines for Am.*, 78 F.4th at 1152 (cleaned up). By contrast, when the government employs "a coercive mechanism, available to no private party, it acts with the force and effect of the law." *Id.* It is that use of "the force and effect of law" that divides "the State acting as a State" from the State acting as a contracting entity or, in shorthand, as a "market actor." *Id.* (cleaned up).

22

### B.  The Clean Truck Partnership Is a Voluntary Agreement, not a State Law

Unable to establish that Section 209(a) preempts voluntary agreements, AmFree alternatively attempts to paint the CTP as an *involuntary* agreement—one that acts, in effect, as a unilaterally imposed state obligation. No facts support such a finding.

Precedent identifies only two factors relevant to this analysis: (1) whether the allegedly preempted obligations were voluntarily undertaken (rather than unilaterally imposed by a regulator), and (2) whether those obligations are enforceable through contract remedies or means available only to governments—e.g., civil or criminal penalties. Thus, in *American Trucking*, the challenged contract was subject to preemption, first, because it was imposed unilaterally through "municipal ordinance," and second, because violations were "punishable by a fine or a prison sentence." 569 U.S. at 650; *see also id.* at 651 ("commitments result[ed] not from ordinary bargaining" but instead "from the threat of criminal sanctions"); *Airlines for Am.*, 78 F.4th at 1152 (contrasting "government-imposed policies" with "contractual commitments voluntarily undertaken"); *id.* ("civil penalty provisions alone may amount to the force and effect of law").

On the first factor, evidence abounds that the CTP signatories entered into the agreement voluntarily and that the terms were bargained-for exchanges. AmFree cannot show otherwise. Indeed, the manufacturers have repeatedly touted the CTP's consensual nature and the benefits they secured for themselves. At signing, the manufacturers' trade association (EMA) said the CTP "demonstrate[d] how EMA and CARB can work together to achieve shared clean air goals." RJN, Ex. 4 at 1. Individual manufacturers praised the "cooperative effort []" that produced the CTP. *Id.* at 3. More than two years later, another manufacturer reiterated that "through the CTP, [the OEM] was able to obtain benefits for its dealers and for customers of its trucks." RJN, Ex. 11 at 2. And another affirmed that it signed the CTP to "gain" promises from CARB "[i]n exchange" for promises they had offered. RJN, Ex. 50 at 1.

The very terms of the agreement confirm it was no one-sided deal. *E.g.*, CTP at 1 (CARB "commits" to propose to the Board increased lead time and certain regulatory amendments); *id.* at App'x D (manufacturers "agree to be neutral" in proceedings by other States considering whether to adopt Omnibus and ACT). CARB's own account of the negotiations corroborates this

23

narrative. For example, CARB staff spent "many hours in one-on-one conversations" with OEM counterparts, bargaining over terms. Heroy-Rogalski Decl., ¶ 19. The manufacturers were free to—and did—reject some of CARB's proposals. *Id.* ¶ 20. In short, the CTP was achieved through "ordinary bargaining (as in *Wolens*)," not the unilateral imposition of obligations by "threat of criminal sanctions" (as in *American Trucking*). *Am. Trucking*, 569 U.S. at 651.

AmFree responds that the CTP was *per se* involuntary owing to the "enormous leverage" that CARB purportedly "wields" over manufacturers. Mot. 20:24-21:1. But not all manufacturers signed the CTP, *e.g.*, Heroy-Rogalski Decl., ¶ 34—a puzzling omission if CARB could require each of them to agree to any terms. The manufacturers who did choose to sign were "sophisticated players" represented by counsel, outweighing any "generalized concerns about [CARB's] powers or enforcement tactics." *Powell v. SEC*, 149 F.4th 1029, 1042 (9th Cir. 2025); *see also* Heroy-Rogalski Decl., ¶¶ 20-22 (recounting how the manufacturers outright rejected certain terms and CARB ultimately compromised on others). Indeed, the manufacturer plaintiffs in *Daimler* raise a similar preemption claim against the CTP, yet, in doing so, do not contest that they signed the agreement voluntarily. *See Daimler*, ECF No. 84 at 5:20-8:14. AmFree cannot create a genuine issue of material fact to the contrary.

