**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE, | No. 2:25-cv-03255-DC-AC_____ |
| Plaintiff, | |
| v. | **DECLARATION OF DR. JASON SCOTT JOHNSTON IN SUPPORT OF PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, SUMMARY JUDGMENT** |
| STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, | |
| Defendant. | |
| | **Date: August 7, 2026** |
| | **Time: 1:30 PM** |
| | **Place: Courtroom 10, 13th Floor** |
| | **Judge: Hon. Dena Coggins** |

I, Jason Scott Johnston, declare under penalty of perjury that the following declaration is true and correct to the best of my knowledge:

1.      My name is Jason S. Johnston. At the University of Virginia Law School, I am the Blaine T. Phillips Distinguished Professor of Environmental Law, Nicholas E. Chimicles Research Professor of Business Law and Regulation, and Director, Olin Program in Law and Economics. I am submitting this declaration in support of Plaintiff American Free Enterprise Chamber of Commerce's Reply in Support of Motion for Judgment on the Pleadings or, in the Alternative, Summary Judgment and Opposition to Defendant's Cross-Motion. I was retained by Boyden Gray PLLC to give my opinion on the economic impact of the Clean Truck Partnership on members of Plaintiff's organization.

2.      Prior to joining the University of Virginia, I was the Robert G. Fuller, Jr. Professor of Law and the founding Director of the Program on Law, Environment, and Economy at the University of Pennsylvania Law School. Over the course of my career, I have used my joint J.D. and Ph.D. in economics to pursue scholarly research on the economic impact of legal rules and

institutions, and in particular regulation and liability, on the behavior of firms. I have published dozens of articles on these subjects in leading peer-reviewed economics journals and law reviews, including the Yale Law Journal and the Journal of Law, Economics, and Organization. My most recent peer-reviewed publication, in the *International Journal of the Economics of Business,* analyzes the impact of retrospective liability for climate change on fossil fuel production. I have served on the National Science Foundation's Law and Social Science Program Advisory Panel and as an Adjunct Scholar at the Cato Institute's Center for the Study of Science.

3.     My CV is attached to this declaration.

## I.     Introduction

4.     The Clean Truck Partnership ("Partnership") imposes two primary requirements on manufacturers. *See* Third Am. Compl., Ex. A ("Partnership Agreement"), ECF No. 142-2. First, manufacturers must promise to meet tougher emission standards for air pollutants such as nitrogen oxide ("$NO_x$") emission standards. Second, the manufacturers must promise to begin reducing sales of internal combustion engine ("ICE") medium-duty ("MD") and heavy-duty ("HD") vehicles in favor of electric MD and HD vehicles (called "zero-emission" vehicles, or "ZEVs" in the Partnership), with the share of ICE vehicles dropping to zero by 2036. More specifically, signatories to the Partnership agreed to meet revised HD and MD ICE vehicle requirements under California's Omnibus Regulation, *id.* at 12,[1] to comply with the 2021 Advanced Clean Truck ("ACT") Regulation, Cal. Code Regs. tit. 13, § 1963, and to comply with the 100 percent zero-emission vehicle requirement as it existed on April 28, 2023, which is part of the Advanced Clean Fleets ("ACF") rule later adopted by the California Air Resources Board ("CARB") and incorporated into ACT, *id.* § 1963.6.

5.     The Partnership thus both increases the cost of producing ICE vehicles—through the new emission standards—and requires reduction in the supply of new ICE MD and HD vehicles. Since 2010 at least, the North American market for MD and HD engines and chassis has been highly concentrated and oligopolistic or at best imperfectly competitive. This means that

---

[1] Page numbers for citations to documents on this docket refer to ECF pagination.

producers are not simply price takers—as are, for example, producers of wheat, who sell at prices determined by an international market—but instead have the power to set price, constrained only by the fact that a higher price reduces sales.

6.    Today, the internal-combustion HD engine/chassis market is served by virtually *only* the signatories to the Partnership. Table 1[2] below depicts U.S. Class 8 truck sales for the year 2025.

| Company | Brands | 2025 Market Share |
|---|---|---|
| Daimler Trucks North America | | |
| | Freightliner | 35.2% |
| | Western Star | 5.5% |
| PACCAR | | |
| | Peterbilt | 15.3% |
| | Kenworth | 15.1% |
| Volvo Group North America | | |
| | Volvo Trucks | 9.1% |
| | Mack | 8.7% |
| Navistar/International (TRATON) | International | 11% |

**Table 1. Manufacturer Class 8 Truck Market Shares, 2025**

7.    As one can see in Table 1, four companies—Daimler, PACCAR, Volvo Group and Navistar—all of whom are signatories to the Partnership, produce and sell virtually all Class 8 HD vehicles in the United States.[3] This overview shows clearly the extreme concentration of the Class

---

[2] *See* Cliff Abbott, *2025 Ends with Surge of New Class 8 Truck Sales — but Not Enough to Offset Declines*, The Trucker (Jan. 29, 2026), https://perma.cc/KC3S-2UKZ.

[3] Signatory Cummins is an independent engine producer which makes engines for PACCAR and, to a lesser extent, Daimler; Daimler Truck's captive subsidiary Detroit Diesel builds engines for Freightliner and Western Star; PACCAR both buys engines from Cummins and makes them for Kenworth and Peterbilt; Volvo Powertrain supplies Volvo Trucks and Mac; and Navistar supplies engines to International.

