# Exhibit 15

## (FTC Statement on CTP Investigation)

**Statement of the Federal Trade Commission Regarding**
***The Clean Truck Partnership Investigation***
**FTC File Number 251-0054**
August 12, 2025

Today, the Federal Trade Commission ("FTC") closed its investigation into whether several truck and engine manufacturers and their trade association violated the antitrust laws by entering into the "Clean Truck Partnership" ("CTP") with one another and with the California Air Resources Board ("CARB"). The Commission has determined that the truck and engine manufacturers and their trade association's commitments to the Commission, together with actions taken by other federal regulators, have accomplished the agency's objectives in this investigation. This statement explains the Commission's decision and provides guidance to market participants, public authorities, and the general public about the Commission's view of the CTP and analogous agreements between private actors and States that may undermine American dynamism.

## I.      Background on the Commission's Investigation

From 2020 to 2023, CARB issued three regulations that sought to reduce greenhouse gas emissions from medium- and heavy-duty trucks with internal combustion engines ("ICE trucks"): (1) the Advanced Clean Trucks Regulations ("ACT"), (2) Advanced Clean Fleets Regulations ("ACF"), and (3) the Heavy-Duty Engine and Vehicle Omnibus Regulations ("Omnibus," collectively the "Heavy Truck Regulations"). CARB then requested waivers from the EPA for each of the Heavy Truck Regulations, which would otherwise have been preempted by the federal Clean Air Act.[1]

The ACT and ACF required truck and engine manufacturers to sell and promote certain percentages of zero-emission trucks in California. The Omnibus regulation imposed stringent emissions standards on ICE trucks. Collectively, these regulations had a substantial effect on the market for heavy duty ICE trucks in California, reducing supply and increasing prices.[2]

---

[1] See 42 U.S.C. § 7543(b) (enabling the State of California to request a waiver from Clean Air Act emissions regulations).

[2] *Cleaner Vehicles: Good for Consumers and Public Health*, Hr'g Before the Subcomm. on Clean Air, Climate, & Nuclear Safety of the S. Comm. on Env't & Pub. Works, 118th Cong. 4 (Apr. 18, 2023) (statement of Andrew Boyle, First Vice Chair, American Trucking Ass'n) ("[E]ach [battery electric vehicle (BEV)] truck costs 2–3× that of today's clean diesel truck (a roughly $300,000 upcharge per unit) and it's easy to see that the negative economics of BEVs would be felt severely by the trucking industry and in turn shared by shippers and consumers."); *It's Electric: A Review of Fleet Electrification Efforts*, Hr'g Before the Subcomm. on Highways & Transit of the H. R. Comm. on Transp. & Infrastructure, 118th Cong. 7 (Apr. 30, 2024) (statement of Taki Darakos, Vice President, Vehicle Maint. & Fleet Serv., PITT OHIO) ("It could be done without subjecting fleets to the enormous expense of ZEV technology vehicles that are not readily available…."); CARB, *Staff Memorandum to Board re: California Truck Availability Analysis*, at 6 (Sept. 25, 2024) ("This has led to significantly fewer legacy engines being available."); CARB, *Staff Memorandum to Board re: California Truck Availability Analysis*, at 10 (Sept. 25, 2024) ("California zero-emission trucks (ZET) have <u>increased</u> in price by an average of $86,512 since 2021–22."); see also Press Release, Office of Neb. Att'y Gen. Mike Hilgers, *Attorney General Hilgers Leads 24 States in Opposing California's Electric Truck*

Four companies control roughly 99 percent of the heavy-duty truck market in the United States—Daimler Truck North America LLC, International Motors, LLC (formerly known as Navistar, Inc.), PACCAR Inc, and Volvo Group North America, LLC (collectively, the "OEMs").[3] After issuing the Heavy Truck Regulations, CARB entered into the CTP with the OEMs on July 6, 2023. Under the CTP, the OEMs agreed with CARB and among themselves to abide by the Heavy Truck Regulations—with certain modifications as granted under the CTP.

