Michael Buschbacher*
James R. Conde*
Laura B. Ruppalt*
Nicholas A. Cordova*
Boyden Gray PLLC
800 Connecticut Avenue NW, Suite 900
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com
jconde@boydengray.com
lruppalt@boydengray.com
ncordova@boydengray.com

* *pro hac vice*

Counsel for Plaintiff

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE,<br><br>    Plaintiff,<br><br>    v.<br><br>STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board,<br><br>    Defendant. | ) No. 2:25-cv-03255-DC-AC<br>)<br>)<br>) **PLAINTIFF'S REPLY IN SUPPORT OF**<br>) **MOTION FOR JUDGMENT ON THE**<br>) **PLEADINGS OR, IN THE**<br>) **ALTERNATIVE, SUMMARY**<br>) **JUDGMENT AND OPPOSITION TO**<br>) **DEFENDANT'S CROSS-MOTION FOR**<br>) **JUDGMENT ON THE PLEADINGS OR,**<br>) **IN THE ALTERNATIVE, SUMMARY**<br>) **JUDGMENT**<br>)<br>)<br>)<br>) **Date: August 7, 2026**<br>) **Time: 1:30 PM**<br>) **Place: Courtroom 10, 13th Floor**<br>) **Judge: Hon. Dena Coggins** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................1

ARGUMENT ................................................................................................................. 2

I.     AmFree Has Standing............................................................................................ 2

       A.     Intervenors United States and EPA Have Standing ................................................3

       B.     Law of the Case Applies.........................................................................................3

       C.     AmFree Has Demonstrated Standing......................................................................5

II.    California's Standards Are Preempted and Unenforceable...............................................17

       A.     Section 209(a) Does Not Include a "Voluntariness" Exception..........................17

       B.     Prohibited "Standards" Include Those Expressed In the Partnership ..............................................................................................................19

III.   The Partnership Is Inseverable .................................................................................21

       A.     The Partnership's Terms Are Not Severable.........................................................21

       B.     Cliff's Arguments About the CRA Resolutions Cannot Succeed.........................23

IV.   The Court Should Grant a Declaratory Judgment and an Injunction.............................. 28

CONCLUSION ............................................................................................................ 28

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Airlines, Inc. v. Wolens*,
 513 U.S. 219 (1995) ................................................................................................. 17, 19

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
 569 U.S. 641 (2013) ................................................................................................. 17, 18

*Arizona v. United States*,
 567 U.S. 387 (2012) .........................................................................................................3

*Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot.*,
 208 F.3d 1 (1st Cir. 2000) ............................................................................................ 20

*Baker v. Carr*,
 369 U.S. 186 (1962) ........................................................................................................25

*Barbour v. United States*,
 No. 1:18-CV-0246 JLT BAM, 2025 WL 2754125 (E.D. Cal. Sept. 29, 2025) ........................ 28

*Barnes-Wallace v. City of San Diego*,
 704 F.3d 1067 (9th Cir. 2012) ...................................................................................... 4

*Barnum Timber Co. v. EPA*,
 633 F.3d 894 (9th Cir. 2011)...........................................................................................15

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
 637 F.3d 1047 (9th Cir. 2011) .........................................................................................3

*Cal. Tow Truck Ass'n v. City & County of San Francisco*,
 693 F.3d 847 (9th Cir. 2012) ...................................................................................... 22

*Canada v. Blain's Helicopters, Inc.*,
 831 F.2d 920 (9th Cir. 1987) ...........................................................................................3

*Christianson v. Colt Indus. Operating Corp.*,
 486 U.S. 800 (1988) ...................................................................................................... 4

*Clinton v. City of New York*,
 524 U.S. 417 (1998) ........................................................................................................14

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*,
 482 F.3d 1157 (9th Cir. 2007).....................................................................................24, 25

*Corrie v. Caterpillar, Inc.*,
  503 F.3d 974 (9th Cir. 2007) ................................................................................25

*Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*,
  218 F. Supp. 2d 1203 (C.D. Cal. 2002) ...............................................................16

*Ctr. for Biological Diversity v. Bernhardt*,
  946 F.3d 553 (9th Cir. 2019)............................................... 23, 24, 25, 26, 27

*Daimler Truck N. Am. LLC v. CARB*,
  No. 2:25-cv-2255-DC-AC, 2025 WL 3049944 (E.D. Cal. Oct. 31, 2025)..................... 2, 17, 28

*Diamond Alt. Energy, LLC v. EPA*,
  606 U.S. 100 (2025) ....................................................................5, 6, 9, 12, 14

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
  541 U.S. 246 (2004) ...................................................................................15, 20

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ...................................................................................... 6

*Gonzalez v. U.S. Immigr. & Customs Enf't*,
  975 F.3d 788 (9th Cir. 2020) ...................................................................... 4

*Grand Canyon Tr. v. Provencio*,
  26 F.4th 815 (9th Cir. 2022) ...................................................................... 4

*Hodges v. Snyder*,
  261 U.S. 600 (1923)......................................................................................27

*INS v. Chadha*,
  462 U.S. 919 (1983) ...................................................................................... 26

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
  478 U.S. 221 (1986)......................................................................................25

*Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*,
  971 F.3d 1222 (10th Cir. 2020) .................................................................. 24

*Khodara Env't, Inc. v. Blakey*,
  376 F.3d 187 (3d Cir. 2004)........................................................................ 8

*Larson v. Valente*,
  456 U.S. 228 (1982) .................................................................................... 8

*Leiter Mins., Inc. v. United States*,
  352 U.S. 220 (1957)......................................................................................16

*Loffman v. Cal. Dep't of Educ.*,
119 F.4th 1147 (9th Cir. 2024)........................................................................1, 3

*Marathon Ent., Inc. v. Blasi*,
174 P.3d 741 (Cal. 2008) ................................................................................ 22

*Minidoka Irrigation Dist. v. Dep't of Interior*,
406 F.3d 567 (9th Cir. 2005) ........................................................................... 4

*Mistretta v. United States*,
488 U.S. 361 (1989)........................................................................................ 28

*Mitchum v. Foster*,
407 U.S. 225 (1972)........................................................................................16

*Mount Graham Coal. v. Thomas*,
89 F.3d 554 (9th Cir. 1996) ............................................................................27

*Murphy v. NCAA*,
584 U.S. 453 (2018).......................................................................................19

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......................................................................................... 6

*Musacchio v. United States*,
577 U.S. 237 (2016) .........................................................................................3

*Nat'l Meat Ass'n v. Harris*,
565 U.S. 452 (2012)......................................................................................... 2

*Nordstrom v. Ryan*,
856 F.3d 1265 (9th Cir. 2017)..........................................................................3

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
557 U.S. 193 (2009) ........................................................................................27

*Olympic Pipe Line Co. v. City of Seattle*,
437 F.3d 872 (9th Cir. 2006) .................................................................... 18, 19

*Papasan v. Allain*,
478 U.S. 265 (1986)........................................................................................16

*Paramino Lumber Co. v. Marshall*,
309 U.S. 370 (1940)........................................................................................27

*Pennsylvania v. Wheeling & Belmont Bridge Co.*,
59 U.S. 421 (1855) .........................................................................................27

*Pepper v. United States*,
    562 U.S. 476 (2011) ...........................................................................................4

*Peralta v. Dillard*,
    744 F.3d 1076 (9th Cir. 2014) ...........................................................................4

*Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*,
    204 F.3d 867 (9th Cir. 2000) ...........................................................................16

*Ramirez v. Charter Commc'ns, Inc.*,
    551 P.3d 520 (Cal. 2024) .................................................................................22

*Ray v. Atl. Richfield Co.*,
    435 U.S. 151 (1978).........................................................................................15

*Ronderos v. USF Reddaway, Inc.*,
    114 F.4th 1080 (9th Cir. 2024).........................................................................22

*South Carolina v. Baker*,
    485 U.S. 505 (1988).........................................................................................27

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ..........................................................................................5

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
    517 U.S. 544 (1996) .....................................................................................5, 11

*United States v. Ballin*,
    144 U.S. 1 (1892) .......................................................................................24, 28

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019).............................................................................3

*United States v. Frank*,
    956 F.2d 872 (9th Cir. 1991).............................................................................18

*United States v. Ga. Pub. Serv. Comm'n*,
    371 U.S. 285 (1963) ..........................................................................................3

*Washington v. Daley*,
    173 F.3d 1158 (9th Cir. 1999)...........................................................................16

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ..........................................................................................6

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992)........................................................................................4, 5

*Yesler Terrace Cmty. Council v. Cisneros,*
37 F.3d 442 (9th Cir. 1994) ........................................................................................25, 26

*Ex Parte Young,*
209 U.S. 123 (1908).................................................................................................16

**Constitutional Provisions**

U.S. Const. art. I, § 5, cl. 2............................................................................................ 24

U.S. Const. art. I, § 7 .....................................................................................................23

**Statutes**

5 U.S.C. § 801(b) ...........................................................................................................23

5 U.S.C. § 805 ..........................................................................................................23, 24

42 U.S.C. § 7507(2) ....................................................................................................... 26

42 U.S.C. § 7521(a)(2) ................................................................................................... 26

42 U.S.C. § 7543(a)............................................................................................1, 2, 16, 17, 20

42 U.S.C. § 7543(b)(3) ................................................................................................... 26