On the second factor, AmFree likewise cannot establish that the CTP is enforceable through regulatory penalties or some other "coercive mechanism" available only to the government. *Airlines for Am.*, 78 F.4th at 1152. As AmFree acknowledges, CARB has brought suit in state court seeking contract remedies against four signatory manufacturers for breaching their commitments under the CTP. Mot. 14:21. AmFree identifies no action by CARB seeking to exact civil penalties for such breaches. Indeed, the CTP contains no term authorizing that relief. *See* CTP at 1-3; Heroy-Rogalski Decl., ¶ 32. Nor can AmFree point to any provision of California law that does so. Certainly, CARB may seek civil penalties for violations of "any provision of [Health & Safety Code Division 26, Part 5], or any *order, rule, or regulation* of the state board"—but not of a contract term. Cal. Health & Safety Code § 43016(a) (emphasis added). AmFree contends that the CTP nonetheless provides a penalty hook by "purport[ing] to preserve" CARB's certification role. Mot. 20:13-23. But the referenced language says nothing about penalties or

24

anything else that could bring the CTP within the realm of civil enforcement prescribed by statute. To the contrary, it simply manifests the parties' understanding that California law would continue to operate, independent of (and in addition to) the CTP's contractual commitments. Heroy-Rogalski Decl., ¶ 24. Specifically, the manufacturers agreed that they would still be required "to demonstrate compliance with" California law and recognized that CARB's certification program is a means by which they do so. CTP, App'x B.

Though the CTP is both voluntary and enforceable through contract remedies, AmFree asserts that other aspects of the agreement nonetheless give it the effect of state law. These arguments are irrelevant to the inquiry, *supra* at 23:5-14, and are unpersuasive in any event.

AmFree takes issue with the CTP's cross-references to the California Code of Regulations. Mot. 20:3-5. To begin, AmFree identifies no precedent that makes incorporation by reference relevant to the preemption analysis. Regardless, when the government "exact[s] promises from a party within whom it contracts that he will comply with [certain] regulations," those promises are independent of the referenced regulation and are enforceable through a "breach of contract" suit. *Nutt v. United States*, 12 Cl. Ct. 345, 351 (1987), *aff'd sub nom. Smithson v. United States*, 847 F.2d 791 (Fed. Cir. 1988); *see also* 11 Williston on Contracts § 30:19 (4th ed. 2025) ("When a contract expressly incorporates a statutory enactment by reference, that enactment *becomes part of the contract* …." (emphasis added)). In other words, the ensuing obligations "emanate from contract" and are "separate animals" from "obligations created by statute [or regulation]." *Black Diamond Asphalt, Inc. v. Superior Ct.*, 109 Cal. App. 4th 166, 171 (2003). Thus, when the federal government failed to abide by statutory provisions "incorporated" into its contracts with private parties, the Supreme Court held that the Government "broke *its promise*" in the contracts—not that it violated the incorporated statute. *Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 607, 609, 624 (2000) (emphasis added); *see also Griffin & Griffin Expl., LCC v. United States*, 116 Fed. Cl. 163, 176-77 (2014).[11] The same is true here: the CTP incorporates by

_____

[11] Cases addressing the converse—laws that incorporate contract terms—are irrelevant. *See United States v. Duquesne Light Co.*, 423 F. Supp. 507, 510 n.5 (W.D. Pa. 1976) (cited at Mot. 14:22-24) (action to enforce executive order and regulations that incorporated contract terms was an "attempt to enforce" an "administrative program"); *Am. Trucking*, 569 U.S. at 650 (ordinance was preempted state law, even though it incorporated an agreement).