HD truck market in the U.S. It is precisely the sort of market in which producers not only benefit from suppressing competition but would likely be able to effectively collude to do so. The Partnership provides an ideal mechanism for so doing.

## II.        The ICE HD Phase-Out and EV Mandate

8.        Under ACT, which the Partnership incorporates, manufacturers are required to steadily increase the fraction of ZEV HDs sold (relative to total HD sales) beginning with model year 2024. Cal. Code Regs. tit. 13, §§ 1963.1, 1963.2. Manufacturers who fail to meet the required level of ZEV HD sales must buy credits from a competitor who has gained credits by selling more ZEVs than required. The required ZEV share increases annually until reaching 1 in model year 2036, meaning that manufacturers may not sell any ICE vehicles after that year. *Id.* § 1963.6.

9.        Economic theory predicts that such a gradual replacement of ICE HD vehicles, eventually reaching 100 percent ZEV HDs, will act as a supply restriction that will allow the Partnership signatories to use higher prices to ration constrained ICE HD vehicle sales, even as they suffer losses on the sale of ZEVs. The effect is shown by Figure 1 below, which is taken from McKitrick (2024).[4]



**Figure 1.** Simultaneous EV and ICEV markets with EV sales mandate.

---

[4] Ross McKitrick, *Economic Implications of a Phased-In EV Mandate in Canada*, 57 Canadian Journal of Economics 1434, 1440 (2024).

10.    Figure 1 depicts the market for ICE vehicles on the right side and the market for ZEVs (or electric vehicles, "EVs") on the left side. Demand for ICE vehicles (right graph) and EVs (left graph) are given by the $D_{ICEV}$ and $D_{EV}$ curves, respectively, and supply for those vehicles are given by the $S_{ICEV}$ and $S_{EV}$ curves, respectively. In the ICE market, the market clearing quantity sold of ICE vehicles is given by $Q_g^*$ while the constrained quantity of such vehicles sold under an EV mandate is given by $\widetilde{\theta Q}_e$. As Figure 1 shows, when supply is constrained, the market clearing price rises, generating economic rents (supra-competitive profits) for a vehicle maker in the amount of the blue-striped box. (Correspondingly, if forced to sell a quantity $\tilde{Q}_e$ of EVs, a vehicle maker would lose an amount equal to the light gray-shaded box on the left).

11.    Figure 1 shows how a product phase-out allows a product maker in an imperfectly competitive market, such as the MD and HD chassis/engine market, to restrict supply and charge a supra-competitive price. Declarant DeMartini, a California RV dealer, has vividly described how his business has already suffered from precisely such a supply restriction and price increase. *See* Third Am. Compl., Ex. D, ECF No. 142-5. DeMartini recounts how a major RV manufacturer told him that it would supply only five Class A RV chassis in the first half of 2025—compared with the 30 usually purchased annually and incorporated into motorhomes by DeMartini. *Id.* at ¶ 14. That manufacturer also demanded a $9,000 surcharge for each chassis sold to DeMartini, with all orders non-cancellable and for immediate delivery. *Id.* This manufacturer's behavior is precisely what economic price theory predicts. The ICE phase-out is an opportunity for Partnership signatories to restrict supply and earn economic rents—supra-competitive profits—beyond those already made possible by the highly concentrated and imperfectly competitive nature of the ICE MD and HD engine market.

**III.     Manufacturers Will Pass On the Cost of Complying With Tighter NO$_x$ Emission Standards In the Form of Higher Prices**

12.     California itself has estimated that the Omnibus rule would increase purchase prices for model year 2027 to 2030 vehicles by up to $7,423.[5] Because the rule affects the average and also the marginal cost of producing vehicles, in an oligopolist industry such as that for ICE HD engines, when marginal cost changes so too does the profit maximizing level of production for each firm. Such firms face demand that declines in price, and for this reason they may not pass on cost increases dollar for dollar to higher prices, but buyers will bear at least some of the cost increase.[6] California's estimated impact of the Omnibus rule on vehicle model prices is what economic theory predicts and what the existing economic evidence from other industries.

**IV. Nationwide Impacts on Commercial Truck Buyers of California's Tailpipe Emission Standards**

13.     Because the Partnership requires signatories to comply with California's Omnibus regulation in all states that adopt it under section 177 of the Clean Air Act, Partnership Agreement at 17, the Partnership creates a split federal-state MD/HD vehicle emissions regime. The states of Colorado, Massachusetts, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington, have all agreed to implement California's Omnibus regulations,[7] and, the Partnership requires signatories to comply with Omnibus in those states.

14.     The supply restrictions attested to by declarant DeMartini pertain to California. But if the Partnership is performed as promised, price increases will likely occur in all Section 177 states. Most importantly, such price increases will not be confined to these states but will become

---

[5] CARB, *Omnibus Rule Staff Report: Initial Statement of Reasons* IX-51 Tbl. IX-35 (2020), https://perma.cc/T8XZ-CH9E.

[6] There is evidence that in such an oligopolistic industry, the price increase to buyers may be even greater than the compliance cost increase. *See* Nathan H. Miller, Matthew Osborne & Gloria Sheu, *Pass-through in a Concentrated Industry: Empirical Evidence and Regulatory Implications*, 48 RAND Journal of Economics 69, 84–86 (2017).

[7] CARB, *States That Have Adopted California's Vehicle Regulations* (last visited June 22, 2026), https://perma.cc/MH35-R267.

national in scope.