The antitrust concerns are obvious: a group of competitors controlling essentially all of a market contemporaneously signed a self-styled "Agreement" under the auspices of government that contains caps on the sales of certain products in that market and collectively adopted emissions limits that, in practice, would similarly limit production. Our antitrust laws take the dimmest possible view of agreements among competitors to restrict output or otherwise to cease competing.[4] Worse still, the output restrictions at issue here affected a critical trucking sector that powers the entire American economy. The Commission could not turn a blind eye to the dangers posed by this agreement.

While certain state regulations may be immune from antitrust scrutiny under the Sherman Act and Clayton Act under the "state action" doctrine, "given the fundamental national values of free enterprise and economic competition that are embodied in the federal antitrust laws, state-action immunity is disfavored, much as are repeals by implication."[5] Likewise, although the *Noerr-Pennington* doctrine provides some space for cooperating with one's competitors to petition the government to redress shared grievances, the doctrine "does not extend to every concerted effort that is genuinely intended to influence governmental action."[6] We must therefore construe these

---

*Mandate* (Sept. 16, 2024) ("[E]lectric trucks are inefficient and costly and will harm Nebraskans by increasing the costs of interstate transportation, raising prices for goods….").

[3] Josh Fisher, *Fleets Explained: History of the 7 Major Heavy-Duty Truck Manufacturers in the U.S.*, FleetOwner (Oct. 4, 2024), https://www.fleetowner.com/fleets-explained/article/55127030/fleets-explained-history-of-the-7-major-heavy-duty-truck-manufacturers-in-the-us ("Today, seven brands from four global companies account for 99.9% of all new Class 8 truck sales in the U.S."); Keiron Greenhalgh, *Economic Factors Bombard Truck Makers from All Angles*, Transport Topics News (May 23, 2025), https://www.ttnews.com/articles/truck-makers-economics (displaying a graph that shows Daimler, Paccar, Volvo, and International Motors account for 98.5% of the U.S. market for heavy-duty freight trucks); Gov. Gavin Newsom, Executive Order N-27-25, Executive Department of the State of California (June 12, 2025) ("[O]n July 5, 2023, the California Air Resources Board reached an agreement with manufacturers that represent over 90 percent of California's truck market ….").

[4] *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007) ("A horizontal cartel among competing manufacturers … that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful.").

[5] *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 225 (2013) (citation omitted); see also *Parker v. Brown*, 317 U.S. 341, 352 (1943) (holding that the Sherman Act does not prohibit anticompetitive restraints imposed by a state "as an act of government," and thus state-mandated raisin marketing program was immune from federal antitrust liability); *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980) ("First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy; second, the policy must be actively supervised by the State itself.'" (quoting *City of Lafayette v. Power & Light Co.*, 435 U.S. 389, 410 (1978))).

[6] *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 425 (1990) (citation and quotation marks omitted**)**; *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) (providing that certain joint efforts to

2

doctrines to protect only the politically accountable exercise of state governmental powers and legitimate petitioning activities, rather than shield anticompetitive conduct and unchecked delegations of state authority that contravene the federal policy in favor of competition.[7]

Three important aspects of the CTP, at minimum, move it outside the heartland of those doctrines and thus create serious antitrust concerns. *First*, the form of the CTP "Agreement" as a single document signed by all the significant competitors in a market is decidedly different than a traditional regulation imposed by a politically accountable state regulator in accordance with the dictates of a clearly articulated state policy. The multilateral form of the CTP raises the specter of one OEM attempting to enforce the CTP's output restrictions against its competitors. Whether or not an OEM would succeed in attempting to enforce the agreement against a competitor, even the *possibility* of cross-enforcement could have real and detrimental effects on the OEMs' incentive and ability to compete unilaterally and freely in this market. And any actual cross-enforcement amounts to a *de facto* delegation of regulatory authority to private entities and eliminates the traditional political accountability underlying the state-action doctrine.[8]

*Second*, in a provision that FTC staff has aptly taken to calling the "Dead Hand Provision," the OEMs committed to the output reductions mandated by the Heavy Truck Regulations *even if CARB lacked authority to implement them*. Paragraph 2 of the CTP states:

> The OEMs commit to meet, in California, the relevant provisions of the CARB regulations set forth in Appendices A and B, and any agreed upon modifications to such regulations as set forth in this Agreement, irrespective of the outcome of any litigation challenging the waivers or authorizations for those regulations or of CARB's overall authority to implement those regulations.