42 U.S.C. § 7602(k) ....................................................................................................... 20

Cal. Code Regs. tit. 13, § 1956.8(a)(2)(C)(3) ...............................................................13

Pub. L. No. 119-15, 139 Stat. 65 (2025) .................................................................23, 24

Pub. L. No. 119-17, 139 Stat. 67 (2025) .................................................................23, 24

**Other Authorities**

Fed. R. Civ. P. 19(a) ......................................................................................................15

18B *Wright & Miller's Federal Practice & Procedure Juris.* (3d ed.) .................................. 4

**INTRODUCTION**

American Free Enterprise Chamber of Commerce ("AmFree") has shown that Defendant Steven S. Cliff's ("Cliff") "Clean Truck Partnership" ("Partnership") is preempted under section 209(a) of the Clean Air Act. 42 U.S.C. § 7543(a). Cliff makes no persuasive argument otherwise, but instead raises a host of other issues that ultimately don't matter. Def.'s Mem. in Opp'n to Pl.'s Mot. and in Supp. of Def.'s Cross-Mot. ("Def.'s Mem."), ECF Nos. 174 & 175.[1]

Attempting to dodge the merits, Cliff argues that AmFree lacks standing. But that is now irrelevant. The United States and EPA have intervened as plaintiffs. ECF No. 180. Those parties have standing to vindicate federal law, and "the presence of one party with standing is sufficient to permit [the Court] to reach the merits." *Loffman v. Cal. Dep't of Educ.*, 119 F.4th 1147, 1164 (9th Cir. 2024) (quotation marks omitted).

Regardless, AmFree's standing was conclusively resolved by the transferring court, *see* Mem. Op. & Order at 3–5, ECF No. 145, and is, in any event, beyond doubt: the Partnership has caused AmFree members concrete harm—and will continue to do so if it remains in force—and an injunction would alleviate that harm. Pl.'s Mem. in Supp. of Mot. for J. on the Pleadings or, in the Alternative, Summ. J. ("Pl.'s Mem.") at 10:5–12:8, ECF No. 166-1. Cliff's arguments confuse mootness with standing, but Cliff can't (and doesn't) argue mootness while seeking to enforce the Partnership in another court, Def.'s Stmt. of Undisp. Facts ("Def.'s SOF") ¶ 66, ECF No. 174-1, and threatening retaliatory retroactive enforcement if truck manufacturers don't comply, Pl.'s Req. for Jud. Not. ("Pl.'s RJN"),[2] Ex. 1 (April 2026 Manufacturers Advisory Correspondence) at 2–3. To top things off, Cliff now denies that the Partnership would reduce the supply of heavy-duty internal-combustion vehicles and increase prices, despite acknowledging in an official memo a shortage attributed to the regulations embedded in the Partnership's terms, Pl.'s RJN, Ex. 2

---

[1] The memoranda filed as ECF Nos. 174 and 175 are identical, so this Reply references ECF No. 174, only.

[2] AmFree filed its Request for Judicial Notice simultaneously with this Reply.

Pl.'s Reply. in Supp. of Mot. and Opp'n to Def.'s Cross-Mot.    Page 1

("Availability Memo") at 1, and projecting that the embedded regulations would increase purchase prices. *See, e.g.*, Pl.'s RJN, Ex. 3 ("Omnibus ISOR") at IX-51, tbl. IX-35 (projecting that Omnibus Low $NO_x$ ("Omnibus") regulation will increase price of model year 2027 to 2030 internal-combustion vehicles up to $7,423, averaging $5,437 across all classes of covered vehicles). The Court should reject Cliff's attempt to make standing more complicated than it needs to be.

On the merits, Cliff ignores section 209(a)'s operative text, which prohibits any "attempt to enforce" preempted standards, 42 U.S.C. § 7543(a), and instead argues that section 209(a) doesn't apply to voluntary agreements, but only to standards formally expressed in a State's code. But section 209(a) doesn't include a "voluntariness" exception, nor limit preempted "standards" to codified rules. *See* Pl.'s Mem. at 15:7–17:28. Such a limitation would "make a mockery of the [Clean Air Act's] preemption provision." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012).

Cliff also urges the Court to preserve some of the Partnership by severing provisions that enforce only one of the three preempted California standards. But Cliff's proposal wouldn't cure the illegality, and the Partnership is inseverable in any event. A declaration that the Partnership is unlawful and an injunction preventing Cliff from enforcing it are the only remedies that provide AmFree complete relief.

In October 2025, this Court preliminarily enjoined enforcement of the Partnership, recognizing that the signatory manufacturers were likely to succeed "on their claim that the Clean Truck Partnership violates the Clean Air Act and the Supremacy Clause." *Daimler Truck N. Am. LLC v. CARB*, No. 2:25-cv-2255-DC-AC, 2025 WL 3049944, at *17 (E.D. Cal. Oct. 31, 2025). This Court should affirm that conclusion now, and issue a declaration that the Partnership is preempted and a permanent injunction prohibiting Cliff from enforcing it.

## ARGUMENT

### I.    AmFree Has Standing

Cliff's attempt to cast doubt on AmFree's standing falls flat. *See* Def.'s Mem. at 8–17. As an initial matter, even if AmFree didn't have standing, intervenors United States and EPA do, so this case may proceed. Regardless, the transferring district court's holding that AmFree has standing, Mem. Op. & Order 3–5, is law of the case for AmFree's motion for judgment on the

pleadings. And even if law of the case does not apply, AmFree more than satisfies its burden of showing standing for that stage or for summary judgment. At the least, Cliff has not satisfied his burden for summary judgment, which requires him to show that "no reasonable juror, viewing the evidence in the light most favorable to [AmFree], could find … by a preponderance of the evidence" that at least one of AmFree's member declarants has standing. *Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 922 (9th Cir. 1987).

### A.    Intervenors United States and EPA Have Standing

Now that the United States and EPA have intervened as plaintiffs, ECF No. 180, this Court can reach the merits. That is because "the presence of one party with standing is sufficient to permit [the Court] to reach the merits," *Loffman*, 119 F.4th at 1164 (quotation marks omitted), and the federal intervenors have standing. United States's Mem. in Supp. of Mot. for Summ. J. ("U.S.'s Mem.") at 11:9–13:8, ECF No. 181-1. Courts have repeatedly permitted the United States to sue to prevent a State from attempting to enforce preempted state laws or regulations. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 393 (2012); *United States v. Ga. Pub. Serv. Comm'n*, 371 U.S. 285, 286–87 (1963); *United States v. California*, 921 F.3d 865, 872–73 (9th Cir. 2019). Because the United States has standing to prevent the sovereign injury that California's Partnership inflicts, the Court need not consider whether AmFree also has standing to reach AmFree's substantive arguments.

### B.    Law of the Case Applies

Regardless, law of the case applies to the transferring court's explicit determination that AmFree had standing. Mem. Op. & Order 3–5. "[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Musacchio v. United States*, 577 U.S. 237, 244–45 (2016). That doctrine applies to AmFree's standing because the case is in "virtually the same procedural posture" as the motion-to-dismiss stage. *Nordstrom v. Ryan*, 856 F.3d 1265, 1270 (9th Cir. 2017); *see also United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) (Rule 12(c) motions are "functionally identical to Rule 12(b)(6)" (quotation marks omitted)).

Relying upon a footnote in *Gonzalez v. United States Immigration & Customs Enforcement*,

975 F.3d 788, 805 n.10 (9th Cir. 2020), Cliff claims that law-of-the-case principles don't apply to jurisdictional rulings. Def.'s Mem. at 9:12–10:27. But "[t]here is no reason to apply law-of-the-case principles less rigorously" to jurisdictional issues because "[p]erpetual litigation of any issue—jurisdictional or nonjurisdictional—delays, and therefore threatens to deny, justice." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 n.5 (1988). Moreover, since *Gonzalez*, the Ninth Circuit has affirmed a district court's application of law of the case to the issue of standing. *Grand Canyon Tr. v. Provencio*, 26 F.4th 815, 821 (9th Cir. 2022). And the *Gonzalez* footnote does not mention, let alone distinguish, Ninth Circuit precedent applying law of the case to its own standing determinations. *See, e.g.*, *Barnes-Wallace v. City of San Diego*, 704 F.3d 1067, 1076–77 (9th Cir. 2012).[3]

Cliff argues that *Grand Canyon Trust* and *Barnes* are distinguishable because the Ninth Circuit there applied law of the case to "a prior *appellate* opinion from that court." Def.'s Mem. at 10:16. But law of the case applies regardless of court level. *Minidoka Irrigation Dist. v. Dep't of Interior*, 406 F.3d 567, 573 (9th Cir. 2005). Equally unconvincing is Cliff's attempt to dismiss *Wyoming v. Oklahoma*, 502 U.S. 437, 446 (1992). Def.'s Mem. at 10:20–25. The Supreme Court's respect for "the general principles of finality and repose, absent changed circumstances or unforeseen issues not previously litigated" in jurisdictional rulings in *Wyoming* applies in original actions before a district court no less than in original actions before the Supreme Court. 502 U.S. at 446; *see also Pepper v. United States*, 562 U.S. 476, 506–07 (2011) (law of the case should apply unless prior decision was "clearly erroneous").