25

reference certain regulatory requirements *as terms of the agreement*. That does not transform it into a government-imposed regulation within the scope of Section 209(a). [12]

Finally, AmFree's reliance on the CTP's purpose and the consideration offered again misses the mark. Mot. 20:5-13. The Supreme Court has expressly held that "intentions are not what matters," *Am. Trucking*, 569 U.S. at 651; that controls over any contrary suggestion in *Olympic Pipe Line*, Mot. 20:5-10. And AmFree does not cite *any* authority establishing the nature of CARB's consideration as relevant. Mot. 20:11-13. To the contrary, the Supreme Court readily found that "the law applicable to contracts between private individuals" governed an agreement in which the government's consideration included a promise to take regulatory action according to statutory timelines. *Mobil Oil*, 530 U.S. at 607. The CTP is no different.

### III. EVEN IF THE CTP WERE AN ATTEMPT TO ENFORCE PREEMPTED STANDARDS, THE OMNIBUS AND ACT RULES ARE NOT PREEMPTED AND THE CTP IS SEVERABLE

As discussed, the CTP is a voluntary agreement, not a regulatory scheme, and Section 209(a) does not preempt such agreements. But if the Court disagrees on the grounds that the CTP is an unlawful attempt to enforce preempted standards, enforcement of the Omnibus and ACT regulations would still not be preempted because the Resolutions purporting to disapprove the waivers for those regulations are invalid. Thus, at most, the Court could invalidate the CTP's term regarding the 2036 sales requirement as that term is plainly severable.

#### A. The Allegedly Preempting Resolutions Are Unconstitutional

The Resolutions purporting to disapprove EPA's waivers for the ACT and Omnibus standards are unconstitutional. Those waivers therefore remain in effect—defeating any argument that the CTP is an unlawful attempt to enforce either ACT or Omnibus. [13]

---

[12] Hence, Executive Order N-27-25 recognizes that the CTP binds signatories to their "agreements," not to regulations. RJN, Ex. 6 at 2, 3; *contra* Mot. 14:17-18.

[13] Because this brief draws the Resolutions' constitutionality into question, Defendant Cliff is concurrently filing the notice required by Federal Rule of Civil Procedure 5.1(a). However, the Court need not reach these constitutional questions unless it concludes AmFree has standing *and* determines that the CTP is an attempt to enforce standards that might be preempted.

26

**1.    The Congressional Review Act does not bar this Court's review**

In the *California* case, *supra* at 5:9-15, AmFree as amicus argued that Section 805 of the CRA prohibits review of the Resolutions' constitutionality. But Section 805 bars review of any "determination, finding, action, or omission under this chapter," 5 U.S.C. § 805, i.e., "under" the CRA itself. It does not bar constitutional claims—or, as here, constitutional defenses. *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 561 (9th Cir. 2019).

Additionally, Section 805 does not bar *any* claim or defense as to these Resolutions because they were not enacted "under" the CRA. That phrase "is most naturally read to mean … 'pursuant to' or 'by reason of the authority of'" the CRA. *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 124 (2018). But every obligation or activity under the CRA is conditioned on the presence of a "rule." Only a rule can trigger an agency's duty to report "the rule" to Congress. 5 U.S.C. § 801(a)(1)(A). The submission of that report about a rule triggers, *inter alia*, the agency's duty to submit a further report "if the rule is made ineffective," *id.* § 801(a)(1)(D), and the window for Congress to pass a special type of "joint resolution" to "disapprove[] the rule," *id.* § 802(a). Accordingly, a resolution that disapproves something other than a "rule"—as the CRA expressly defines that term, *id.* § 804(3)—cannot be legislation "under" the CRA to which Section 805's jurisdiction-stripping bar could apply.