15.    To understand why, one must understand that an engine manufacturer's decision regarding which engines to produce and sell in different states is a function of both supply considerations and demand considerations. An engine manufacturer has the following choices:

    1) apply the Partnership to all products sold nationally;

    2) apply the Partnership only to products sold in Section 177, Omnibus states;

    3) cease selling in Section 177, Omnibus states and sell products that do not conform to the Partnership in the other states.

16.    A manufacturer's choice among these three strategies is determined by both demand and supply. On the demand side, the larger a manufacturer's sales are in Section 177 states that require compliance with the Omnibus standards, the greater is the demand for Omnibus-compliant MD and HD vehicles. Estimates vary, but CARB's own website indicates the following market shares. [8]

| State | Share of U.S. Heavy-Duty Vehicle Registrations |
| --- | --- |
| California | 9% |
| Colorado | 2% |
| Massachusetts | 1.7% |
| New Jersey | 2% |
| New Mexico | 0.7% |
| New York | 7.2% |
| Oregon | 1.5% |
| Rhode Island | 0.3% |
| Vermont | 0.3% |
| Washington | 2.5% |

---

[8] *Id.*

Decl. of J. Johnston in Supp. of Pl.'s Reply in Supp. of Mot. and Opp. to Def.'s Cross-Mot.          Page 7

17. According to this data, the total market share of heavy-duty registrations that have adopted Omnibus is 27% of the market.

18. This is a substantial demand side incentive for manufacturers to offer Omnibus compliant HD vehicles in all states. In addition, there is no evidence that buyers in Section 177 states demand HD vehicles that are in any way different from buyers elsewhere; indeed, as declarants Meiborg and Riggan make clear, their companies operate nationally and their trucks are driven across the country. Third Am. Compl., Ex. B ("Meiborg Decl."), ECF No. 142-3 ¶ 1; Ex. C ("Riggan Decl.") ¶ 1, ECF No. 142-4.

19. On the supply side, Omnibus compliance requires large fixed, sunk costs in ICE redesign. For example, to ensure its compliance with post 2027 standards, Daimler has reportedly: 1) changed the piston bowl to increase peak cylinder pressure and upgraded the injection system; 2) changed the turbocharger fuel injection system causing less efficient work transfer to the turbine but a hotter exhaust, for improved $NO_x$ conversion; and 3) changed the exhaust system to include a diesel oxidation catalyst ("DOC"), a diesel particulate filter ("DPF") and two selective catalytic reduction and ammonia slip catalysts each, in parallel.[9] From an economic point of view, these changes entail fixed costs, that is, costs that do not vary with the level of output, and which on an average basis must therefore decline with total output. Other things equal, producing and selling these redesigned engines nationally minimizes the average fixed cost of compliance and is profit maximizing. The alternative would require manufacturers to create separate production lines for two types of product, segregated by the type of destination state—i.e., along Section 177 lines and non-Section 177 lines. Given that no such segregated production lines currently exist, this strategy would certainly be complex and likely entail much larger fixed costs. Even the roughly $7,000 marginal cost of complying with Omnibus standards estimated by California, CARB, *Omnibus Rule Staff Report: Initial Statement of Reasons* IX-51 Tbl. IX-35 (2020), https://perma.cc/T8XZ-CH9E, may be modest compared with the cost of manufacturing two separate products.

---

[9] *See Daimler's New 15L Heavy-Duty Engine: Primed to Meet Upcoming Low $NO_x$ and GHG Regulation*, Mobility Notes (last visited June 22, 2026), https://perma.cc/TF4Q-2LR6.

20.     The manufacturers own choices thus far clearly show that these supply and demand factors have dictated a uniform product strategy. Volvo Trucks certifies its D13 engine to CARB Omnibus standards for all North American sales, not just California.[10] Daimler Truck North America's DD15 is similarly certified to CARB MY2024 Omnibus standards for all U.S. customers.[11]

21.     The fact that Omnibus-compliant states make up such a large portion of HD vehicle sales is significant, for it explains why the Partnership is imposing higher prices on and therefore harming commercial truck buyers such as declarants Riggan and Meiborg, whose trucking businesses are located, respectively, in Iowa and Illinois. Riggan Decl. ¶ 1; Meiborg Decl. ¶ 1.

Dated: June 23, 2026

/s/ Jason Scott Johnston

Jason Scott Johnston, Ph.D.
(original on file with counsel)

---

[10] Press Release, Volvo Trucks N. Am., *Volvo Trucks North America Announces It Is Seeking Certification of a CARB-24 Compliant Engine for All-New Volvo VNL and VNR Models* (Apr. 29, 2025), https://perma.cc/THC6-UKCC

[11] Press Release, Daimler Truck, *Daimler Truck Introduces New Heavy-Duty Diesel Engine Generation in North Americ*a (Feb. 23, 2026), https://perma.cc/B2S2-BQWR.

# JASON SCOTT JOHNSTON

*University of Virginia School of Law*
*580 Massie Road*
*Charlottesville, VA 22903-1738*

Office:          (434) 243-8552
Fax:             (434) 924-7536
E-mail:          jjohnston@law.virginia.edu

## EDUCATION:

Graduate:          The Joint Program in Law and Economics, The University of Michigan.

J.D., cum laude. The University of Michigan. Order of the Coif.

Ph.D., Economics. The University of Michigan. Aloca Fellow in Law and Economics.