In other words, even if a court concluded that CARB lacked the authority to compel compliance with the Heavy Truck Regulations, the OEMs agreed amongst themselves to implement them

---

influence public officials are generally protected by the First Amendment right to petition the government); see also *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).

[7] *Nat'l Soc'y of Prof. Engineers v. United States*, 435 U.S. 679, 695 (1978) ("The heart of our national economic policy long has been faith in the value of competition." (quoting *Standard Oil Co. v. FTC*, 340 U.S. 231, 248 (1951))).

[8] *N.C. State Bd. of Dental Examiners v. FTC*, 574 U.S. 494, 505 (2015) ("Immunity for state agencies, therefore, requires more than a mere facade of state involvement, for it is necessary in light of *Parker*'s rationale to ensure the States accept political accountability for anticompetitive conduct they permit and control."); *Phoebe Putney Health Sys.*, 568 U.S. at 224–25 ("[U]nder certain circumstances, immunity from the federal antitrust laws may extend to nonstate actors carrying out the State's regulatory program. But given the fundamental national values of free enterprise and economic competition that are embodied in the federal antitrust laws, 'state-action immunity is disfavored, much as are repeals by implication.' Consistent with this preference, we recognize state-action immunity only when it is clear that the challenged anticompetitive conduct is undertaken pursuant to a regulatory scheme that 'is the State's own.' Accordingly, '[c]loser analysis is required when the activity at issue is not directly that of' the State itself, but rather 'is carried out by others pursuant to state authorization.' When determining whether the anticompetitive acts of private parties are entitled to immunity, we employ a two-part test, requiring first that 'the challenged restraint . . . be one clearly articulated and affirmatively expressed as state policy,' and second that 'the policy . . . be actively supervised by the State.'" (citations omitted)).

voluntarily. This provision complicates, and may well remove, any basis for the OEMs to invoke the state-action or *Noerr-Pennington* doctrines. The OEMs had, on one view, jointly agreed to output restrictions that the state entity lacked authority to impose by traditional state action. CARB's regulatory authority was definitively resolved when the President signed the Congressional Review Act ("CRA") disapprovals of CARB's EPA waivers.[9] The adoption of the CRA resolution rescinded the EPA's approval of CARB's regulations, rendering them a nullity and, in turn, removing any potential defense that CARB or the OEMs were acting pursuant to a clearly articulated state policy of which a "foreseeable result" would be facial output restriction. Whether the CRA waiver revocation formally triggered the Dead Hand Provision is an open question on which the Commission takes no position. But if it did, the CTP would be left as an agreement between competitors to reduce output without any traditional source of regulatory authority. Such an agreement obviously raises grave antitrust concerns.

*Third*, the Dead Hand Provision imposes output restrictions that are outside of the direct political control of the California legislature because it contains no obvious mechanism for California's politically accountable bodies to remove or modify the terms of the agreement. Political accountability is one of the animating principles of the state-action doctrine.[10] The doctrine requires both that the government-imposed restraint be clearly articulated government policy and be supervised by state officials so that, should the restraint prove not to advance public welfare, the people may clearly identify and punish those responsible for the restraint at the ballot box.[11]

The CTP sets in stone a quasi-regulatory scheme that, by virtue of its form as a contract with private entities, limits the ability of California voters to revisit the wisdom of that scheme in light of changing market conditions. Hence the label of "Dead Hand Provision" for this feature of the CTP. While California's current legislature or governor may approve of CARB's decision to permanently bind the state to this scheme, the CTP, by its own terms, operates to bind California even if unacceptable increases in transportation costs cause political pressure to revise the CTP. While California could in theory remedy this defect, the Commission must evaluate the CTP by

---

[9] *Diamond Alternative Energy v. EPA*, No. 24-7, slip op. at 4, n.1 (U.S. Sup. Ct. June 20, 2025) ("Acting under the Congressional Review Act, Congress recently passed and the President signed legislation to block [California's] regulations." (citing H.J. Res. No. 88, 119th Cong., 1st Sess. (2025))); see also Briefings & Statements, The White House, Congressional Bills H.J. Res. 87, H.J. Res. 88, H.J. Res. 89 Signed into Law (June 12, 2025), https://www.whitehouse.gov/briefings-statements/2025/06/congressional-bills-h-j-res-87-h-j-res-88-h-j-res-89-signed-into-law/.