Even if the Court construes this motion as a motion for summary judgment, it should give persuasive weight to the prior court's standing determination because there has been no relevant "factual development," *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) (en banc), or

---

[3] In any event, unlike in *Gonzalez*, the district court here *explicitly* considered standing, and even "a terse decision is … clearly the law of the case because it does not require a determination whether actual decision can be inferred." 18B *Wright & Miller's Federal Practice & Procedure Juris.* § 4478 (3d ed.).

"change of circumstance, whether of fact or law" that warrant departing from the prior ruling, *Wyoming*, 502 U.S. at 446. This Court should therefore apply law of the case and conclude that AmFree has standing. At a minimum, principles of finality and repose support following the holding of the transferring court.

### C.    AmFree Has Demonstrated Standing

Regardless, AmFree has established the facts necessary for associational standing, that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (citation omitted); Pl.'s Mem. at 10:5–12:8. Cliff does not seriously dispute the second or third prongs, and objects only that AmFree has not shown its members satisfy the three requirements for standing in their own right. Def.'s Mem. at 11:2–16:1.

But Cliff tries to "make standing law more complicated than it needs to be." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114, 125 (2025). AmFree need only show "a substantial risk" that its members will experience a "concrete and particularized" harm from the Partnership. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation marks omitted). AmFree can rely upon "commonsense economic principles," and "one dollar" of harm is enough. *Diamond Alt. Energy*, 606 U.S. at 114, 116. AmFree's members easily clear that bar.

In response, Cliff offers unfounded speculation and arm-chair economic theories that conflict with his agency's own previous projections and studies. The Supreme Court rejected very similar speculation by California in *Diamond Alternative Energy*, *see id.* at 109–10, 120–21, and so should this Court.

### 1.    DeMartini RV Has Standing

As a California RV dealer who has experienced supply shortages and increased prices from the Partnership, AmFree member DeMartini RV Sales ("DeMartini RV") clearly has standing to challenge the Partnership in his own right. Pl.'s Mem. at 11:3–16; Third Am. Compl. ("Compl."), Ex. D ("DeMartini Decl.") ¶¶ 3, 13–16, ECF No. 142-5. Cliff launches a slew of objections, but

none undercut the concrete harm DeMartini RV has already suffered, and continues to face, from the Partnership.

First, Cliff argues that DeMartini RV fails to show a "current, or certainly impending injury-in-fact" because he has "not provided an updated declaration concerning his actual sales in 2025." Def.'s Mem. at 13:4, 8–9. Cliff's demand that AmFree provide "updated" evidence is a "Freudian slip" that "reveals the basic flaw in [Cliff's] argument: It is the doctrine of *mootness*, not standing, that addresses" intervening events. *West Virginia v. EPA*, 597 U.S. 697, 719 (2022). [4] Standing is evaluated at the outset of the suit. And Mr. DeMartini's declaration documents RV chassis shortages and surcharges he experienced throughout 2024 and continuing through January 2025 that are attributable to the Partnership. DeMartini Decl. ¶¶ 13–15. That is a concrete injury at the outset of the suit sufficient for standing. *Diamond Alt. Energy*, 606 U.S. at 114. Cliff claims that DeMartini RV's past injuries are not redressable through forward-looking relief, so they cannot support standing. Def.'s Mem. at 13 n.13. But past injuries "serve as evidence of expected future harm." *Murthy v. Missouri*, 603 U.S. 43, 70 (2024).

And DeMartini RV *has* continued to experience harm from the Partnership through 2025 and into 2026. In his supplemental declaration, Mr. DeMartini explains that DeMartini RV was charged surcharges on California RV chassis ranging from about $9,000 to $12,000 on a variety of RV chassis—including diesel Class A, Class C, and Class Super C—through most of 2025. Suppl. Decl. of Tim DeMartini ("Suppl. DeMartini Decl.") ¶ 15. DeMartini RV also experienced stark declines in sales of Class Super C RVs—which make up a significant portion of DeMartini RV's sales—since the Partnership took effect. *Id*. ¶ 4. DeMartini RV's sales of Class Super C RVs to California purchasers declined by more than 50% from 2023 to 2025, in line with statewide trends. *Id*. ¶¶ 9–10. So, it was not "speculation that RV sales would decrease in 2025 due to the

---

[4] Cliff has not argued that this case is moot. Nor is it. A case becomes moot only if "it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). Cliff can hardly allege that the Partnership is moot when he is attempting to enforce it in state court. Def.'s SOF ¶ 66.

[Partnership]." *Contra* Def.'s Mem. at 14:2.

Sales of Class Super C RVs nationwide, however, increased during that time. Suppl. DeMartini Decl. ¶ 11. And although some neighboring states have also experienced decreases in Class Super C RV sales since 2023, none are as pronounced as the decline in California. *Id.* The Partnership's effects aren't limited to the supply side. Mr. DeMartini also reports that the Partnership—and the uncertainty over the applicability of its obligations—has affected demand, with California customers hesitant to buy RVs that are not certified to the regulations embedded in the Partnership. *Id.* ¶ 8.

These effects of the Partnership should come as no surprise to Cliff, who reported in a September 2024 memo that "numerous upfitters and dealers" had informed the California Air Resources Board ("CARB") of "limited chassis availability" for "combustion products from manufacturers in California." Availability Memo at 1. "The shortage … generally affect[ed] Class 4-8 diesel HD vehicles, with a prevalent impact on Class 6 and 7 vehicles." *Id.* at 3. Cliff further reported that "numerous manufacturers have begun to inform their customers they will be applying future requirements to purchase [so-called zero-emission vehicles ("ZEVs")] before they can acquire combustion vehicles to each of their dealer or upfitters" and that "[s]ome are using these ratios in order to meet their percentage sales requirement under the ACT [("Advanced Clean Trucks")] regulation," while other manufacturers "are instead setting ratios of 1 ZEV to 1 to 3 [internal-combustion] vehicles in order to achieve compliance" with the "HD Omnibus" regulation. *Id.* at 4. Cliff projected that "[t]hese policies … will have an increasing impact in 2025 MY and beyond as more manufacturers implement ZEV ratios across their product portfolio." *Id.* at 4–5. Cliff also reported that "some engine manufacturers have limited their … sales because of the [Omnibus] sales caps," and that projections "at the time of [the Partnership] signing were inaccurate," such that "significantly fewer legacy engines [are] available." *Id.* at 6. Cliff's memo confirms that the Partnership's predictable effects on heavy-duty vehicle supply were already being felt in late 2024.

Indeed, Cliff admits that manufacturers said they would comply with the regulations by, among other things, tying deliveries with the purchase of electric vehicles that lack consumer

demand, thus raising the effective cost of buying internal-combustion vehicles. Def.'s Resp. to Pl.'s Stmt. of Undisp. Facts ("Def.'s Resp. to Pl.'s SOF") ¶ 19, ECF No. 174-5. Cliff further admits that sales of Class 7 and 8 internal-combustion tractors delivered for sale in California by reporting manufacturers fell by a stunning 82% from 2023 to 2024, as the regulations embedded in the Partnership took effect. *Id.* ¶¶ 17–18. Cliff's new suggestion that state-wide decline may be caused by "industry-wide factors that led to decreased sales … *nationwide*," Def.'s Mem. at 12 n.3, is implausible: sales nationwide dropped only about 5.5% from 2023 to 2024, a fraction of the catastrophic decline in California, *see* Pl.'s RJN, Ex. 13.

Second, Cliff claims it's merely "[s]peculation" that DeMartini RV's supply shortages and surcharges were "caused *by the [Partnership]*." Def.'s Mem. at 13:8, 13, 16. But Cliff's own memo refutes that claim, acknowledging that the constricted supply of heavy-duty vehicles and engines stemmed from the Partnership, and the Omnibus and ACT regulations it incorporates. Availability Memo at 1, 3–6. The divergence in Class Super C RV sales trends since the Partnership took effect in California—where they declined by about 45%, Suppl. DeMartini Decl. ¶ 10—compared to the nation as a whole—where they increased by about 1.5% over that same time, *id.* ¶ 11—also points to a California-specific origin for DeMartini RV's injuries: the Omnibus and ACT regulations, and the Partnership that locks those regulations in place. And for purposes of standing, it doesn't matter which: "where there are multiple sufficient causes" for an injury that present "independent … obstacles" to relief, "both the causation and redressability prongs" of Article III standing "are plainly satisfied." *Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 194–95 (3d Cir. 2004); *see also Larson v. Valente*, 456 U.S. 228, 242–43 (1982) (plaintiffs had standing to challenge one part of state law requiring registration, even though another provision might ultimately require plaintiffs to register).

Third, Cliff claims that DeMartini RV's harm from the Partnership is undercut by manufacturers' unsworn claims—in the face of an antitrust lawsuit and investigation—that the Partnership had no impact on truck pricing or availability and that the manufacturers would "independently make decisions about the type and quantity of vehicles [they] sell[] without regard to whether those decisions are compliant with any restrictive terms of the [Partnership]." Def.'s

Mem. at 13:22–24. It is unsurprising that manufacturers would blame the regulations alone when faced with antitrust allegations they wanted to settle. But those unsworn claims are little more than manufacturer "press releases" that get no weight in the standing analysis. *Diamond Alt. Energy*, 606 U.S. at 124.