A waiver granted under Section 209(b)(1) of the Clean Air Act, 42 U.S.C. § 7543(b)(1), is not a "rule" as the CRA defines it, 5 U.S.C. § 804(3). Indeed, EPA held that view, consistently, for decades and reiterated it in the waiver decisions later targeted by the Resolutions. *E.g.*, 69 Fed. Reg. 59,920, 59,922 (Oct. 6, 2004); 84 Fed. Reg. 51,310, 51,352 (Sept. 27, 2019); RJN, Ex. 5 at 5. The GAO—whose views of the CRA's applicability Congress normally follows— concurred. RJN, Ex. 5 at 6-9. The GAO and (initially) EPA were simply following the statutory language. EPA's waiver grants an individual requesting party (California) a statutory exemption from the "application of" Section 209(a) of the Clean Air Act. 42 U.S.C. § 7543(b)(1). Under the Administrative Procedure Act definitions that the CRA directly incorporates, *see* 5 U.S.C. § 804(3), such a "grant," *id.* § 551(9), of a "statutory exemption or other form of permission" qualifies as a "license," *id.* § 551(9). And "licensing" is "a matter other than rulemaking." *Id.*

27

§ 551(6). Licenses like EPA waivers, then, are not "rules"; they are "orders" that result from agency "adjudication[s]." *Id.* § 551(7). The CRA thus is no barrier to this Court's review.[14]

### 2.    The Resolutions are impermissible legislative adjudications

As explained, EPA's grant of a waiver to California is an adjudicatory order. Each Resolution merely nullified a single waiver grant. That violates the separation of powers.

The Constitution prohibits Congress from overturning an adjudication concluded by a different Branch. "[S]ince the beginning of the Republic," the Executive Branch has, in appropriate cases, executed laws by determining individual parties' legal rights in adjudications. *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013). Where Article III permits, the Judiciary—whose province is "to say what the law is," *id.* at 316 (Roberts, C.J., dissenting)—may review adjudications performed by the Executive and overturn unlawful ones. But whether in the first instance or on review, *Congress* exceeds its power when it declares the rights of individual parties under its own laws. *See Bowsher v. Synar*, 478 U.S. 714, 726 (1986) (constitutional structure "does not permit Congress to execute the laws"). Congress has authority to *change* the law—it cannot adjudicate disputes arising under *existing* law. *See Fletcher v. Peck*, 10 U.S. 87, 136 (1810); *cf. Plaut v. Spendthrift Farm*, 514 U.S. 211, 225 (1995) ("[R]evers[ing] a determination once made, in a particular case…. exceeds the powers of Congress.").

Congress cannot nullify a completed adjudication by the Executive Branch any more than it can nullify a final judgment of the Judiciary. *Cf. United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021) (federal agencies' adjudicatory duties "partake of a Judicial quality as well as Executive" (quotation omitted)). For agencies and (inferior) courts alike, "Congress may from time to time ordain and establish" bodies in a different Branch, U.S. Const. art. III, § 1, and may assign those bodies a power that Congress itself can never wield: the power to adjudicate rights of individual parties using substantive laws and procedural rules that Congress wrote. Congress may also

---

[14] Contrary to AmFree's suggestion, Mot. 5:27-28, the descriptive reference to the Resolutions in *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 107 n.1 (2025), does not speak to their constitutionality or to whether they were enacted "under" the CRA. That case—briefed and argued before the Resolutions' enactment—involved a different waiver action (and no joint resolution). Put simply, the issues raised here were "not at issue" there. *Id.* at 107.

28

revoke or reshuffle those assignments of adjudicatory power, or it may sway the outcomes of pending and future adjudications by changing the laws that govern the conduct of the parties or the adjudicator. But Congress lacks authority to nullify an adjudication completed by either of the other two Branches. As then-Judge Kennedy observed in *Chadha v. INS*, "[p]lenary power for making laws does not import authority to revise particular administrative dispositions." 634 F.2d 408, 434 (9th Cir. 1980); *see id.* ("[T]he greater power definitely does not include the lesser….").