Undergraduate:          A.B., summa cum laude. Dartmouth College. Phi Beta Kappa, Highest Distinction in Economics Major; Haney Prize for Outstanding Senior Thesis.

## PERMANENT ACADEMIC AND PROFESSIONAL POSITIONS:

2024 - 2026,
2018 - 2020          Nicholas E. Chimicles Research Professor of Business Law and Regulation

2022 - present          Blaine T. Phillips Distinguished Professor of Environmental Law

2010 - present          Director, Olin Program in Law and Economics

2010 - 2022          Henry L. and Grace Doherty Charitable Foundation Professor of Law, University of Virginia School of Law

1999 - 2010          Director, Program on Law, Environment, and Economy, University of Pennsylvania Law School

1995 - 2010          Professor, Robert G. Fuller Jr. Professor (since 2001), University Pennsylvania Law School

1989-1994:          Professor (initially Associate Professor) Vanderbilt Law School

| | |
|---|---|
| 1985-1989: | Associate (initially Assistant Professor)  Professor of Law, Vermont Law School |
| 1984-1985: | Law Clerk, The Honorable Gilbert S. Merritt, United States Court of Appeals, Sixth Circuit |

## FELLOWSHIPS, VISITING POSITIONS

| | |
|---|---|
| August, 2018: | Julian Simon Fellow, Property and Environment Research Center |
| June, 2013: | Erasmus MUNDUS Scholar, Rotterdam Institute of Law and Economics, Erasmus University Rotterdam, Netherlands |
| October, 2008 July, 2010 August, 2012 | Lone Mountain Research Fellow, Property and Environment Research Center (PERC) |
| Fall, 2007: | Bosch Fellow in Public Policy, American Academy in Berlin |
| Spring 2001: | Visiting Professor, University of Virginia School of Law |
| Summer 1998: | Olin Visiting Fellow, University of Southern California Law Center |
| Fall 1993: | Visiting Professor, University of Pennsylvania Law School |
| 1988-1989: | Senior Fellow in Civil Liability, Yale Law School |

## GRANTS AND AWARDS:

Searle Foundation Grant, 2009-2012, "Penn Workshops on Markets and the Environment"

Berlin Prize Fellowship, American Academy in Berlin, Fall 2007.

Robert A. Gorman Award for Teaching Excellence, University of Pennsylvania Law School, 2003

University Research Foundation Grant, 1998, "Studies in the Law and Economics of Litigation and Liability" (with Joel Waldfogel of Wharton).

2

**BAR ADMISSIONS:**  Idaho (Status: Inactive)


**PUBLICATIONS:**

   **Books**

*Climate Rationality: From Bias to Balance* (Cambridge University Press, 2021)

*Institutions and Incentives in Regulatory Science* (Editor and Contributor.  Lexington Press: 2012)


   **Articles and Book Chapters**


"An Economic Perspective on Contractual Excuse: Lessons from COVID-19," 30(1) *Stanford Journal of Law, Economics and Business* 72-132 (2025).

"Fossil Fuel Production under Liability for Climate *Change," International Journal of the Economics of Business*,  https://doi.org/10.1080/13571516.2025.2477688 (2025).

"Environmental Permits: Public Property Rights in Private Lands and the Extraction and Redistribution of Private Wealth," 96(4) *Notre Dame Law Review* 1559-1579 (2021).

"The EPA's Conflicted "Science" on Fine Particulate Mortality," in *Scientocracy: The Tangled Web of Public Science and Public Policy* 257-290 (Cato Institution, 2019).

"Regulatory Carrots and Sticks in Climate Policy: Some Political Economic Observations," 6 *Texas A&M L. Rev.* 107-146 (2018).

"High Cost, Little Compensation, No Harm to Deter: New Evidence on Class Actions under Federal Consumer Protection Statutes," 2017 *Columbia Business Law Review*  1-91

"The Consumer Financial Protection Bureau's Arbitration Study: A Summary and Critique," (with Todd Zywicki), *Banking & Financial Services Policy Report* 9 (2016)

"Do Product Bans Help Consumers?: Questioning the Economic Foundations of Dodd-Frank Mortgage Regulation, " 23 *Geo. Mason L. Rev.* 617-696 (2016)

"The Social Cost of Carbon: How is it Derived and how is it used to Justify America's Climate Policy?," 39 *Regulation* 36-44 (2016)

"A Positive Political Economic Theory of Environmental Federalization," 64 *Case Western Res. L. Rev.* 1549-1619 (2014) (Symposium Issue: PERC/LEC Workshop

on Environmental Federalism)

"Disasters and Decentralization." 37 *Geneva Papers Risk & Insurance* 228-256 (2012)

"Fire Suppression Policy, Weather, and Western Wildland Fire Trends: An Empirical Analysis," in *Wildfire Policy: Law and Economic Perspectives* 158-177 (Karen Bradshaw and Dean Lueck, eds., 2012)(with Jonathan Klick).

"Reforming State Consumer Protection Liability: An Economic Approach," 2010 *Columbia Business Law Review* 1-109 (2010)(with Henry Butler).

"Problems of Equity and Efficiency in the Design of International Greenhouse Gas Cap    and Trade Schemes," 33 *Harvard Environmental Law Review* 405-430 (2009).

"The Law and Economics of Environmental Federalism: Europe and the United States Compared," 27 *Virginia Environmental Law Review* 207-274 (2009)

"Fashioning Entitlements: A Comparative Law and Economic Analysis of the Judicial Role in Environmental Centralization in the U.S. and Europe" (with Michael G. Faure), in *Responsibility and Governance* (Giorgio Brosio, et. al., eds. ,Edward Elgar, 2009).