[10] *N.C. State Bd. of Dental Examiners*, 574 U.S. at 505 ("Immunity for state agencies, therefore, requires more than a mere facade of state involvement, for it is necessary in light of *Parker*'s rationale to ensure the States accept political accountability for anticompetitive conduct they permit and control."); *Phoebe Putney Health Sys.*, 568 U.S. at 228–29; *Midcal*, 445 U.S. 103–04 ("[I]mmunity for state regulatory programs [from federal antitrust violations] is grounded in our federal structure. 'In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.'" (quoting *Parker*, 317 U.S. at 351)).

[11] See, e.g., Daniel A. Crane & Adam Hester, *State-Action Immunity and Section 5 of the FTC Act*, 115 Mich. L. Rev. 365, 373–74 (2016); cf. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 502 (1988) ("But where … the restraint is imposed by persons unaccountable to the public and without official authority, many of whom have personal financial interests in restraining competition, we have no difficulty concluding that the restraint has resulted from private action.").

its own terms. As currently written, the Dead Hand Provision serves as another reason to question the state-action doctrine's application to the CTP.

## II.    The Commission Acted Decisively to Eliminate the CTP and Prevent Its Recurrence

The Trump-Vance Administration has now taken multiple steps to protect the free markets fueling American trucking. President Trump signed Congressional Review Act resolutions disapproving of CARB's EPA waivers. And the Commission has secured commitments from the four leading OEMs and their trade association to jettison the CTP and refrain from similar conduct in the future.

In particular, the OEMs have committed in writing that (i) the CTP was rendered unenforceable by President Trump's signing of the CRA resolution on June 12, 2025; (ii) the President's actions did not trigger any obligations on the OEMs or their trade association, the Truck and Engine Manufacturers' Association, through the CTP; (iii) no OEM has ever attempted to enforce the CTP; (iv) no OEM will ever attempt to enforce the CTP against any other signatory; and (v) each OEM will act independently and without regard to the restrictive terms of the CTP in attempting to sell heavy trucks.

Just as importantly, the Commission has obtained written commitments, backed by reporting and disclosure obligations, to ensure that the OEMs do not replicate the CTP's most problematic provisions in the future. Specifically, the OEMs have committed never to enter an agreement with the two features of the CTP that presented the most acute antitrust concerns. *First*, each of the OEMs has committed not to enter an agreement with any U.S. state regulator or U.S. state government that fixes output or emissions levels and permits cross-enforcement by competitors. *Second*, the OEMs have committed not to enter another agreement with a U.S. state regulator or U.S. state government that contains a Dead Hand Provision. What is more, the Truck & Engine Manufacturers Association, which represents the OEMs at issue and dozens of other manufacturers in a range of markets, has made similar commitments, including agreeing not to negotiate another problematic agreement on behalf of any of its members. Together, these critical commitments will protect American trucking—and the distribution chains underlying great swaths of our economy—from future regulatory overreach by the State of California or others with similar ESG aspirations.

## III.    Conclusion

The Trump-Vance Administration has taken forceful action to restore competition to our nation's trucking industry. As part of that approach, the Commission's investigation of the anticompetitive nature of the CTP agreement has brought the matter to a swift and decisive conclusion in the form of firm commitments to eschew the CTP and prevent similar conduct in the future. Considering these developments, it now appears that no further action is warranted by the Commission. Accordingly, the Commission has closed its investigation into the OEMs. This

decision is not to be construed as a determination that a violation did not occur. The Commission retains authority to take such further action as the public interest may require. We are confident that today's outcome ensures the continued free functioning of competition, including by ensuring that consumers are not harmed by California's attempts to coopt private businesses to enforce preempted regulations in large swaths of the nation.

Going forward, the Commission will intervene where, as here, private parties coordinate with a state actor to execute a sub-regulatory scheme to reduce competition, especially where the legal authority to do so is in grave doubt.