They are also belied by the facts on the ground and by manufacturers' sworn statements. DeMartini RV has experienced supply shortages, surcharges, and decreased sales. DeMartini Decl. ¶¶ 14–15; Suppl. DeMartini Decl. ¶¶ 3–6, 9, 15. Whether the manufacturers want to attribute those effects to the underlying Omnibus and ACT regulations or to the Partnership doesn't matter for standing. *See supra* at 8:9–13. And manufacturers have confirmed in *sworn* statements that those regulations—with which the Partnership commits the manufactures to comply—will "necessarily impact pricing." Pl.'s RJN, Ex. 4 (Decl. of Michael Noonan on behalf of Int'l Motors, LLC in *Daimler Truck N. Am. LLC v. CARB*, No. 2:25-cv-2255 (E.D. Cal.)) ("Int'l Motors Decl.") ¶ 10. They also explained that attempts to enforce the preempted regulations—like the Partnership— result in "downstream harm to dealers, customers, and the public," Pl.'s RJN, Ex. 5 (Decl. of Carl Hergart on behalf of PACCAR, Inc. in *Daimler Truck N. Am. LLC v. CARB*, No. 2:25-cv-2255 (E.D. Cal.)) ("PACCAR Decl.") ¶ 12; *see also id.*, Ex. 6, (Decl. of Andrea Brown on behalf of Volvo Grp. N. Am., LLC in *Daimler Truck N. Am. LLC v. CARB*, No. 2:25-cv-2255 (E.D. Cal.)) ("Volvo Decl.") ¶¶ 18–19 (explaining the costs of complying with the preempted regulations). At least in *Diamond Alternative Energy*, Cliff conceded that "affidavits … from directly regulated automakers explaining how they would respond" would be enough to satisfy standing. 606 U.S. at 120. Here, AmFree cites not only affidavits from its members and Cliff's predictions, but also sworn declarations by directly regulated manufacturers indicating that enforcing the Partnership would increase prices and harm dealers. That is far more than enough for Article III standing. *Id.* at 120– 21.

Fourth, Cliff argues that any future harm from RV chassis supply shortages or price increases is based on a "chain of causation" that "depends on several unsupported assumptions." Def.'s Mem. at 14:4. In support, Cliff offers a CARB employee's theory that manufacturers "could continue to sell combustion-engine RV chassis while meeting their zero-emission vehicle sales

commitments" with other vehicles in the class. *Id.* at 14:14–16. That purported regulatory flexibility is a red herring. Under the Partnership's incorporation of ACT, every RV chassis produced and delivered for sale in California incurs a commensurate regulatory obligation to produce and deliver another electric vehicle in the relevant class, which predictably raises the costs of delivering an RV chassis to California and harms DeMartini RV, regardless of how manufacturers ultimately meet their obligations. California's Partnership therefore increases the marginal cost of selling an RV chassis, and it doesn't matter that the regulations apply to several other vehicles. For example, if California required that each pound of real beef be offset on average with a pound of plant-based beef, it wouldn't matter that the regulations apply to different types of beef, or can be met by selling tofu hot dogs and mushroom burgers. The cost of selling real beef, whether ground beef or sirloin, would predictably increase.

Cliff's glib suggestion that "other *non*-signatory manufacturers (existing or new)" might "fill any gap between supply and demand" for internal-combustion RV chassis as signatory manufacturers pull back, Def.'s Mem. at 15:4–6, is no more plausible, as it fails to account for market barriers such as the time and capital required to design, build, and market a new product in the RV industry and, in any event, wouldn't avoid DeMartini RV's harms in the near-term. *See* DeMartini Decl. ¶¶ 4–7 (describing the complexity of the RV supply chain); Pl.'s RJN, Ex. 8 (Cal. E.O. N-27-25) at 1–2 (Gavin Newsom stating that signatory manufacturers "represent over 90 percent of California's truck market").

In any event, CARB's employee has no relevant experience in the RV industry, Decl. of Paul Arneja ¶ 1, ECF No. 174-3 (listing experience as having "worked at CARB for 10 years"), and he offers no support for such a theory, which conflicts with California's own economic analyses, basic economics, and the real-world experience of DeMartini RV, Suppl. DeMartini Decl. ¶¶ 5, 9 (manufacturers have limited sales of RV chassis and Class Super C RV sales have declined). He also focuses solely on ACT and fails entirely to account for the Partnership's requirement of compliance with Omnibus in California and section 177 states, which California admits increases costs by thousands of dollars that are passed through, predictably harming entities like DeMartini RV by at least a dollar. Omnibus ISOR at IX-51, tbl. IX-35.

Finally, Cliff's attempt to nitpick Mr. DeMartini's declaration fails. Cliff challenges Mr. DeMartini's (correct) observation that "[t]here are presently no electric powertrain options for RV chassis," Def.'s Mem. at 15:13–14 (quoting DeMartini Decl. ¶ 13), but admits that it is "[u]ndisputed that, at the time of this filing, there are no RVs for consumer purchase in California that utilize an electric powertrain." Def.'s Resp. to Pl.'s SOF ¶ 25. In any event, Cliff's referenced sources do not undermine Mr. DeMartini's statement. The CARB employee's "expect[ation] that zero-emission RVs … will be commercially available in California *by 2036*" does not conflict with the fact that "[t]here are *presently* no electric powertrain options." Def.'s Mem. at 15:13–14, 17–18 (citing Arnjea Decl. ¶ 7 and quoting DeMartini Decl. ¶ 13, emphases added). And "announc[ements]" of forthcoming electric RVs doesn't mean they are available for the commercial market. *Id.* at 15:15–17. They aren't. Def.'s Req. for Jud. Not., Ex. 23, ECF No. 176-23 (THOR hybrid motorhome is only a "Test Vehicle"); *id.*, Ex. 24, ECF No. 176-24 (Winnebago camper van is a "prototype"). If experience is any guide, there's a good chance they will never be. Suppl. DeMartini Decl. ¶ 13 (Coachmen RV canceled their Class B all-electric camper van in late 2025). Cliff's citation to manufacturers' "investments in electric vehicle technology" and "public[] commit[ments] to electrification" are no more help. Def.'s Mem. at 15:20–21. Investments and commitments are not commercially available products that DeMartini RV can sell.

In sum, it is Cliff's objections to DeMartini RV's standing that are "long on conjecture but short on facts." *Id.* at 15:27. Because DeMartini RV has standing to challenge the Partnership, AmFree has standing to do so on its behalf. *Brown Grp.*, 517 U.S. at 553.

### 2.   AmFree's Fleet Operator Members Have Standing

AmFree's member fleet operator Declarants, Meiborg Bros. Inc. ("Meiborg") and TanTara Transportation Corp. ("TanTara") also have standing because the Partnership forces manufacturers to reduce production of the new internal-combustion heavy-duty trucks their businesses need, which will increase prices for those vehicles, including through requiring bundled purchases with more expensive electric trucks. Compl., Ex. B ("Meiborg Decl.") ¶¶ 6–9, ECF No. 142-3; *id.*, Ex. C ("Riggan Decl.") ¶¶ 6–9, ECF No. 142-4. Cliff raises two objections: that

(1) AmFree's "theory" that the Partnership will increase prices is speculative, Def.'s Mem. at 12:10–23, and (2) there's no support for the assertion that the Partnership will have a nationwide effect, *id.* at 11:11–12:9.[5] But Cliff's objections are, themselves, no more than speculation, and belied by well-established economic principles and Cliff's own public statements.

AmFree's declarants explained that the Omnibus and ACT regulations embedded in the Partnership require manufacturers to "increase the share of electric trucks they sell" and so "to reduce the share of internal-combustion trucks they sell." Meiborg Decl. ¶ 6; Riggan Decl. ¶ 6. Since "[it] is a basic economic principle that reduced supply leads to increased prices for consumers," the "industry-wide Clean Truck Partnership … will thus predictably increase the price of internal combustion trucks for companies … who want to purchase them." Meiborg Decl. ¶ 7; Riggan Decl. ¶ 7. Indeed, some manufacturers had announced they would require bundled purchases of much more expensive electric trucks to meet their California obligations. Meiborg Decl. ¶ 7; Riggan Decl. ¶ 7.

Cliff claims this "economic theory requires guesswork as to how independent decisionmakers—manufacturers—will exercise their judgment." Def.'s Mem. at 12:10–11 (cleaned up). But it requires no more "guesswork" than other "commonsense economic realities" regularly recognized by courts—and endorsed by the Supreme Court— "when evaluating Article III standing." *Diamond Alt. Energy*, 606 U.S. at 116. "When third party behavior is predictable, commonsense inferences may be drawn." *Id.* CARB itself predicted that the Omnibus regulations embedded in the Partnership would increase truck prices. Omnibus ISOR at IX-51, tbl. IX-35 (projecting Omnibus will increase purchase prices for model year 2027 to 2030 internal-combustion vehicles by up to $7,423, averaging $5,437 across all classes of covered vehicles). Manufacturers confirmed in sworn statements that the ACT and Omnibus regulations and

---

[5] Cliff incorrectly suggests that AmFree's memorandum in support of its motion did not rely on Mr. Meiborg's and Mr. Riggan's declarations for standing. Def.'s Mem. at 11:3–6. AmFree cited both declarations and explicitly argued that "[t]hose declarations are sufficient for standing at the summary judgment stage." Pl.'s Mem. at 9:25–28.