Waivers are not rules; they are adjudications. *See supra* at 27:18-28:2. The Clean Air Act directs that EPA "shall" adjudicate the fact-bound application of an individual party (California) and decide, as a court would, whether the Act does or does not preempt a particular state program. 42 U.S.C. § 7543(b)(1). The direction bears no resemblance to language Congress uses when it empowers the Executive Branch to make rules for vehicle emissions. *Id.* § 7521(a). It is California, not EPA or any other federal agency, that makes the rules in the waiver context. EPA is authorized solely to determine whether the revised set of California rules—i.e., State vehicle emission standards—is preempted or not. *Id.* § 7543(b)(1).

Each Resolution did no more than nullify an EPA waiver, i.e., overturn an adjudication:

> *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled*, That Congress disapproves the rule submitted by the Environmental Protection Agency relating to [the Federal Register notice of a waiver], and such rule shall have no force or effect.

H.R.J. Res. 87, 89. There is no plausible construction of this text that could broaden its effects beyond that. *See Boumediene v. Bush*, 553 U.S. 723, 787 (2008) ("We cannot ignore the text and purpose of a statute in order to save it."). The text does not "alter[] the legal standards governing" an agency adjudication; it just "direct[s] the result" of one already-finished adjudication, *Bank Markazi v. Peterson*, 578 U.S. 212, 228 (2016), in which EPA had made "findings of fact," *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 438 (1992); *see* 42 U.S.C. § 7543(b)(1)(A)-(C). That is an unconstitutional act.

### 3.    The Resolutions violate the Tenth Amendment and structural federalism

The Resolutions arose from "failings in the national political process" that infringe on the "special and specific position [that States occupy] in our constitutional system." *Garcia v. San*

29

*Antonio Metro. Transit Auth.*, 469 U.S. 528, 554, 556 (1985). Two of the three Branches of the Federal Government joined in an unprecedented effort to invoke an extraordinary congressional procedure that everyone understood to be inapplicable, with the express aims of invalidating the laws of one particular State *and* of depriving that State of any opportunity to defend itself against the attack (including in court). These unprecedented and calculated maneuvers are "extraordinary defects in the national political process," and they make the Resolutions "invalid under the Tenth Amendment" and structural federalism. *South Carolina v. Baker*, 485 U.S. 505, 512 (1988).

1. The ordinary process under the CRA begins with Executive Branch agencies reporting their rules to Congress and the GAO. 5 U.S.C. § 801(a)(1)(A). Receipt of such a report opens a short window for a member of Congress to introduce a special "joint resolution" to disapprove the reported agency rule. *Id.* § 802(a). These specialized joint resolutions are easier to enact than most: they bypass the Senate filibuster, get prioritized consideration, allow no opportunity for amendments, and tightly limit time for debate. *Id.* § 802. But they apply only to federal agency rules. *Supra* at 27:10-15.

The CRA worked as designed—and as the Senate that passed the statute had unanimously consented to—from 1996 until last year. It was used only to target rules, and only rules issued by federal (as opposed to state) agencies. Before these Resolutions, Congress had never purported to use the CRA's procedures to disapprove an agency action where there was a dispute over whether it qualified as a CRA "rule," unless the GAO independently found the agency action *was* a rule. *See* RJN, Ex. 28 at 13-14. For example, when members of Congress believed EPA had failed to submit a waiver action in 2022, they asked the GAO to opine on whether the CRA applied. RJN, Ex. 29 at 1. The GAO agreed with EPA that it did not, on the basis that Clean Air Act waivers are orders, not rules. *Id.* at 4-7. No member of Congress introduced a joint resolution concerning that waiver action. *See* RJN, Ex. 27 at 26 & App'x B.

2. In fact, because EPA had consistently maintained that its Clean Air Act preemption waivers were orders, not rules, it had never submitted a single of these waivers to Congress. *E.g.*, 69 Fed. Reg. at 59,922 ("The [CRA] … does not apply because [the EPA waiver] action is not a rule."). EPA maintained this view even when the first Trump Administration purported to

30

withdraw parts of a waiver issued six years earlier. 84 Fed. Reg. at 51,352 ("EPA's action here …

is not a rule ..., consistent with its previous actions on waiver requests….").