"Climate Change Confusion and the Supreme Court: The Misguided Regulation of Greenhouse Gas Emissions under the Clean Air Act," 84 *Notre Dame L. Rev.* 1-75 (2008).

"A Looming Policy Disaster," 31 *Regulation* 38-44 (Fall, 2008).

"Tradable Pollution Permits and the Regulatory Game,"  in *Moving to Markets in Environmental Regulation: Lessons from Twenty Years of Experience*  353-385 (Charles Kolstad and Jody Freeman, eds., Oxford  University Press, 2007).

"The Promise, and Limits of Voluntary Approaches to Regulatory Reform: An Economic and Legal Analysis of EPA's Metal Finishing Industry Strategic Goals Program," in *Leveraging the Private Sector* 167-200 (Cary Coglianese and Jennifer Nash, eds., Resources for the Future Press, 2006).

"The Return of Bargain: An Economic Theory of How Standard Form Contracts Enable Cooperative Negotiation between Businesses and Consumers," 104 *Michigan Law Review*  857-898 (2006).

"The Rule of Capture and the Economic Dynamics of Natural Resource Use and Survival Under Open Access Management Regimes, 35 *Environmental Law* 855-898 (2005).

"The Tragedy of Centralization: The Political Economics of American Natural Resource Federalism," 74 *University of Colorado Law Review* 487 – 649 (2003)

"Paradoxes of the Safe Society: A Rational Actor Approach to the Reconceptualization of Risk and the Reformation of Risk Regulation," 150 *University of Pennsylvania Law Review* 747-786 (2003)

"A Game-Theoretic Analysis of Alternative Institutions for Regulatory Cost-Benefit Analysis," 150 *University of Pennsylvania Law Review* 1343-1428 (2002)

"On the Market for Ecosystem Control," 21*Virginia Journal of Environmental Law* 130 – 187 (2002)

"Does Repeat Play Elicit Cooperation? Evidence from Federal Civil Litigation," (with Joel Waldfogel), 31(1) *Journal of Legal Studies* 39 -60 (June, 2002)

"The Law and Economics of Environmental Contracts," in Kurt Deketelaere and Eric Orts, eds., *Environmental Contracts: Comparative Approaches to Regulatory Innovation in the United States and Europe* 271-304 (2000).

"Experimental Results on Bargaining under Alternative Property Rights Regimes," (with Rachel Croson), *Journal of Law, Economics and Organization* 16(1): 50-73 (April 2000).

"On the Commons and the Common Law," in Roger Meiners and Andrew Moriss, eds.*, The Common Law and the Environment* 211-242 (2000).

"Communication and Courtship: Cheap Talk Economics and the Law of Contract Formation," 85 *Virginia Law Review* 385-501 (1999).

"Rules and the Possibility of Social Cooperation," in Linda Meyer, ed. *Rules and Reasonings*: *Essays in Honor of Frederick Schauer* 109-126 (1999).

"Legal Formalities," in Peter Newman, ed., *The New Palgrave Dictionary of Economics and Law* (1998).

"The Statute of Frauds," in Peter Newman, ed., *The New Palgrave Dictionary of Economics and Law* ( 1998).

"Million Dollar Mountains: Prices, Sanctions, and the Economic Theory of Collective Social and Environmental Goods," 146 *University of Pennsylvania Law Review* 1327-1370 (1998).

"The Statute of Frauds and Business Norms: A Testable Game-Theoretic Model," 144 *University of Pennsylvania Law Review* 1859-1912 (1996).

"Bargaining Under Rules versus Standards," 11 *Journal of Law, Economics and Organization* 256-281 (1995).

"Default Rules/Mandatory Principles: A Game Theoretic Analysis of Good Faith and the Contract Modification Problem," 3 *S. Cal. Interdisc. L.J.* 1701-1754 (1993).

"The Influence of *The Nature of the Firm* on the Theory of Corporate Law," 18 *J. Corp. Law* 213-244 (1993).

'Opting In and Opting Out:  Bargaining for Fiduciary Duties in Cooperative Ventures," 70 *Washington University Law Quarterly* 291-340 (1992).

"Uncertainty, Chaos and the Torts Process:  An Economic Analysis of Legal Form," 76 *Cornell Law Review* 341-400 (1991).

"Strategic Bargaining and the Economic Theory of Contract Default Rules," 100 *Yale Law Journal* 615-664 (1990).

"Law, Economics and Post-Realist Explanation," 24 *Law and Society Review*, 1217-1254(1990).

"Bayesian Fact-Finding and Efficiency:  Toward An Economic Theory of Liability Under Uncertainty," 61 *Southern California Law Review* 137-181 (1987).

"Punitive Liability:  A New Paradigm of Efficiency in Tort Law," 87 *Columbia Law Review* 1385-1446 (1987).

**Comments, Notes, Reviews, Online Contributions**

"Restoring Science and Economics to EPA's Benefit Calculation," The Regulatory Review, October 15, 2018, available at https://www.theregreview.org/2018/10/15/johnston-restoring-science-economics-epa/.

"Restoring Objectivity and Balance to Regulatory Science: A Comment on Dudley and Peacock," 24 *Supreme Court Economic Review* 101-108 (2017).