Partnership will "necessarily impact pricing," Int'l Motors Decl. ¶¶ 10–11, and will result in "downstream harm to dealers, customers, and the public," PACCAR Decl. ¶ 12. And Cliff's September 2024 memo confirms that manufacturers are responding as AmFree's declarants said they were—"inform[ing] their customers they will be applying future requirements to purchase ZEVs before they can acquire combustion vehicles … regardless of the types of vehicles they sell as ZEVs" and "whether or not the manufacturer offers ZEVs in the market segment the dealer specializes." Availability Memo at 4.

Economic theory also confirms that increased product pricing is the predictable result of supply constrictions in a concentrated market, like that for heavy-duty vehicles. Decl. of Jason Johnston, PhD ("Johnston Decl.") ¶¶ 5–7, 9–11. The ACT zero-emission vehicle mandate, which requires the gradual phase-out of new internal-combustion trucks, "act[s] as a supply restriction that will allow the Partnership signatories to use higher prices to ration constrained [internal-combustion] vehicle sales." *Id.* ¶ 9. The Omnibus regulations work as a similar supply constraint, with caps on the number of non-conforming "legacy" vehicles a manufacturer can sell, Cal. Code Regs. tit. 13, § 1956.8(a)(2)(C)(3), and so will have similar price effects. Cliff's September 2024 memo again confirms these principles, reporting that the Omnibus and ACT regulations embedded in the Partnership have led to "limited chassis availability" and "shortage[s]" across "Class 4-8 diesel HD vehicles." Availability Memo at 1, 3, 6–7.

Cliff's theories, on the other hand, are based on "guesswork" and conflict with Cliff's own projections and observations. Def.'s Mem. at 12:10. Cliff suggests that the Partnership's compelled supply of electric vehicles will lead to "[i]ncreased competition among manufacturers of zero-emission trucks … putting downward pressure on the cost of those vehicles *and* of the diesel trucks that must compete with them." *Id.* at 12:16–19. But as noted *supra* at 12:19–22, Cliff predicted that the Omnibus and ACT regulations incorporated in the Partnership would increase, not decrease, average truck prices. And Cliff's September 2024 memo reported that electric trucks in California had "increased in price by an average of $86,512 since 2021–2022." Availability Memo at 10 (underline in original). Limiting the market share of internal-combustion vehicles (and eventually banning them) limits competition by constraining output. Pl.'s RJN, Ex. 15 (Statement of FTC

Regarding the Clean Truck Partnership Investigation) at 1–2.

Cliff's attacks on the nationwide effects of the Partnership, Def.'s Mem. at 11:11–12:9, fare no better. Cliff implies that the Partnership has no effect outside of California. *Id.* at 11:6–24. But as the transferring court observed, Cliff's actions and the Partnership, itself, reach beyond California's borders. *See* Mem. Op. & Order 7–10. The Partnership requires manufacturers "to comply with [the Omnibus regulations] adopted in any Section 177 state"—which includes Colorado, Massachusetts, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington—and to "put forth their best efforts to sell as many zero emissions trucks as reasonably possible in every state that has or will adopt CARB's ACT regulations"—which includes the same states plus Maryland. Compl., Ex. A (Partnership Agreement) at 17, ECF No. 142-2; Pl.'s RJN, Ex. 7 (states that have adopted Omnibus and ACT). Economic theory indicates that given the large portion of the heavy-duty vehicle market these states comprise and the enormous fixed costs of complying with the Omnibus and ACT standards, the effects of the Partnership and its embedded regulations "will not be confined to these states but will become national in scope," as manufacturers rationally choose to maximize profits by spreading those fixed costs over as large a quantity of sales as possible and passing those costs on to purchasers. Johnston Decl. ¶¶ 14, 12, 15–20.

The increase in internal-combustion truck prices outside California need not match that inside California for AmFree's members to have standing. Even "one dollar" of economic harm is enough. *See Diamond Alt. Energy*, 606 U.S. at 114. Given the economic realities of the heavy-duty vehicle market, the obligations imposed by the Partnership, and the nationwide footprint of the signatory manufacturers, it is Cliff's suggestion that the Partnership will have no impact whatsoever on prices outside of California that is "counter-intuitive." Def.'s Mem. at 12:8–9.

In sum, the Supreme Court "routinely recognizes probable economic injury resulting from governmental actions that alter competitive conditions as sufficient to satisfy" Article III's injury-in-fact requirement, *Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (cleaned up), and this Court should do the same. AmFree's members' "declarations offer a commonsense assessment of the market" for heavy-duty internal-combustion vehicles: the Partnership's "regulatory

restrictions" on manufacturers' sale of these vehicles predictably will constrict supply and increase prices. *Barnum Timber Co. v. EPA*, 633 F.3d 894, 900 (9th Cir. 2011); Meiborg Decl. ¶¶ 7–8; Riggan Decl. ¶¶ 7–8. Because those members have standing to challenge the Partnership, AmFree does, too.

### 3.    AmFree Has Standing to Seek to Enjoin the Partnership

Finally, Cliff is wrong that AmFree lacks standing for the relief it requests because it is not a party to the Partnership. *See* Def. Mem. at 16:2–17:19. Cliff's argument assumes that preemption under section 209(a) of the Clean Air Act is an individual right of the manufacturers, alone. It is not. *See infra* at 19:15–16. AmFree does not "seek[] to vindicate the alleged rights of the manufacturers," Def.'s Mem. at 17:1–2, but to vindicate its own members' rights to be free from the constraints of California's preempted emissions standards on their business activities. *See Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004) (section 209(a) protects both a "manufacturer's right to sell federally approved vehicles" and "a purchaser's right to buy them"). A declaration that the Partnership is preempted and an injunction prohibiting Cliff from enforcing it will restore AmFree's members' right to purchase heavy-duty vehicles free from the Partnership's preempted standards. "Where a successful challenge to [California's] action[s] could reduce or eliminate those regulatory restrictions, causation and redressability are satisfied." *Barnum Timber Co.*, 633 F.3d at 901.

Cliff cites no case that bars a preemption suit by an affected non-party in this posture. Preemption cases are often brought by injured parties, regardless of whether they are not parties to or objects of a state's scheme of regulation. *See Ray v. Atl. Richfield Co.*, 435 U.S. 151, 155–56 (1978) (considering refinery preemption challenge to oil tanker law). The only case Cliff does cite is about joinder, not standing, and Cliff does not argue the manufacturers are necessary parties under Federal Rule of Civil Procedure 19(a). *See* Def.'s Mem. at 16:19–22 (citing *EEOC v. Peabody W. Coal Co.*, 610 F.3d 1070, 1082 (9th Cir. 2010)). Nor are they. Under Rule 19(a), a party is necessary if (1) in that party's absence, "the court cannot accord complete relief among existing parties;" or (2) that party "claims an interest relating to the subject of the action" and disposing of the action without them may impair that interest or leave an existing party at "substantial risk"

of "inconsistent obligations." Fed. R. Civ. P. 19(a). Neither applies. Declaring the Partnership preempted and enjoining Cliff from enforcing it will afford AmFree complete relief for its preemption claim, and the signatory manufacturers have not claimed an interest in this action. Indeed, the manufacturers have already resolved any interest and agreed to dismissal from this case. Notice of Written Consent to File a Third Am. Compl., ECF No. 142-1.[6]

It also would not be "inequitable" for this Court to enjoin Cliff, but not the manufacturer signatories. Def.'s Mem. at 17:5. Section 209(a) of the Clean Air Act provides that "*[n]o State …* *shall … attempt to enforce*" any preempted standard. 42 U.S.C. § 7543(a) (emphasis added). It is not inequitable to require Cliff to comply with federal law.

Lastly, Cliff argues in passing that *Ex Parte Young*, 209 U.S. 123 (1908), and the Anti-Injunction Act, 28 U.S.C. § 2283, bar the injunction that AmFree seeks. Def.'s Mem. at 16:22–27, 17:14–16. But he is wrong on both points. Although the manufacturers may benefit from the injunction, that "cost-free" gain, *id.* at 16:26, requires no payment of damages, and requiring Cliff to comply with section 209(a) would not "upset the balance of federal and state interests that [is] embodie[d]" by *Young*. *See Papasan v. Allain*, 478 U.S. 265, 277 (1986). There is thus no Eleventh Amendment bar to the relief AmFree seeks here. Nor is the Anti-Injunction Act a barrier. The Anti-Injunction Act does not apply to cases, such as this one, brought under section 1983. *Mitchum v. Foster*, 407 U.S. 225, 242–43 (1972) ("We conclude that … § 1983 is an Act of Congress that falls within the 'expressly authorized' exception of that law."). It also does not apply to the United States, which is now a party and seeks the same relief, *Leiter Mins., Inc. v. United States*, 352 U.S. 220, 225–26 (1957); U.S.'s Mem. at 10:19–26, nor does the statute "bar one who is not a party to state proceedings, nor in privity with a party"—like AmFree here—"from seeking a federal injunction against enforcement of the resulting judgment." *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 879 (9th Cir. 2000). And the Act applies only "to state cases instituted before the initiation of the federal action." *Cottonwood Christian Ctr. v. Cypress*

---

[6] Because they are not necessary parties, they also are not indispensable parties under Rule 19(b). *Washington v. Daley*, 173 F.3d 1158, 1169 (9th Cir. 1999).