Each of the EPA waivers later targeted by a Resolution followed this pattern. When considering California's waiver request, EPA did not follow rulemaking procedures. *Cf.* 5 U.S.C. § 553(b). And when granting each waiver, EPA reiterated the view that it was not a "rule" subject to the CRA. 88 Fed. Reg. at 20,725; 90 Fed. Reg. at 645. EPA did not submit the waivers to Congress, and no legislator even asked GAO to determine whether any of the actions were "rules" subject to the CRA. *See* RJN, Ex. 5 at 5.

3. Nonetheless, the Executive and Legislative Branches later sought to invoke the CRA processes that departed from this ordinary course of business. Weeks after President Trump took office in 2025, he and EPA Administrator Lee Zeldin declared, without process or explanation, that the targeted EPA waivers—which had taken effect months or years earlier—were in fact rules, not orders. RJN, Ex. 33 at 1; *see* RJN, Ex. 34 at 1 (proposing invocation of CRA to avoid both "administrative process" and "the 60-vote filibuster in the Senate"). President Trump's allies in Congress decided to play along, introducing joint resolutions of disapproval after EPA reported these waiver actions to Congress.

Asked to opine on the matter again, the GAO reaffirmed that EPA waivers are not rules to which the CRA applies. RJN, Ex. 5 at 6-9. The Senate Parliamentarian, ordinarily the Senate's "sole definitive arbiter[] of the CRA parliamentary mechanism," reached the same conclusion. RJN, Ex. 28 at 18; *see also* RJN, Ex. 60 at 1946, 1958 ("[I]n the ordinary course of business, … the parliamentarians' interpretation of" legislative procedures "are as good as binding.").

Those determinations left waiver opponents in Congress in a bind, because they wanted to override the waivers without abandoning their facial support for the filibuster or their traditional adherence to the Senate Parliamentarian's rulings on procedural issues—including whether the CRA's special procedures governed. *See* 171 Cong. Rec. S3017, S3047-48 (daily ed. May 21, 2025) (Sen. Thune); *id.* at S3087-88 (Sen. Capito). Accordingly, Majority Leader Thune teed up a "vote[] on what qualifies for [a] fast-track procedure," *id.* at S3048, and the Senate sustained a point of order that:

31

> joint resolutions that meet all the requirements of section 802 of the [CRA] or are disapproving of Agency actions which have been determined to be rules subject to the CRA by a legal decision from GAO are entitled to expedited procedures ….

*Id.* at S3051 (Sen. Thune). The Senate then fast-tracked these Resolutions "[p]ursuant to the precedent just established" in this point of order. *Id.* at S3052 (Sen. Capito as presiding officer).

At first blush, these proceedings are puzzling. The first half of the point of order—that fast-track procedures are used for joint resolutions meeting "all the requirements of section 802," *id.* at S3051—seemed to recite the status quo, 5 U.S.C. § 802. As did the second half—that these procedures are used for resolutions "disapproving of Agency actions which have been determined to be rules subject to the CRA by a legal decision from GAO." 171 Cong. Rec. at S3051; *see also* RJN, Ex. 28 at 13-14. Moreover, that second half would not apply to *these* Resolutions because GAO had already found the waivers *not* subject to the CRA.

Waiver opponents later "clarif[ied]" the procedural-rule change they had made, 171 Cong. Rec. S3099, S3140 (daily ed. May 22, 2025) (Sen. Lankford): where the *Executive Branch* determined an action to be a rule subject to the CRA, that view (as embodied in the submission to Congress) would now control, whether or not the action *was* a rule. The Senate effectively amended its internal process to substitute the term "Agency-submitted rule," 171 Cong. Rec. at S3018 (Sen. Barrasso); *accord id.* at S3088 (Sen. Capito), for "rule" as defined (still) in the CRA.

Relying on this "Agency-submitted" trigger and the Executive Branch's thirteenth-hour reports, the Senate passed each Resolution by a slim majority, and President Trump signed them. *See supra* at 5:2-9. When California and ten other States sued, the Federal Government said they had no remedy. *See supra* at 5:9-14.