"The Freedom to Fail: Market Access as the Path to Overcoming Poverty and Inequality," 40 *Harv. J. L. & Pub. Policy* 41-49 (2017)

"Public Nuisance Liability for Greenhouse Gas Emissions: A Cause of Action that Should not Exist,"160 *University of Pennsylvania Law Review PENNumbra* 33 (2011) (opening statement of online debate with Dean Heidi Hurd of the University of Illinois, "Climate Change and the Courts")

"Desperately Seeking Numbers: Global Warming, Species Loss, and the Use and Abuse of Quantification in Climate Change Policy," 155 *U. Pa. L. Rev.* 1901-1924 (2007).

**"**Investment, Information, and Promissory Liability," 152 *U. Pa. L. Rev.* 1923-1946 (2004).

"Law, Judicial Review, and Formal Models of the Regulation Game: A Comment on de Figueiredo & de Figueiredo," 4 *Business & Politics* 183-185 (2002).

6

"Should the Law Ignore Commercial Norms?: A Comment on the Bernstein Conjecture and Its Relevance for Contract Law Theory and Reform," 99 *Michigan Law Review* 1791- 1810 (2001).

"Not So Cold An Eye:  Richard Posner's Pragmatism" (Review), 44 *Vanderbilt Law   Review* 743-767 (1991).


**SELECTED LECTURES AND PRESENTATIONS:**

2023-2025: Invited Participant, Federalist Society Senior Scholars Summer Retreat

2023, 2025: Invited Participant, International Center for Law and Economics Affiliates Retreat

2020:   Panelist, Federalist Society Conference, "COVID-19 and the Law"
"Environmental Permits: Public Property Rights and the Extraction and Redistribution of Private Value," NYU Classical Liberal Institute Conference on Public Valuation of Private Assets"

2019:   Debate Participant, ABA National Class Action Institute, "Class Actions and Deterrence"

2017:   "High Cost, Little Compensation, No Harm to Deter: New Evidence on Class Actions under Federal Consumer Protection Statutes," Stanford Law School, Law and Economics Workshop


2016:   "High Cost, Little Compensation, No Harm to Deter: New Evidence on Class Actions under Federal Consumer Protection Statutes," Harvard Law School, Law and Economics Workshop

2015:
"Do Product Bans Help Consumers? Questioning the Economic Foundations of Dodd-Frank Mortgage Regulation," Harvard Law School, Law and Economics Workshop

"Is Every Regulation Cost-Benefit Justified? The Costs of Methodological Pluralism in Benefits Estimation," Society for Cost-Benefit Analysis Annual Meeting

2013:   "Class Actions versus Arbitration: New Evidence and New Normative Questions," George Mason University Law and Economics Center, Eighth Annual Symposium on Civil Justice Issues;

 "From Nudges to Mandates: Dodd Frank Mortgage Regulation as a Case  Study in Behavioralist Policy   Paradox," Rotterdam Institute of Law and Economics, Erasmus University, and Joint Workshop of the European Association of Law and   Economics and the Geneva Association of Risk and Insurance, University of Girona;

"Regulation with Interested Experts," Annual Meeting of the American Law and Economics Association.

2012: ""Economic Implications and Insights"(excerpt from *Global Warming and the End of Environmental Law,* draft book manuscript), Property and Environment Research Center;

"Regulation with Interested Experts," International Society for New Institutional Economics Annual Meeting;

"Class Actions versus Arbitration:  New Evidence and New Normative Questions," George Mason University Law and Economics Center, Workshop  on Arbitration;

"Competition and Regulation in the New World of Commoditized and Unbundled Legal Products," George Mason University Law and Economics Center,  Conference "Unlocking the Law."

2011: "Disasters and Decentralization," Joint Workshop of the European Association of Law and Economics and Geneva Association on Risk and Insurance ("Climate Change and Insurance"), University of Innsbruck

2010**:** "On the Obstacles to Government-Directed Green Growth," OECD conference ("Regulatory Policy at the Crossroads")

"The Omitted Variables Problem in Studies of the Climate-Wildfire Causal Connection," University of Arizona Workshop on the Law and Economics of Wildfire

"The Structure and Process of the IPCC: A Critique," Property and Environment Center Workshop

"The Influence of the IPCC's Structure and Process on the Evolution of Climate Science and Policy," Penn Workshop on Markets and the Environment

"Uncertainty and Climate Change Policy," University of Virginia Debate on Uncertainty in Climate Change Science and Policy

2009: "Wildfire, Climate and Policy," Penn Workshops on Markets and the Environment

2008:

"Consumer Harm Acts? An Economic Analysis of State Consumer Protection Laws," (with   Henry Butler) presented to the Harvard Law and Economics Workshop, Harvard Law School

"Climate Change Confusion and the Supreme Court: The Misguided Regulation of Greenhouse Gas Emissions under the Clean Air," presented at the Georgetown University Law Center Environmental Law and Policy Seminar

"The Complexity and Cost of the Lieberman-Warner Climate Change Security Act," presented to the U.S. Chamber of Commerce

2007:

Commentator and Principal Organizer, University of Pennsylvania Law Review Volume 155 Symposium, "Responses to Climate Change: Law, Economics and Science," November, 2006.

"Fashioning Entitlements,…" presented to the Environmental Law and Economics Seminar, University of Arizona, April, 2007.

"Climate Change Litigation: The Interaction of Science and Economics," Brookings/AEI Joint Regulatory Studies Program, Symposium on Scientific Evidence in the Courts, Georgetown University Law School, June, 2007.