*Redevelopment Agency*, 218 F. Supp. 2d 1203, 1217 (C.D. Cal. 2002) (citing *Wulp v. Corcoran*, 454 F.2d 826, 831 n.5 (1st Cir. 1972)). For all these reasons, the Anti-Injunction Act does not apply. *See also Daimler*, 2025 WL 3049944, at \*17 (preliminarily enjoining the Partnership, despite CARB's later-filed state court action).

## II.    California's Standards Are Preempted and Unenforceable

As AmFree explained, the Partnership is an "attempt to enforce" state emissions standards, which is prohibited by section 209(a) of the Clean Air Act. Pl.'s Mem. at 12:9–17:28; 42 U.S.C. § 7543(a). Cliff does not dispute that the Partnership "attempts to enforce" the Omnibus and ACT regulations, but argues that section 209(a) doesn't apply to "voluntary" agreements, but only to "standards" expressed in a State's regulatory code. Def's Mem. at 18:5–22:28. Cliff is wrong in both respects.

### A.    Section 209(a) Does Not Include a "Voluntariness" Exception

Section 209(a) does not include a "judge-made exception for regulations manufacturers have purportedly consented to." Pl.'s Mem. at 16:7–8. The relevant question for preemption under section 209(a) is whether a state action is an "attempt to enforce any standard relating to the control of emissions from new motor vehicles or … engines." 42 U.S.C. § 7543(a). It is. *See* Pl.'s Mem. at 14:10–15:6.

In arguing for a "voluntariness" exception, Cliff misreads *American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995), and *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 569 U.S. 641 (2013). Def.'s Mem. at 18:10–19:2, 22:9–12, 23:8–14. Neither case held that a party's consent invalidates the normal operation of preemption principles. Rather, preemption turned on whether the parties were contracting in a sovereign or proprietary (or otherwise private) capacity. The contract in *Wolens* was *not* preempted because it was between private parties—an airline and passengers enrolled in its frequent flyer program—and embodied only "privately ordered obligations," not a "State's enactment or enforcement of any law, rule, regulation, standard, or other provision having the force and effect of law within the meaning of" the preemption provision. 513 U.S. at 224–25, 228–29 (cleaned up). The agreement in *American Trucking*, on the other hand, *was* preempted because it involved a sovereign party—the Port of Los Angeles—that was "not act[ing] as a private

party, contracting in a way that the owner of an ordinary commercial enterprise could mimic," but rather "exercis[ing] classic regulatory authority" in its sovereign capacity. 569 U.S. at 650–51.

Here, there is no question that Cliff was acting in a sovereign, not proprietary, capacity, in entering the Partnership. He signed the agreement as "Executive Officer, California Air Resources Board." Compl., Ex. A at 5. The Partnership requires manufacturers to comply with regulations codified in the California Code of Regulations. *See e.g.*, *id.* at 2 n.1, 11 nn.2–5, 17. In return, Cliff committed to, in his capacity as Executive Director, "direct the CARB staff to propose, and recommend that the CARB Board adopt" regulatory amendments that would ease manufacturers' state regulatory burden. *Id.* at 3. And the Partnership purports to preserve California's role in pre-sale certification, a classic exercise of state regulatory authority. *Id.* at 10. These are actions no private party could undertake. It therefore does not matter whether the manufacturers entered the Partnership willingly.

The Ninth Circuit has already rejected Cliff's argument that preemption cannot apply to voluntary, "self-imposed requirements," Def.'s Mem. at 18:27–19:5, when one party is a government acting as sovereign. *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872 (9th Cir. 2006). That holding is binding on this Court.[7] In *Olympic Pipe Line*, the Ninth Circuit held that an agreement between Seattle and a pipeline operator, in which the operator "knowingly and voluntarily consented" to meet certain state safety standards, was nonetheless preempted. 437 F.3d at 878–80, 882. The Court distinguished contracts in which "the City acted as a municipal proprietor" or "market participant"—which may not be subject to preemption—and those in which it acted in its sovereign capacity "as a regulator"—which undoubtedly are. *Id.* at 881.

*Olympic Pipe Line* is on all-fours here. In entering the Partnership, Cliff "was acting as a regulator rather than" a private party. *Id.* Cliff's "interest is not that of a private market participant" or "proprietor," but that of CARB acting in "its sovereign capacity" "pursuant to

---

[7] Cliff suggests *Olympic Pipe Line* is no longer good law, Def.'s Mem. at 22:1–7, but until the Ninth Circuit abrogates the decision, it is binding on this Court, *United States v. Frank*, 956 F.2d 872, 882 (9th Cir. 1991).

its general duty to protect the public health and safety." *Id.*; *see* Def.'s Mem. at 2:19–3:3 (emissions regulations are necessary to protect "public health and well-being"); Compl., Ex. A at 2 (Partnership entered, in part, to "preserv[e] and protect[] the environment"). Because Cliff was acting in a sovereign capacity, the Partnership is subject to federal preemption, regardless of whether the manufacturers entered it willingly.

Cliff's attempts to distinguish *Olympic Pipe Line* fall flat. Def.'s Mem. at 21:23–22:1. That the City "attempt[ed] to enforce the 'agreement' through 'its police and regulatory powers,'" *id.* at 21:24–27, was merely one of the many factors the Court listed when concluding the City entered the contract in its sovereign capacity "as a regulator." *Olympic Pipe Line*, 437 F.3d at 881–82. It was not dispositive. *See id.* at 882 n. 26 (court's conclusion would not have changed had the City "pursue[d] its contract claims" in court). And here, there is ample evidence that Cliff entered the Partnership in his sovereign capacity. *See supra* at 18:3–11.

*Olympic Pipe Line* also squarely forecloses Cliff's argument that manufacturers can waive preemption. Def.'s Mem. at 18:20–23, 21:23–22:12 & n.9. As the Ninth Circuit explained in that case, "[p]reemption is a power of the federal government, not an individual right of a third party that the party can 'waive.'" *Olympic Pipe Line*, 437 F.3d at 883. Nor does that statement conflict with the Supreme Court's observation in *Murphy v. NCAA*, 584 U.S. 453 (2018), that federal preemption "confers on private entities … a federal right to engage in certain conduct subject only to certain (federal) constraints." *Id.* at 478–79; *contra* Def.'s Mem. at 18:18–20, 22:2–6. *Olympic Pipe Line* vindicated the very right recognized by *Murphy*, and also observed that the right cannot be waived. *Murphy*'s use of the word "federal right" says nothing about waiver. Nor does *Wolens* support Cliff. *See* Def.'s Mem. at 19:1–2 (asserting that "the airline could waive—and had waived—its statutory preemption rights through contract"). *Wolens* did not hold that the airline waived preemption (it never even mentions "waiver"), but that preemption under the relevant statute did not reach a contract between private parties. 513 U.S. at 228–29.

### B.    Prohibited "Standards" Include Those Expressed In the Partnership

Cliff is also wrong that section 209(a)'s prohibition applies only to "state laws enacted unilaterally, not commitments offered and accepted as consideration in a bargained-for exchange."

Def.'s Mem. at 20:8–9. As AmFree explained, section 209(a) contains no language limiting preempted emissions standards to those in a State's regulatory code. Pl.'s Mem. at 15:7–17:2; 19:17–23; 20:24–21:5. Rather, section 209(a) prohibits a State from attempting to enforce "*any* standard relating to the control of emissions from new motor vehicles," no matter how imposed. 42 U.S.C. § 7543(a) (emphasis added). Indeed, the Supreme Court has already foreclosed Cliff's argument by observing that in section 209(a), "standards" include not only requirements formally created by the "authority" of the state—like the regulations, themselves—but also those "established by … custom, or general consent." *Engine Mfrs. Ass'n*, 541 U.S. at 252–53. Holding otherwise would render "attempt to enforce" nugatory: the independent prohibition on "adopt[ing]" standards would suffice. 42 U.S.C. § 7543(a).

The Clean Air Act's definition of the specific term "emission standard" does nothing to undermine this conclusion. *Contra* Def.'s Mem. at 20:6–9. Under the Act, "'emission standard' mean[s] a requirement *established by the State* or Administrator …." 42 U.S.C. § 7602(k). The Partnership's terms qualify: they are "requirement[s] established by [California]," through contract. The Act's definition does not purport to limit the means by which the State requirements are established. In any event, section 209(a)'s prohibition doesn't use the defined term "emission standard" and is broader than the Act's definition: it prohibits attempts to enforce "any standard *relating* to the control of emissions from new motor vehicles or … engines." *Id.* § 7543(a). Regardless, the Partnership *does* attempt to enforce regulations promulgated by a state agency and codified in the state code. *See* Compl., Ex. A at 3 (manufacturers "commit to meet … the relevant provisions of the CARB regulations set forth in [the] Appendices"). That a regulatory standard is enforced through contract remedies rather than state regulatory action doesn't make it any less of a "standard." And, although California has elected so far to enforce it through contract claims, the Partnership is at least arguably enforceable through state regulatory action, since it incorporates the penalty provisions of the state code. *See, e.g.*, Compl., Ex. A, at 10–11 nn.1–2 (incorporating, *e.g.*, Cal. Code Regs. tit. 13, § 2170).