4. The national political process failed California at every turn. The State was not simply outvoted, or unrepresented on a congressional committee whose members were selected in the ordinary way. *Cf. Nevada v. Watkins*, 914 F.2d 1545, 1556-57 (9th Cir. 1990). Nor was Congress merely "uninformed" or reliant "upon incomplete information." *Baker*, 485 U.S. at 513 (cleaned up). This concerted attack "singl[ing] out" individual disfavored State laws, *id.*, was orchestrated and carried out by both political Branches of the Federal Government—who professed to invoke procedures they knew did not apply and to which States had unanimously consented (through the

32

CRA) only for *other* kinds of agency actions. *Compare* RJN, Ex. 37 at 2-4, *with* RJN, Ex. 43 at 1-2; *see also* RJN, Ex. 5 at 4 (noting the CRA was enacted "to strengthen congressional oversight of agency *rulemaking*" (emphasis added)). The Executive Branch set the wheels in motion by transmogrifying adjudicatory orders into "rules" months (or years) after finalization and while judicial review was pending—providing no process or justification for the change, and thus depriving California "of any right to participate in" that step. *Baker*, 485 U.S. at 513. The Senate then made that step the crucial one when it accepted the Executive Branch's say-so as to the CRA's applicability—over the traditional arbiters of that question.

The Framers designed the federal government to "be disinclined to invade the rights of the individual States, or the prerogatives of their governments." *Garcia*, 469 U.S. at 551 (quoting The Federalist No. 46, at 332). That design failed, extraordinarily, here. So must the Resolutions.

**4.    The Senate impermissibly delegated the power to set its internal rules**

The Federal Government's process of birthing the Resolutions violated not only the Tenth Amendment and principles of structural federalism, but also the separation of powers. The Rules Clause of the Constitution grants each House of Congress exclusive and preclusive authority to set its internal rules of procedure. U.S. Const. art. I, § 5, cl. 2. To pass the Resolutions, the Senate adopted a new rule of legislative procedure that transfers to another Branch (the Executive) a power that the Constitution vests exclusively in the Senate itself: the power to decide which agency actions can be subject to extraordinary Senate procedures paralleling those of the CRA. *Supra* at 31:26-32:17. The Resolutions are unconstitutional because the Senate passed them only by abdicating its exclusive rule-setting power to the Executive Branch.

The Senate's *when you say so* regime invites the Executive to manipulate the procedure to serve Executive purposes. The President may, in his sole discretion, direct an agency head to slap a new (and errant) label "rule" on any action by a prior Administration—even from decades ago—that the President disfavors and report it to Congress, upon which the Senate will duly fast-track a resolution for disapproval of that action. It is of no moment that the Senate ceded control over its internal procedures willingly. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010). Nor does it matter that the Senate stayed *more* in control of its procedures

33

than the Executive insofar as the Senate could have changed procedures again at any time until it passed the Resolutions. The Senate had a passenger-side brake, but it still let the President drive. The Constitution demands that the Senate stay in absolute, not relative, control of its procedures. Defining internal rules of procedure "only empowers Congress to bind itself," *INS v. Chadha*, 462 U.S. 919, 955 n.21 (1983), but that is precisely why the power must be kept "independent … of the President," *id.* at 955. The procedure that resulted in the Resolutions is unconstitutional.

### B.     The Clean Truck Partnership Is Severable

Should the Court agree that the Omnibus and ACT rules are not preempted, the CTP's terms committing signatory manufacturers to selling vehicles or engines consistent with the Omnibus rule and ACT's sales requirements should be permitted to stand even if the Court concludes that the CTP is a preempted attempt to enforce the ACF 2036 sales requirement. AmFree's argument to the contrary—that the CTP is not severable—is meritless, whether the Court views the CTP as akin to a regulation or as a contract. *See Cal. Tow Truck Assoc. v. City & County of San Francisco*, 693 F.3d 847, 855, 860, 863 (9th Cir. 2012) (reciting severability principles as applied to regulations); *Marathon Ent., Inc. v. Blasi*, 70 Cal.Rptr.3d 727, 738-41, 743-45 (Cal. 2008) (cited at Mot. 22:25-26) (reciting severability principles under contract law).