2006:

Commentator on Eric Maskin (Institute for Advanced Study, Princeton), On the Rationale for Penalty Default Rules, Conference on the "Law and Economics of Contracts," Columbia University Law School.

Presentation of "Centralization versus Decentralization in the Regulation and Management of Large Scale Risks" at the Law and Economics Workshop, University of Virginia School of Law.

Presentation of "Centralization versus Decentralization in the Regulation of Large Scale Risks," American Law and Economics Association Annual Meetings, University of California, Berkeley.

Referee and Commentator (Environmental Law), Stanford/Yale Junior Faculty Colloquium

2005:

"Signaling Social Responsibility: The Law and Economics of Market Incentives for Corporate Environmental Performance," New Directions in Regulation Seminar, Kennedy School of Government, Harvard University

"Centralization versus Decentralization in the Regulation and Management of Large Scale Risks," Montreal-Toulouse Conference on the Law and Economics of Risk Management, University of Montreal/University of Toulouse Departments of Economics

"Fashioning Entitlements: A Brief Analytical History of the Judicial Role in American Environmental Regulation," Symposium on Environmental Policies in Decentralized Governmental Systems, Alghero, Sardinia, University of Turin Department of Economics

"The Rule of Capture in American Environmental and Land Use Law: An Economic Analysis," Conference on the Rule of Capture and its Consequences, Northwestern Law School, Lewis & Clark College

"Tradable Pollution Permits and the Regulatory Game," University of Arizona, Department of Agricultural and Resource Economics Colloquium

"Regulatory Structure and Market Incentives for Clean Technology: on Optimal Grandfathering," Temple University Law School Conference on Environmental Regulation and Intellectual Property

"Signaling Social Responsibility," Vanderbilt University Law School and Owen School of Business, Law and Economics Seminar

2004:

"The Return of Bargain: An Economic theory of Standard Form Contracts and the Negotiation of Business Relationships," University of Pennsylvania Law School Fall Retreat, and University of Arizona Law School Faculty Enrichment Colloquium Seminar, University of Chicago Law School

2003:

"The Promise and Limits of Voluntary Approaches to Environmental Regulatory Reform," Harvard University/Resources for the Future conference, "Leveraging the Private Sector"

"Tradable Pollution Permits and the Regulatory Game," University of California, Santa Barbara, Bren School of the Environment, Workshop on Thirty Years of Economic Incentive Schemes in Environmental Regulation

"Signaling Social Responsibility," University of Michigan Law School, Law and Economics Workshop; American Law and Economics Association Annual Meetings

2002:

"Thresholds, Tipping Points and the Law," Stanford Law School Law and Economics Workshop

2001:

"A Game Theoretic Analysis of Alternative Institutions for Regulatory Cost-Benefit Analysis," University of Virginia School of Law, Olin Law and Economics Workshop.

2000:

"Adversarial versus Inquisitorial Regulatory Cost-Benefit Analysis", American Law and Economics Association Meeting, New York University School of Law, Georgetown University Law Center, Duke University School of Law.

"Law and Commercial Norms: What do we Learn from Private Lawmaking?", University Of Michigan Law School conference on Empirical Methods in Commercial Law Scholarship.

"Does Repeat Play Enhance Cooperation? Evidence from Federal Civil Litigation," (with Joel Waldfogel), National Bureau of Economic Research Summer Institute, Cambridge, Massachusetts.

"On the Market for Ecosystem Control," University of Virginia School of Law Conference ("Saving Nature")

1999:

"The Law and Economics of Environmental Contracts," Wharton/Penn Law Impact Conference; University of Texas Law School Faculty Colloquium.

"Why History Matters" American Law and Economics Association Annual Meeting, Yale Law School.

1998:

"Communication and Courtship," Cornell Law School Faculty seminar:

"The Economics of Environmental Regulation and Enforcement," Stanford Law School Environment and Natural Resource Policy Seminar.

"Experimental Evidence on Bargaining under Alternative Property Rights Regimes," American Law and Economics Association Annual Meetings, University of California, Berkeley.

"On the Commons and the Common Law," PERC Conference on the Common Law and the Environment

1997:

"Million Dollar Mountains," University of Pennsylvania Symposium on Law and Incommensurability.

"Communication and Courtship," New York University, Law, Economics and Politics Colloquium.

1996:

"Legal Enforcement of Contracts and the Evolution of Cooperation," Gruter Institute Symposium on Law, Biology and Evolution.

11

"The Statute of Frauds and Business Norms," University pf Pennsylvania Symposium on Law, Economics and Social Norms; Law & Society Assoc. Annual Meetings, Glasgow, Scotland.

1995:

"The Regulation of Solid Waste.  An Economic Approach," University of Pennsylvania Roundtable on Environmental Federalism and the Regulation of Solid and Hazardous Waste.

"Discovering Contract," American Law and Economic Association.  Annual meetings, University of California at Berkeley.

"Statutory Interpretation and Legislative Incentives, " University of California at Berkeley, Workshop on the Economics of Law and Organizations.

1994:

Comment on Klausner, University of Pennsylvania Law and Economics Institute Roundtable on the Regulation of Mutual Funds.

"Bargaining Under Rules versus Standards": Stanford University Law and Economics Workshop; Cardozo Law School, Yeshiva University, Legal Theory Workshop; University of Chicago Law and Economics Workshop.