Cliff's reliance on the First Circuit's decision in *Ass'n of International Automobile Manufacturers, Inc. v. Commissioner, Massachusetts Department of Environmental Protection*, 208

F.3d 1 (1st Cir. 2000) ("*AIAM*"), Def.'s Mem. at 19:9–12, is unavailing for the reasons AmFree previously explained, *see* Pl.'s Mem. at 21:14–22:22 (explaining that *AIAM*'s construction of section 209(a) is dicta, its reasoning is wrong, and it conflicts with later Supreme Court precedent, *Engine Mfrs. Ass'n v. S. Coast Air Quality Dist.*, 541 U.S. 246 (2004)). Cliff's characterization of AmFree's argument, however, is misleading. AmFree did not "acknowledge[] that the First Circuit correctly interpreted the word 'standards' to mean 'formal state laws and regulations'" in *AIAM*. Def.'s Mem. at 20:12–14 (citing Pl.'s Mem. at 22:1–12). As AmFree explained, the *phrase* "California standards for which a waiver has been granted" in Clean Air Act section 177—the provision at issue in *AIAM*—could reasonably be understood as "referring to formal regulations of California." Pl.'s Mem. at 22:7–9. That is because typically waivers are granted only for California's formal regulations submitted to EPA. This argument is not "hard to follow." Def.'s Mem. at 20:15.

## III. The Partnership Is Inseverable

Finally, Cliff argues that if the Court concludes that the Partnership is an unlawful attempt to enforce preempted standards, the Court should sever only those terms concerning the Advanced Clean Fleets ("ACF") 2036 "zero-emissions" sales requirement—which Cliff concedes is preempted, Def.'s Mem. at 4:5–7—but preserve the terms concerning the Omnibus and ACT regulations, which Cliff argues are not, *see id.* at 26–35. Cliff's last-ditch attempt to salvage the Partnership fails in two respects. First, the Partnership is inseverable; this Court cannot alter its terms by selectively blue-penciling central provisions. Second, like those concerning the ACF requirement, the Partnership's terms concerning the Omnibus and ACT regulations are preempted following Congressional Review Act ("CRA") Resolutions passed by Congress and signed by the President in June 2025 rescinding their waivers.

Significantly, if the Court concludes the Partnership is inseverable, it need not address Cliff's (meritless) arguments that the Omnibus and ACT regulations are not preempted.

### A. The Partnership's Terms Are Not Severable

As AmFree previously explained, the Partnership is inseverable because it is a contract for an illegal purpose, namely requiring manufacturers "to meet" federally preempted regulations

"irrespective of … CARB's overall authority to implement" them. Pl.'s Mem. at 22:23–23:4 (quoting Compl., Ex. A at 3, 10, 17). Because "the central purpose of the contract is tainted with illegality, … the contract as a whole cannot be enforced." *Marathon Ent., Inc. v. Blasi*, 174 P.3d 741, 743 (Cal. 2008).

That illegal purpose is plain from the Partnership's text, which repeatedly commits manufacturers to comply with preempted regulations "irrespective of … CARB's overall authority to implement" them. Compl., Ex. A at 3; *see also id.* at 10, 17. This is not, therefore, a case where "the illegality is collateral to the main purpose of the contract." *Ramirez v. Charter Commc'ns, Inc.*, 551 P.3d 520, 546 (Cal. 2024). The manufacturers' commitment to comply with the regulations irrespective of CARB's authority to enforce them under federal law *is* the main purpose. Indeed, there would be no need for the Partnership if Cliff did not intend to extend the regulations further than federal law permits.

The Partnership's lack of a severance clause underscores that it is inseverable. Although not dispositive, a severance clause is "evidence of the parties' intent that, to the extent possible, the valid provisions of the contracts be given effect, even if some provision is found to be invalid or unlawful." *Ronderos v. USF Reddaway, Inc.*, 114 F.4th 1080, 1103 (9th Cir. 2024). That the Partnership includes no severance clause indicates the parties, too, understood that the Partnership would stand or fall as a whole.

In any event, to cure the illegality, the Court could not simply sever the term requiring compliance with the ACF requirement, as Cliff suggests. Def.'s Mem. at 34:21–23. It would have to remove *all* provisions that purport to commit the manufacturers to complying with regulations "irrespective" or "regardless" of CARB's authority. *See* Compl., Ex. A at 3, 10, 17. Because there is "no single provision [the] court can strike or restrict to remove the [illegal] taint from the agreement," the Court "must void the entire agreement." *Ronderos*, 114 F.4th at 1100 (quotation marks omitted).

Cliff's reliance on *California Tow Truck Ass'n v. City & County of San Francisco*, 693 F.3d 847 (9th Cir. 2012), is misplaced. Def.'s Mem. at 34:13–26. *California Tow Truck* addresses how to analyze a preemption "challenge to a *comprehensive law*," 693 F.3d at 860 (emphasis added), which

Cliff insists the Partnership is not, *see, e.g.*, Def.'s Mem. at 23:1 ("The Clean Truck Partnership Is a Voluntary Agreement, not a State Law"). That case's "provision-by-provision" approach is therefore inapplicable here.

### B.    Cliff's Arguments About the CRA Resolutions Cannot Succeed

If the Court concludes that the Partnership is inseverable, it need not address Cliff's arguments that the Resolutions rescinding the Clean Air Act waivers are unconstitutional. *See* Def.'s Mem. at 26:18–34:6. That issue has already been fully briefed before the District Court for the Northern District of California, where California previously filed suit. *California v. United States*, No. 4:25-cv-04966 (N.D. Cal., June 12, 2025). Should this Court elect to address Cliff's CRA arguments, it must reject them. This Court lacks jurisdiction over Cliff's challenges, and, in any event, they are meritless.

### 1.    This Court Lacks Jurisdiction to Review the CRA Resolutions

In 2025, the House of Representatives and the Senate passed by majority vote, and the President signed, Resolutions under the CRA disapproving the Clean Air Act waivers of preemption previously issued by EPA for the ACT and Omnibus regulations. Pub. L. No. 119-15, 139 Stat. 65 (ACT); Pub. L. No. 119-17, 139 Stat. 67 (Omnibus). Enacted consistent with the constitutional requirements of bicameralism and presentment, U.S. Const. art. I, § 7, those Resolutions are federal law, and provide that the Omnibus and ACT waivers "shall not take effect (or continue)" and "may not be reissued in substantially the same form" unless "specifically authorized by a [new] law." 5 U.S.C. § 801(b). Cliff argues, however, that these laws are unconstitutional because Congress inappropriately treated the waivers as "rules" subject to the CRA. Def.'s Mem. at 27:18–28:2. This Court lacks jurisdiction to consider his defenses for at least two reasons.

First, the CRA denies this Court jurisdiction to review any "determination, finding, action, or omission under" the CRA. 5 U.S.C. § 805. Although Cliff cloaks his challenge in constitutional language, at bottom, he argues "that Congress did not validly enact the Joint Resolution[s]." *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 564 (9th Cir. 2019). As the Ninth Circuit has held, courts "lack authority to consider [such a] claim." *Id.* "'Under this chapter' refers to duties

the CRA imposes on various actors, whether those duties take the form of determinations, findings, actions, or omissions," and includes actions and omissions "by agencies, the Comptroller General, the President, and Congress." *Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1235–36 (10th Cir. 2020). EPA's determination that the waivers are "rules," EPA's submission of the waivers to Congress, Congress's agreement that the waivers are "rules," Congress's decision to apply expedited procedures, and all subsequent actions of Congress and the President related to the Resolutions are all "determinations, findings, [or] actions," "[u]nder" the CRA, and so are beyond this Court's review. 5 U.S.C. § 805. Cliff's claim that the Resolutions "were not enacted 'under' the CRA," Def.'s Mem. at 27:8, is belied by the Resolutions' text, which expressly states they "[p]rovid[e] congressional disapproval under chapter 8 of title 5, United States Code," that is, under the CRA. Pub. L. No. 119-15, 139 Stat. 65 (ACT); Pub. L. No. 119-17, 139 Stat. 67 (Omnibus). In any event, the Ninth Circuit has already rejected similar attempts to evade section 805's jurisdictional bar, and the precedent is binding here. *Ctr. for Biological Diversity*, 946 F.3d at 563 (rejecting argument that section 805 doesn't apply because "the Joint Resolution was not enacted 'under' the CRA").[8]

Cliff's defenses concerning the Tenth Amendment, federalism, and separation of powers, Def.'s Mem. at 29:27–34:6, are beyond this Court's jurisdiction for the separate and independent reason that they amount to a non-justiciable challenge to House and Senate procedures. "The constitution empowers each house to determine its rules of proceedings." *United States v. Ballin*, 144 U.S. 1, 5 (1892); U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings[.]"). "Neither … the advantages or disadvantages, the wisdom or folly, of … a rule [of Congress] present any matters for judicial consideration." *Ballin*, 144 U.S. at 5. "In short, the Constitution textually commits the question of legislative procedural rules to Congress." *Consejo*

---

[8] Despite section 805's unambiguously categorical bar, the Ninth Circuit has held that courts may consider "colorable constitutional claims" that "aris[e] out of actions taken under" the CRA. *Ctr. for Biological Diversity*, 946 F.3d at 561 (cleaned up). Even if correct, that carveout does not apply to Cliff's defenses, which are not colorable, but invoke far-fetched constitutional theories.