As *California Tow Truck* instructs, preemption analysis operates on a "provision-by provision basis"; "the mere fact that one part of the [CTP] is preempted does not mean that other parts of the [CTP] are preempted, or that the [CTP] as a whole is preempted." 693 F.3d at 860. The Court must therefore assess "whether the [CTP] can survive, after severing provisions, if any, that are pre-empted." *Id.* at 863. It can. The only relevant term pertaining to ACF—the phrase "the 100 percent ZEV sales requirement set forth in Cal. Code Regs title 13, section 2016, as it existed on April 28, 2023"—could simply be struck. *See* CTP, App'x B at ii, ¶ 2; Heroy-Rogalski Decl., ¶ 31; *see also Ohio House, LLC v. City of Costa Mesa*, 135 F.4th 645, 676 (9th Cir. 2025) (examining whether invalid provision is "grammatically, functionally, and volitionally separable"). No other obligations would be affected, and AmFree does not argue otherwise.

Under California contract law, the "overarching inquiry is whether the interests of justice would be furthered by severance." *Marathon Ent.*, 70 Cal.Rptr.3d at 743 (cleaned up). This

34

"equitable and fact specific" analysis, *id.* at 744, looks to whether, e.g., one party has already performed, such that the other would receive an "inequitable windfall," *see id.* at 740, and whether a particular provision can be struck to "remove the unconscionable taint"—i.e., whether "the good can[] be separated from the bad," *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1272, 1273 (9th Cir. 2017) (cleaned up). As established, the CTP's sole reference to ACF's 2036 sales requirement is easily "extirpated" from the agreement. *Poublon*, 846 F.3d at 1272. Meanwhile, CARB has already completed nearly all of its commitments under CTP. Heroy-Rogalski Decl., ¶ 40. The interests of justice are thus best served, in this instance, by holding the manufacturers to all their non-preempted commitments under the CTP.

**IV.    SHOULD AMFREE PREVAIL, ANY RELIEF MUST BE APPROPRIATELY TAILORED**

Defendant Cliff has explained that AmFree lacks standing to void the CTP or to enjoin CARB from enforcing it. *Supra* Arg. Sec. I.C. Should the Court nonetheless determine that AmFree is entitled to relief, such relief should take the form of a declaratory judgment only—as AmFree now requests. *See* Mot. 1:22-25; *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) ("Equitable relief may be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." (cleaned up)); *Steffel v. Thompson*, 415 U.S. 452, 467 (1974). Severability may also be appropriate, depending on the Court's ruling. Although one outcome could merit the strikethrough of just one term, *supra* Arg. Sec. III, another could warrant invalidation of the entire agreement—despite the CTP's severability—to prevent a one-sided result in which CARB must continue meeting its obligations under the CTP while the manufacturers are largely relieved of theirs, *supra* Arg. Sec. I.C. Defendant Cliff respectfully requests that the Court allow supplemental briefing on this question should it arise.

### CONCLUSION

For the foregoing reasons, Defendant Cliff respectfully requests that the Court deny AmFree's motion for judgment on the pleadings and grant Defendant Cliff's cross-motion.

Def.'s Mem. in Opp'n to Pl.'s Mot. for J. on the Pleadings & in Supp. Def.'s Cross-Mot. (2:25-cv-03255-DC-AC)

Dated:  May 27, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General

*/s/ Cecilia D. Segal*
CECILIA D. SEGAL
Deputy Attorney General
*Attorneys for Defendant*

OK2024305825

36

Def.'s Mem. in Opp'n to Pl.'s Mot. for J. on the Pleadings & in Supp. Def.'s Cross-Mot. (2:25-cv-03255-DC-AC)