"Cheap Talk, Sunk Costs, and Contractual Liability in Preliminary Negotiations": American Law & Economics Association Annual Meetings, Stanford Law School.

1993:

"Bargaining Under Rules versus Standards": University of Pennsylvania Law and Economics Seminar, Public Choice Society Annual Meetings, Duke University Law and Economics Seminar.

"Notes on the Economic Theory of Legal Evolution":  American Law and Economics Association Annual Meeting, Northwestern University Law School.

1992:

"The Economic Analysis of Contract Remedies:  An Updated Survey": AALS Annual Meeting Contracts Section.

"Empathy and Economics": University of Toronto Law and Economics Seminar.

"Bargaining and Form," Duquesne Law and Economics Symposium; American Law and Economics Association Annual Meeting; Washington University Political Economy Center Seminar.

"Nonlinear Economics and the Theory of Legal Evolution" (Comments on Ayres, Hadfield and Kornhauser), American Law and Economics Association Annual Meetings.

12

"Statutory Interpretation and Legislative Incentives," Public Choice Society Annual Meetings, Panel on Positive Political Theory and Statutory Interpretation.

"Consequences of Constructionism, George Mason University Legal Studies Workshop.

"On the Economic Relevance of Default Rules," University of Southern California Law Center Symposium on Default Rules in Contract Law.

1991:

"Opting In and Opting Out"  Bargaining for Fiduciary Duties in Cooperative Ventures," Washington University Law and Economics Center Conference on Corporate Law; The University of Michigan Law and Economics Workshop; European Association of Law and Economics Annual Meeting.

"Empathy and Economics" Law and Society Annual Meetings; Socioeconomic Society Annual Meeting.

"Bargaining and Form"  University of California, Berkeley, Law and Economics Seminar; Northwestern University Law Faculty Seminar.

"Statutory Interpretation and Legislative Incentives": Georgetown University Law and Economics Seminar; University of Southern California Law and Social Theory Workshop.

Discussant: "Rational Choice in Law and Economics": Inaugural Meeting, American Law and Economics Association, University of Illinois.

1990:

"Opting In and Opting Out: Bargaining for Good Faith in Cooperative Ventures": University of Pennsylvania, Law and Economics Seminar.

"An Economic Theory of Good Faith and Cooperation": Vanderbilt Legal Theory Workshop.

1989:

"*Hadley v. Baxendale* and Bargaining Around the Law": Vanderbilt University Microeconomic Theory Seminar

1988:

"Form and Incentives": Yale Law School, Law, Economics and Organization Workshop.

"Rules versus Standards": McGill University Law Faculty, Law and Public Policy Workshop.

1987:

"Rule 11 and the Social Value of Private Lawsuits": Vermont Bar Association Annual Meeting

"Current Issues in the Law of Damages:  A Law and Economics Perspective": Vermont Judicial College.

"Tort Reform and Our Future"; Charles Ives Taggart Lecture, University of Vermont Medical Center.

"Uncertain Fact Finding and Efficiency": Yale Law School Civil Liability Workshop.

"Jury Verdicts in Vermont Since 1980": Testimony on Tort Reform Before the Vermont House Judiciary Committee.

**OTHER PROFESSIONAL ACTIVITIES:**

Member, Federalist Society Working Group on Enforcement and Agency Coercion, 2016-

Adjunct Scholar, Center for the Study of Science, Cato Institute, 2016 -- 2019

Board of Directors, Searle Civil Justice Center, Northwestern University, 2008-2009

Board of Overseers, University of Arizona Program on Economics, Law and the Environment, 2008-2010

American Law and Economics Association:
  Member, Board of Directors, 1996-1999;
  Member Nominating Committee, 1996-1997;
  Annual Meeting Program Committee, 1998-99, 2005.
   2009

American Association of Law Schools, Law and Economics Section;
  Section Chair, 1998, 2015
  Executive Committee Member, 1990, 1993.

National Science Foundation Law and Social Science Program,  Member, Advisory Panel, 1994-1996.

Board of Editors, *Law and Society Review,* 2000-2004.

Member, Board of Regents, Multistate Working Group on Environmental Management Systems Policy Academy,  2000-2002

14

Executive Committee, American Association of Law Schools, Contract Law Section, 1991.

Instructor, Brookings Institution/American Enterprise Institute,  Judicial Education Program, 2003-2007

Referee,  Cambridge University Press; Harvard University Press; Oxford University Press; MIT Press; Princeton University Press; University of British Columbia Press; Yale University Press;  National Science Foundation, Israel Science Foundation; *De Jure; International Review of Law and Economics*; *Science; Journal of Environmental Economics and Management; Journal of Law and Economics; Journal of Law, Economics and Organization; Journal of Legal Studies; Journal of Regulatory Economics; Law and Social Inquiry; Bulletin of Economic Research; Governance.*

**LAW SCHOOL ADMINISTRATIVE SERVICE:**

Vice-Chair, Faculty Appointments Committee, University of Virginia Law School, 2013-2014
Chair, Workshop Committee, University of Virginia Law School, 2012-2013.
Director, Program on Law, Environment and Economy, University of Pennsylvania Law School, 1999 - 2010
Chair, University of Pennsylvania Law School Technology Committee, 1998-2000.
Chair, University of Pennsylvania Law School Appointments Committee 1995-1997.
Chair, Vanderbilt University Law School Workshop Committee 1991-1993.
Member, Vanderbilt University Law School Faculty Appointments Committee 1990-1992.

15