*de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1172 (9th Cir. 2007). Cliff's arguments asserting "extraordinary defects" that violate the Tenth Amendment and federalism, Def.'s Mem. at 30:5–7, and the Senate's purportedly improper reliance on EPA's determination that the waivers were rules, *id.* at 33:16–21, boil down to nothing more than a disagreement over Congress's decision to rescind the waivers without applying the filibuster in the Senate. But determining whether to apply the CRA's "accelerated procedure is 'an exercise of the rulemaking power of the Senate and House of Representatives, respectively,'" *Ctr. for Biological Diversity*, 946 F.3d at 557 (quoting 5 U.S.C. § 802(g)), and so beyond this Court's review. Nor would it matter if Congress's use of the CRA here departed from its previous practice (although it did not). *See* Def.'s Mem. at 30:15–32:21. "[T]he asserted failure of Congress to comply with its own procedural rules … is a non-justiciable political question beyond [this Court's] power to review." *Consejo de Desarrollo Economico*, 482 F.3d at 1171–72. In modern parlance, Congress's use of CRA procedures for the Resolutions is a "political question" that "revolve[s] around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *see also Baker v. Carr*, 369 U.S. 186, 217 (1962). And the "presence of a political question deprives [this] [C]ourt of subject matter jurisdiction" over this issue. *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 980–81 (9th Cir. 2007).

### 2.      The CRA Resolutions Are Valid

Regardless, Cliff's arguments fail on the merits. Because the waivers are rules, they are properly subject to the CRA. And even if they were not, the Resolutions are constitutional.

In *Yesler Terrace Community Council v. Cisneros*, 37 F.3d 442 (9th Cir. 1994), the Ninth Circuit explained that "two principal characteristics distinguish rulemaking from adjudication." *Id.* at 448. "First, adjudications resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals. Second, because adjudications involve concrete disputes, they have an immediate effect on specific individuals[.] … Rulemaking, in contrast, is prospective, and has a definitive effect on individuals only after the rule subsequently is applied." *Id.* (citations omitted).

EPA's waivers allowing California to substitute state emissions standards for federal ones have "all the hallmarks of a rule" under this rubric. *Id.* The waivers "had no immediate, concrete effect on anyone, but merely permitted" California and other states to enforce state emissions standards "in the future," and so have "prospective" effect. *Id.*; *see also* 42 U.S.C. § 7521(a)(2) (applicable through § 7543(b)(1)(C), requiring lead time); *id.* § 7507(2) (other states must "adopt such standards at least two years before commencement of [the applicable] model year"). And they "affected the rights of a broad category of individuals not yet identified": manufacturers who may sell new motor vehicles in those states. *Yesler*, 37 F.3d at 448.

It doesn't matter if "the manner in which [EPA] made its decision[s] shares certain features with adjudications"—"[t]he form of the proceeding is not dispositive; what counts is its effect." *Id.* at 449. And the effect of a waiver is that of a rule that implements an alternative compliance pathway governing conduct of manufacturers nationwide. 42 U.S.C. § 7543(b)(3) ("compliance with [California's] standards shall be treated as compliance with applicable Federal standards"). EPA's waiver decisions "plainly involved more than applying a rule of decision to particular facts," including weighing policy-laden considerations like the standards' technological feasibility and cost appropriateness. *Yesler*, 37 F.3d at 449; 42 U.S.C. § 7521(a)(2) (applicable through section 7543(b)(1)(C)).

Even if the waivers aren't rules, Cliff's constitutional arguments would fail. Cliff's claim that the Resolutions violate the separation of powers because they are "impermissible legislative adjudications," rather than changes to substantive law, Def.'s Mem. at 28:3–29:25, misunderstands the Resolutions, the CRA, and the Constitution itself. "When Congress enacts legislation that directs an agency to [rescind] a particular [action], 'Congress has amended the law.'" *Ctr. for Biological Diversity*, 946 F.3d at 562. The Resolutions are legislation because Congress enacted them through the constitutionally prescribed procedure of "bicameral passage followed by presentment to the President." *INS v. Chadha*, 462 U.S. 919, 954–55 (1983). And the Resolutions create new substantive law because they effectuate a new legal standard: namely, that the carveout from Clean Air Act preemption in section 209(b) does not include the Omnibus and ACT regulations, or substantially similar regulations. The Resolutions are therefore "enforceable

as a change to substantive law, even though [they] did not state that [they] constituted an amendment to" the Clean Air Act or, for that matter, the CRA. *Ctr. for Biological Diversity*, 946 F.3d at 562. "[B]ecause the [Resolutions] changed the substantive law, [they do] not violate the constitutional separation of powers." *Id.* (quotation marks omitted). And regardless, "a judgment declaring a public right may be annulled by subsequent legislation." *Hodges v. Snyder*, 261 U.S. 600, 604 (1923); *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421 (1855); *Mount Graham Coal. v. Thomas*, 89 F.3d 554, 557 (9th Cir.1996) ("judgment enforcing a public right … may be annulled by subsequent legislation"). As the Supreme Court has held, it does not violate the separation of powers for Congress to revisit an executive adjudication. *Paramino Lumber Co. v. Marshall*, 309 U.S. 370, 374, 375 n.3, 381 & n.25 (1940).

Cliff's argument that Congress's enactment of the Resolutions involved "extraordinary defects in the national political process" in violation of the Tenth Amendment and federalism, Def.'s Mem. at 29:27–33:11 (citing *South Carolina v. Baker*, 485 U.S. 505, 512 (1988)), is baseless. Cliff complains that the Senate "invoke[d] procedures they knew did not apply and to which States had unanimously consented" to bypass the filibuster. *Id.* at 30:8–14, 32:27–28. But neither the Tenth Amendment nor federalism principles grant Cliff a constitutional right to particular Senate procedures, much less the filibuster. "Where, as here, the national political *process*, did not operate in a defective manner, the Tenth Amendment is not implicated." *South Carolina*, 485 U.S. at 513. If anything, Congress vindicated federalism principles through the Resolutions by subjecting California to the same preemption as every other state. *Cf. Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009).

Finally, Cliff's argument that the Senate's alleged decision to credit EPA's determination that the waiver is a rule "impermissibly delegated the power to set its internal rules" to the Executive Branch, Def.'s Mem. at 33:12, mischaracterizes what occurred. The Senate did not "abdicat[e] its exclusive rule-setting power," *id.* at 33:21; it exercised it, passing a Point of Order that provided in certain circumstances—where any agency has determined that an action is a "rule" and transmitted it to Congress—the Senate will not defer to GAO's determination that an action does not qualify as a rule. Pl.'s RJN, Ex. 12 (Congressional Record Entries) at 9 (171 Cong.

Rec. S3088 (daily ed. May 21, 2025) (statement of Sen. Capito)) ("the procedural issue before the Senate was simply whether GAO staff should be able to block resolutions of disapproval against Agency-submitted rules"). At no point did the Senate "cede[] control over its internal procedures." Def.'s Mem. at 33:26–27. The Senate remained—and still remains—in full control. It can, at any time, change its Point of Order, or overrule an agency's determination. *Ballin*, 144 U.S. at 5 (each Chamber has "a continuous power" to make its own rules). In any event, the Constitution does not forbid Congress from agreeing with the Executive Branch in determining how it should proceed. *Mistretta v. United States*, 488 U.S. 361, 372 (1989) ("[T]he separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches."). That is all that the Senate did here.

**IV.    The Court Should Grant a Declaratory Judgment and an Injunction**

Lastly, Cliff argues that the court should grant "a declaratory judgment only" and requests "supplemental briefing" on the proper remedy if the Court rules for AmFree. Def.'s Mem. at 35:13, 35:22. But no supplemental briefing on remedy is necessary. *Barbour v. United States*, No. 1:18-CV-0246 JLT BAM, 2025 WL 2754125, at *4 (E.D. Cal. Sept. 29, 2025) ("good cause" required for supplemental briefing). Only an injunction prohibiting Cliff from enforcing the unlawful Partnership gives AmFree complete relief, and this Court has already held that an injunction is appropriate to remedy the Partnership's Clean Air Act and Supremacy Clause violations, *Daimler*, 2025 WL 3049944, at *17.

**CONCLUSION**

The Court should grant AmFree's Motion for Judgment on the Pleadings or, in the Alternative, Summary Judgment; deny Cliff's Cross-Motion for the same; issue a declaration that the Partnership is preempted and unenforceable because it violates the Clean Air Act and the Supremacy Clause; and permanently enjoin Cliff from enforcing it.

Dated: June 24, 2026                Respectfully submitted,

                                    /s/ *James R. Conde*

                                    Michael Buschbacher*
                                    James R. Conde*
                                    Laura B. Ruppalt*
                                    Nicholas A. Cordova*
                                    Boyden Gray PLLC
                                    800 Connecticut Avenue NW
                                      Suite 900
                                    Washington, D.C. 20006
                                    (202) 955-0620
                                    mbuschbacher@boydengray.com
                                    jconde@boydengray.com
                                    lruppalt@boydengray.com
                                    ncordova@boydengray.com

                                    * *pro hac vice*

                                    Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I certify that counsel of record were served a copy of this document via the Court's CM/ECF system this 24th day of June, 2026.

/s/ *James R. Conde*
James R. Conde