ROB BONTA
Attorney General of California
MYUNG J. PARK, State Bar No. 210866
Supervising Deputy Attorney General
BENJAMIN P. LEMPERT, State Bar No. 344239
M. ELAINE MECKENSTOCK, State Bar No. 268861
DAVID M. MEEKER, State Bar No. 273814
CECILIA D. SEGAL, State Bar No. 310935
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 510-3545
  Fax: (415) 703-1107
  E-mail: cecilia.segal@doj.ca.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE**,<br><br>Plaintiff,<br><br>**THE UNITED STATES OF AMERICA**; and **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**,<br><br>Plaintiff-Intervenors,<br><br>**v.**<br><br>**STEVEN S. CLIFF,** in his official capacity as the Executive Officer of the California Air Resources Board,<br><br>Defendant. | 2:25-cv-03255-DC-AC<br><br>**DEFENDANT'S REPLY IN SUPPORT OF CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, SUMMARY JUDGMENT**<br><br>Judge:  Hon. Dena Coggins<br>Courtroom:  10, 13th Floor<br>Date:  None Set<br>Action Filed:  December 16, 2024 |

**TABLE OF CONTENTS**

**Page**

Introduction ................................................................................................. 1

Argument .................................................................................................... 1

    I.    AmFree Lacks Standing to Challenge the CTP ................................. 1

        A.    AmFree Bears the Burden of Demonstrating Standing ............................. 1

        B.    AmFree Does Not Meet Its Burden of Demonstrating Standing ............... 3

            1.    AmFree's Sole California Declarant Falls Short ........................... 3

            2.    AmFree's Out-of-State Declarants Also Fall Short ....................... 7

        C.    AmFree Lacks Standing for the Relief It Seeks ......................................... 9

    II.    AmFree's Preemption Challenge to the CTP Is Meritless ................................. 11

        A.    Contract Terms are not Standards Within the Meaning of Section 209(a) ................................................................................. 11

        B.    Efforts to Enforce the CTP's Contractual Terms are not "Attempts to Enforce" Standards ................................................................. 15

    III.    Even if the CTP Were an Attempt to Enforce Preempted Standards, the Omnibus and ACT Rules Are Not Preempted and the CTP is Severable ............. 16

        A.    The ACT and Omnibus Rules are Not Preempted Because Their Waivers Remain Valid ................................................................. 16

            1.    The Court Has Jurisdiction Over the Constitutional Arguments ................................................................................ 16

            2.    The Congressional Resolutions Are Unconstitutional .................. 17

                a.    Waivers Are Adjudications, Not Rules ............................ 17

                b.    Congress Cannot Nullify Completed Adjudications By The Executive Branch ................................................ 19

                c.    The Resolutions Violate the Tenth Amendment and Structural Federalism ................................................. 20

                d.    The Senate Impermissibly Delegated Its Rules-Clause Power ................................................................. 20

        B.    The 2036 Sales Requirement is Severable ................................................ 21

Conclusion ................................................................................................... 21

i

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Airlines for America v. City and County of San Francisco*
78 F.4th 1146 (9th Cir. 2023)........................................................................... 14

*Am. Airlines, Inc. v. Wolens*
513 U.S. 219 (1995) ......................................................................... 12, 13, 14

*Am. Trucking Ass'ns., Inc. v. City of Los Angeles*
569 U.S. 641 (2013) ............................................................................... 13, 14

*Askins v. U.S. of Dep't of Homeland Sec.*
899 F.3d 1035 (9th Cir. 2018)............................................................................. 2

*Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot. (AIAM)*
208 F.3d 1 (1st Cir. 2000) ................................................................................ 13

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*
733 F.3d 939 (9th Cir. 2013)............................................................................ 14

*Barnum Timber Co. v. EPA*
633 F.3d 894 (9th Cir. 2011)............................................................................ 10

*Black Diamond Asphalt v. Super. Ct.*
109 Cal. App. 4th 166 (2003)........................................................................... 15

*Cal. Expanded Metal Prods. Co. v. Klein*
426 F.Supp.3d 730 (W.D. Wash. 2019)......................................................... 3, 19

*Challenge v. Moniz*
218 F.Supp.3d 1171 (E.D. Wash. 2016) ............................................................. 2

*Chick Kam Choo v. Exxon Corp.*
486 U.S. 140 (1988)......................................................................................... 11

*Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*
626 F.3d 483 (9th Cir. 2010).............................................................................. 8

*City of Los Angeles v. Santa Monica Baykeeper*
254 F.3d 882 (9th Cir. 2001).............................................................................. 2

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*
482 F.3d 1157 (9th Cir. 2007)........................................................................... 17

*Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*
218 F.Supp.2d 1203 (C.D. Cal. 2002)............................................................... 10

ii

**TABLE OF AUTHORITIES**
(continued)

Page

*Ctr. for Biological Diversity v. Bernhardt* (*CBD*)
    946 F.3d 553 (9th Cir. 2019).................................................................. 16, 17, 18

*Davis v. Harrison*
    No. 2:24-cv-0439-SCR, 2025 WL 684409 (E.D. Cal. Mar. 4, 2025) ...................................... 2

*District of Columbia v. Heller*
    554 U.S. 570 (2008) ............................................................................ 16

*Easterday Dairy, LLC v. Fall Line Capital, LLC*
    No. 22-cv-01000, 2022 WL 17104572 (D. Or. Nov. 22, 2022)................................... 11

*Edmo v. Corizon, Inc.*
    935 F.3d 757 (9th Cir. 2019)................................................................. 21

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist (EMA)*
    541 U.S. 246 (2004) ...................................................................... 12, 15, 16

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*
    561 U.S. 477 (2010) .......................................................................... 21

*Freytag v. C.I.R.*
    501 U.S. 868 (1991) .......................................................................... 19

*FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*
    146 S. Ct. 1546 (2026) ....................................................................... 10

*Garcia v. San Antonio Metro. Transp. Auth.*
    469 U.S. 528 (1985)........................................................................... 20

*Gunter v. Janes*
    9 Cal. 643 (1858) ............................................................................. 11

*Hodges v. Snyder*
    261 U.S. 600 (1923)........................................................................... 19

*In re Stevens*
    15 F.4th 1214 (9th Cir. 2021)............................................................... 11, 13

*L.J. Gibson v. Credit Suisse AG*
    No. 1:10-cv-00001, 2016 WL 4033104 (D. Idaho July 27, 2016)............................. 4

*Landor v. La. Dep't of Corr. & Pub. Safety*
    146 S.Ct. 1931 (2026) ........................................................................ 12

iii

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Loffman v. Cal. Dep't of Educ.*
119 F.4th 1147 (9th Cir. 2024)..................................................................................... 2

*Lujan v. Nat'l Wildlife Fed'n*
497 U.S. 871 (2019).................................................................................................... 5

*McIntosh v. United States*
601 U.S. 330 (2024).................................................................................................. 17

*Medina v. Planned Parenthood S. Atl.*
606 U.S. 357 (2025).................................................................................................. 10

*Miller v. Gammie*
335 F.3d 889 (9th Cir. 2003)..................................................................................... 14

*Mitchum v. Foster*
407 U.S. 225 (1972).................................................................................................. 11

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*
627 F.2d 1095 (D.C. Cir. 1979) ........................................................................... 13, 18

*Mount Graham Coalition v. Thomas*
89 F.3d 554 (9th Cir. 1996)....................................................................................... 19

*Murphy v. NCAA*
584 U.S. 453 (2018)....................................................................................... 10, 13, 14

*Murthy v. Missouri*
603 U.S. 43 (2024).............................................................................................. 3, 6, 9

*New York v. Hill*
528 U.S. 110 (2000).................................................................................................. 14

*Nixon v. United States*
506 U.S. 224 (1993).................................................................................................. 17

*NLRB v. Noel Canning*
573 U.S. 513 (2014).................................................................................................. 17

*Ohio v. EPA*
98 F.4th 288 (D.C. Cir. 2024) ................................................................................... 20

*Olympic Pipe Line Co. v. City of Seattle*
437 F.3d 872 (9th Cir. 2006)..................................................................................... 14

iv

TABLE OF AUTHORITIES
(continued)

**Page**

*Papasan v. Allain*
478 U.S. 265 (1986) ................................................................................................ 10

*Paramino Lumber Co. v. Marshall*
309 U.S. 370 (1940) ................................................................................................ 19

*Pennsylvania v. Wheeling & Belmont Bridge Co.*
59 U.S. 421 (1855) .................................................................................................. 19

*Peralta v. Dillard*
744 F.3d 1076 (9th Cir. 2014) ................................................................................... 2

*Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*
204 F.3d 867 (9th Cir. 2000) ................................................................................... 10

*Ray v. Atl. Richfield Co.*
435 U.S. 151 (1978) ................................................................................................ 10

*S.D. Cnty. Gun Rts. Comm. v. Reno*
98 F.3d 1121 (9th Cir. 1996) .................................................................................. 6, 9

*South Carolina v. Baker*
485 U.S. 505 (1988) ................................................................................................ 20

*Stud v. Cains*
No. 15-cv-01045, 2018 WL 11352444 (D. Ariz. Apr. 20, 2018) ........................................ 4, 8

*Trump v. Slaughter*
No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026) ............................................................ 19

*United States v. Kirilyuk*
29 F.4th 1128 (9th Cir. 2022) .................................................................................. 18

*United States v. Klein*
80 U.S. 128 (1871) .................................................................................................. 19

*United States v. Sherwood*
312 U.S. 584 (1941) ................................................................................................ 19

*Yesler Terrace Community Council v. Cisneros*
37 F.3d 442 (9th Cir. 1994) ................................................................................. 17, 18

v

**TABLE OF AUTHORITIES**
(continued)

**Page**

STATUTES

1 U.S.C.
  § 102.................................................................................................................................. 16
  § 103.................................................................................................................................. 16

5 U.S.C.
  § 805............................................................................................................................. 16, 17
  § 806(a) ............................................................................................................................. 16

42 U.S.C.
  § 7416................................................................................................................................ 11
  § 7507................................................................................................................................ 13
  § 7543(a) ............................................................................................................. 11, 12, 15, 18
  § 7543(b)(1) .................................................................................................................. 16, 18
  § 7543(b)(3) ....................................................................................................................... 18
  § 7602(k)...................................................................................................................... 11, 12

Cal. Health & Saf. Code § 43105......................................................................................... 15

OTHER AUTHORITIES

7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
  § 1917 (3d. ed. 2008) ......................................................................................................... 1

## INTRODUCTION

AmFree argues that the Clean Truck Partnership (CTP) is preempted under the Clean Air Act, but even before reaching that issue AmFree must establish that it has standing. It cannot do so. Its efforts to evade that burden—by, e.g., leaning on the United States' recent admission as a party and the law-of-the-case doctrine—falter. So, too, does AmFree's attempt to rehabilitate its original (and inadequate) showing with new and supplemental declarations. AmFree's sole in-state declarant still cannot demonstrate a certainly impending injury-in-fact attributable to the CTP; its out-of-state declarants fare no better. And even if AmFree could overcome those obstacles, it does not establish that any redress is available here.

AmFree's suit fails on the merits, regardless. Certainly, Section 209(a) preempts attempts to enforce emission *standards* not covered by a preemption waiver. But the CTP is a voluntary agreement, and its terms are not government-imposed emission standards having the force and effect of law. Underscoring the point, attempts to enforce those bargained-for terms occur through breach-of-contract suit, not through the imposition of regulatory penalties. Both the CTP and attempts to enforce it are beyond Section 209(a)'s preemptive scope. In any event, two sets of standards incorporated by reference in the CTP are not preempted, and the CTP is severable. The Court should deny AmFree's motion and grant Defendant Cliff's cross-motion.

## ARGUMENT

### I.    AMFREE LACKS STANDING TO CHALLENGE THE CTP

As Defendant Cliff explained, AmFree has failed to meet its burden to establish standing—something it must do to obtain judgment in its favor. ECF No. 174 (Cross-Mot.) Sec. I. Neither AmFree's attempts to evade its burden nor its new declarations persuade otherwise.

#### A.    AmFree Bears the Burden of Demonstrating Standing

In an effort to avoid the fact that it has not established standing, AmFree advances three reasons it need not do so. All three miss the mark.

First, AmFree attempts to argue standing on the United States' behalf and then piggyback on the result. ECF No. 182 (Opp'n) 3:8-18. But intervention "cannot create jurisdiction if none existed before," 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*

1

§ 1917 (3d. ed. 2008)), and the United States lacks standing to challenge the CTP, as Defendant Cliff will demonstrate in a forthcoming brief. And while AmFree cites the rule from *Loffman v. California Department of Education* that standing for one is standing for all, neither that case nor any other AmFree cites applies the rule *across complaints*. *See also Challenge v. Moniz*, 218 F. Supp. 3d 1171, 1179 (E.D. Wash. 2016) (declining to apply rule across complaints). Moreover, even within a single complaint, *Loffman* makes clear that "nothing in this rule *prohibits* a district court from paring down a case by eliminating plaintiffs who lack standing." 119 F.4th 1147, 1164 (9th Cir. 2024) (affirming dismissal of one of three parent plaintiffs) (cleaned up).

Second, AmFree insists that law of the case applies, but continues to overlook that, unlike on a motion to dismiss—where allegations taken as true may suffice to establish standing—the complaint is now "stripped of those allegations which are denied by the defendant's answer." *Davis v. Harrison*, No. 2:24-cv-0439-SCR, 2025 WL 684409, at *3 (E.D. Cal. Mar. 4, 2025). Thus, the complaint's allegations cannot suffice for standing *now* because the answer "controvert[ed]" them. *Id.*; ECF No. 162, ¶¶ 127-62. The Northern District of Illinois simply did not decide, as "a rule of law" or otherwise, that the *admitted* facts establish AmFree's standing. Opp'n 3:21-23. There is also no risk of "perpetual litigation," Opp'n 4:3 (cleaned up); rather, the progression of burdens and factual development inherent in the standing inquiry is precisely why the Ninth Circuit confirmed that "[p]retrial rulings … don't bind district judges for the remainder of the case." *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) (en banc); *contra* Opp'n 4:22-23 (claiming no "factual development" at issue). AmFree may tout principles of "finality and repose," Opp'n 4:16, 5:3-4, but law of the case "simply does not impinge" on this Court's inherent authority to depart from the Northern District of Illinois' interlocutory order, *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 888 (9th Cir. 2001).[1]

Finally, AmFree tries to shift its burden of proof to Defendant Cliff by invoking mootness. Opp'n 6:3-10. But Defendant Cliff pointed out the inadequacies of AmFree's *standing* showing.

---

[1] AmFree ignores *City of Los Angeles* and asserts that law of the case "applies regardless of court level." Opp'n 4:13. But the determining factor is whether the issue previously decided is "binding," such as where the court had issued judgment. *Askins v. U.S. of Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018). AmFree's authorities conform to this test.

When AmFree filed its motion in April 2026, it chose not to shore up its declarant's much earlier speculation about what might (or might not) happen in 2025 with evidence about what *actually happened* that year. Defendant Cliff then demonstrated how facts on the ground refuted the declarant's (Mr. DeMartini's) speculation. Cross-Mot. 13:1-16:1.[2] That was never a mootness argument. It is *AmFree's* burden to establish standing at the time of suit "and maintain[] it" thereafter. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). It is likewise AmFree's burden to support its request for "only forward-looking relief" with a "real and immediate threat" of *future* harm. *Id.* at 58, 59. And while past injury may be "predictive," *Murthy*, 603 U.S. at 59, Mr. DeMartini failed to establish that, too: he did not allege *any* injury "experienced throughout 2024." *Contra* Opp'n 6:9; *see* ECF No. 142-5 (DeMartini Decl.), ¶¶ 14-15 (alleging harms in 2025). Thus, even looking to injury as alleged at the "outset of the suit," Opp'n 6:10-11, Mr. DeMartini's original declaration falls short and AmFree's mistaken reliance on mootness fails.

**B.    AmFree Does Not Meet Its Burden of Demonstrating Standing**

**1.    AmFree's Sole California Declarant Falls Short**

The original DeMartini declaration fails to establish any past, current, or impending injury. Cross-Mot. Sec. I.B.II. The supplemental declaration, even if considered, fares no better.

To begin, Mr. DeMartini's supplemental declaration should be struck because it "alleges new evidence that [AmFree] should have presented [with its] opening brief." *Cal. Expanded Metal Prods. Co. v. Klein*, 426 F. Supp. 3d 730, 743 (W.D. Wash. 2019). For example, the declaration proffers sales data "from 2023 through 2025," ECF No. 182-1 (hereafter "Suppl. DeMartini Decl."), ¶¶ 9-11, and alleges other harms specific to 2025, *e.g.*, ¶ 15. *All* of those allegations are meant to bolster AmFree's initial showing, not respond to Defendant Cliff's opposition, and thus should have been included in a declaration filed alongside AmFree's opening motion in April 2026. AmFree's attempt to get a "second bite at the apple" by belatedly presenting such evidence with its final brief should be rejected. *Klein*, 426 F. Supp. 3d at 743.[3]

---

[2] AmFree filed objections to Defendant Cliff's request for judicial notice of materials controverting AmFree's standing showing, arguing that such materials are irrelevant. *See* ECF No. 182-6 at Sec. II. That is incorrect, as explained in the response filed herewith.

[3] In case the Court allows AmFree's supplementation, Defendant Cliff offers declarations

(continued…)

3

Even crediting this supplemental declaration, it fails to substantiate Mr. DeMartini's previously alleged injuries. For example, while the original declaration alleges that his dealership would face limited supply of a particular Class A RV chassis in California in 2025, DeMartini Decl., ¶ 14, the supplemental declaration makes no mention of this alleged harm coming to pass and, indeed, contains no specific facts about Class A RV chassis at all. And while the original declaration alleges that shortages of Class Super C RV chassis would occur in 2025, DeMartini Decl., ¶ 15, the supplemental declaration alleges that the shortages in fact occurred in 2024, Suppl. DeMartini Decl., ¶¶ 4-5. The disconnect between the two declarations casts doubt on both; at a minimum, it confirms that Mr. DeMartini's original allegations rested on speculation alone.

AmFree's newly offered and cherry-picked data on RV sales is of no help. *See* Suppl. DeMartini Decl., ¶¶ 9-11. Looking to the same data source and accounting for discrepancies, it appears that DeMartini's RV's sales of Class Super C RVs—which have only comprised 25% of sales since 2022, *contra id.*, ¶ 4—continued to be significant due to a substantial increase in out-of-state sales. Suppl. Arneja Decl. (filed concurrently), ¶¶ 15-16. In fact, DeMartini RV saw a 40% *increase* in total Super C RV sales in 2025, belying any assertions of actual injury. *Id.*, ¶ 16 & Ex. A, Tbl. 3. That these sales have apparently declined in California since 2023—by 30%, not 50%, as Mr. DeMartini alleges—is entirely consistent with widely reported trends across the RV industry, which AmFree nowhere acknowledges: a pandemic-driven surge in demand in 2021 and 2022, followed by an expected softening in 2023 and persistent "economic headwinds" causing consumers to delay high-priced, discretionary purchases such as Super C RVs. *Id.*, ¶¶ 9-11, 13.

AmFree maintains that the alleged decrease in Class Super C RV sales since 2023 is more "pronounced" in California, and concludes the CTP must be the cause. Opp'n 6:19-7:8. But California is no outlier, as just established, and "timing alone does not establish causation" in any event. *L.J. Gibson v. Credit Suisse AG*, No. 1:10-cv-00001, 2016 WL 4033104, at *9 (D. Idaho July 27, 2016). Mr. DeMartini does not even allege that the manufacturers who purportedly constrained chassis supplies were CTP signatories, and in fact seems to assert that their actions

---

and exhibits concurrently with this reply that are directly responsive to those materials. *Stud v. Cains*, No. 15-cv-01045, 2018 WL 11352444, at *5 (D. Ariz. Apr. 20, 2018).

4

were driven by the ACT and Omnibus rules. Suppl. DeMartini Decl., ¶ 5 (alleging unidentified manufacturer acted "because of state emissions requirements"); DeMartini Decl., ¶ 14 (similar); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (2019) (courts will not "presume" missing facts). Moreover, the signatories who disavowed the CTP represented in court that they had been "obligated to follow" the ACT and Omnibus rule "as a matter of law, not as a result of the CTP" and that "the CTP had no impact" on the "availability, price, or the markets" for their products "at any time." ECF No. 176-13 at 3. They made similar representations to the Federal Trade Commission. *E.g.*, ECF No. 176-11 at 2. AmFree's attempt to dismiss these "affirmations" to government officials, *see id.* at 1, as "press releases" meriting "no weight" strains credulity. Opp'n at 9:2-3. Finally, AmFree's insistence that the ACT and Omnibus rules and the CTP are interchangeable, Opp'n 9:7-9, is simply incorrect. Regulations apply to *all* manufacturers, while agreements apply only to those who voluntarily signed them—and so, with the CTP, non-signatory manufacturers could step in to fill any gap between supply and demand, as Defendant Cliff has explained. Cross-Mot. 15:3-12; *see also* Jacobsen Decl. (filed concurrently), ¶¶ 9-11.[4]

AmFree also quotes at length from Defendant Cliff's September 2024 memo evaluating past truck availability in the State. Opp'n 7:9-26, 8:9-10. But nowhere does the memo "acknowledg[e]" that supply issues "stemmed from the [CTP]," as AmFree contends. *Id.* at 8:11-12. To the contrary, the memo explains that certain "product availability issues *in 2024*"—raised primarily by the tow truck industry—arose in connection with the Omnibus rule, and that the CTP "explicitly" included terms, based on manufacturer input, to *alleviate* those issues. ECF No. 183-2 (Sept. Memo) at 6 (emphasis added). If those terms did not fully and immediately do so, that resulted from the manufacturers' own "inaccurate" projections. *Id.* CARB staff further indicated that "additional Omnibus-compliant engines" for model years 2025 and 2026 would further alleviate these issues going forward. *Id.* As for other product availability issues in 2024, the memo confirms that they were "*not* driven by the ACT regulation," as had been reported. *Id.* at 4 (emphasis added). Rather, manufacturers were "well-situated to comply" with the ACT's

---

[4] Because AmFree fails to establish the CTP as a cause of its members' alleged injuries, its cases involving "multiple sufficient causes" are irrelevant. *See* Opp'n 8:17-23.

Def.'s Reply re Cross-Mot. for J. on the Pleadings or Summ. J. (2:25-cv-03255-DC-AC)

requirements for that model year yet told dealers and fleets otherwise. *Id.* at 5. Far from pinpointing the CTP as the cause, the September 2024 memo underscores the role the manufacturers' own choices played in any harm DeMartini RV Sales purportedly faced in 2024. Courts are rightly "reluctant to endorse standing theories that require guesswork as to how [such] independent decisionmakers will exercise their judgment." *Murthy*, 603 U.S. at 57 (cleaned up); *see also id.* at 61 (even where the parties, independent actors, timing, and conduct "line up," the links "must be evaluated in light of" the independent actors' own "incentives" and "judgment").[5]

Even assuming Mr. DeMartini can establish past harm, that "is insufficient." *S.D. Cnty. Gun Rts. Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996), *abrogated in part on other grounds by Dist. of Columbia v. Heller*, 554 U.S. 570 (2008). Mr. DeMartini must assert a credible *future* injury, *Murthy*, 603 U.S. at 58, 59, and his allegations continue to fall short. His latest declaration refers vaguely to "[s]upply chain disruptions," "delivery delays," and "uncertainty," but those references are premised on hearsay and identify *non-CTP* factors as the root cause. *E.g.*, Suppl. DeMartini Decl., ¶ 6 (attributing delays "to California certification"); *id.*, ¶ 7 (citing the congressional resolutions as the precipitating cause of subsequent uncertainty). The declaration also indicates that manufacturers stopped applying any purported chassis surcharges in "fall 2025," and alleges no facts to support that such surcharges are likely to recur, much less be caused by the CTP. *See id.*, ¶ 15. Any future predictions based on past compliance with the ACT and Omnibus *rules* are also inadequate. *See* Opp'n 7:20-21 (citing September 2024 memo's projections). That particular market effects might have resulted from industry-wide compliance with those rules is simply not probative of the market effects that might flow from an agreement governing fewer than all chassis suppliers. *See* Cross-Mot. 15:3-12 (citing *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 125-27 (1978)); *contra* Opp'n 10:12-19 (ignoring previous

_____

[5] None of the cited *Daimler* declarations assert that the CTP—or the ACT or Omnibus rules, for that matter—will "increase prices and harm dealers." *Contra* Opp'n 9:20-24. Read in context, they merely alleged that the *uncertainty* of whether CARB's or EPA's standards applied to vehicle sales in California were affecting manufacturers' "business decisions." ECF No. 183-5, ¶ 12; *see also* ECF No. 183-4 (Int'l Decl.), ¶ 10 ("[T]o cost out and price its products accurately and competitively," it is "critical to know with certainty the regulatory requirements that will govern sales in California …."); ECF No. 183-6 (Volvo Decl.), ¶ 13 (similar). Far from "explaining" how the manufacturers "would respond" to the CTP, Opp'n 9:18-20 (cleaned up), these declarations underscore the speculative market factors and independent judgment at play.

6

concession that at least one non-signatory manufacturer already supplies RV chassis).[6]

AmFree also cannot overcome CARB Manager Paul Arneja's conclusion that signatory manufacturers could continue to sell combustion-engine RV chassis for another *eight years* and still meet their zero-emission vehicle sales commitments under the CTP. Cross-Mot. 14:13-15:2; ECF No. 174-3 (Arneja Decl.), ¶¶ 15-18. To begin, AmFree does not explain why Mr. Arneja would need "experience in the RV industry" to explain how CTP signatories' sales commitments operate. Opp'n 10:20; *see also* Suppl. Arneja Decl., ¶ 3. AmFree also asserts, without support, that these commitments would "predictably raise[] the costs" of signatory-produced RV chassis sold in California. Opp'n 10:4-5. That is not evident. As Mr. Arneja explained, signatories may meet their commitments through 2035 by selling zero-emission vehicles that are already available and in high demand, while non-signatories—including those already in the chassis market, *contra* Opp'n 10:12-16—could compete to fill any gap in combustion-engine RV demand even past 2036. Arneja Decl., ¶¶ 23-24; *see also id.*, ¶ 21 (rising electric bus demand). That there are "*presently* no electric powertrain options" for RV chassis is irrelevant to that calculus. Opp'n 11:8; *see also id.* at 11:15-18 (acknowledging signatories' "[i]nvestments and commitments" to electrification). Finally, AmFree cites projected compliance costs for the Omnibus rule beginning in 2027, *id.* at 2:2-4, 10:24-28, but Mr. DeMartini notably makes no mention of anticipated cost increases beginning in 2027, nor does he allege any inability to pass such costs on to customers.

### 2. AmFree's Out-of-State Declarants Also Fall Short

Zach Meiborg's and Michael Riggan's declarations do not establish standing for one simple reason: they fail to demonstrate that the CTP, whose zero-emission vehicle sales commitments apply solely within California, would affect their purchases of heavy-duty trucks in other States. AmFree's late-coming arguments and supporting declaration do not cure that core defect.

Although it is AmFree's burden to establish standing, AmFree did not make any affirmative arguments on these declarants' behalf in its opening brief. Cross-Mot. 11:3-6. AmFree may have cited to those declarations in passing, Opp'n 12 n.5, but that is insufficient to avoid waiver.

---

[6] AmFree argues, in its Request for Judicial Notice, that this manufacturer's products all use signatory engines. ECF No. 183, ¶ 14. This outside argument fails. Mr. DeMartini does not allege any concrete injury from engine shortages, focusing instead on chassis.

7

*Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 487 (9th Cir. 2010); *contra* Opp'n 12 n.5. The new declaration offered by Dr. Jason Scott Johnston, advancing theories that should have been developed in AmFree's opening motion, is likewise improper. *See Stud*, 2018 WL 11352444, at *5; *see generally* ECF No. 182-3 (Johnston Decl.) (citing AmFree's papers and making no reference to Defendant Cliff's).

Regardless, AmFree's arguments fail. AmFree spills much ink describing the CTP's purported constraints on the supply of combustion-engine trucks. *See* Opp'n 12:5-14:1. But even assuming they exist, any such constraints would be specific to California. Jacobsen Decl., ¶¶ 15-20. On its face, CTP signatories' commitment to selling specified percentages of zero-emission vehicles consistent with the ACT rule do not apply beyond California. ECF No. 174-2 (Heroy-Rogalski Decl.), ¶ 28. Meanwhile, their commitment to selling new combustion-engine trucks consistent with the Omnibus rule in certain other States (known as "177 States") beginning with model year 2027 do not constrain the supply of such trucks at all. Heroy-Rogalski Decl., ¶¶ 29, 31.[7] The sources AmFree relies on are likewise California specific. *E.g.*, Opp'n 13:25-26 (truck prices "in California"); *id.* at 13:2-27 (memo describing vehicle availability "in California for the 2024 model year," Sept. Memo at 1).[8] Yet Mr. Meiborg and Mr. Riggan do not allege any concrete plans to purchase trucks in California, and in fact admit they shop nationwide for best prices. Meiborg Decl., ¶ 5; Riggan Decl., ¶ 5. Any alleged effects from the CTP in California or even the 177 States—none of which are home to these declarants' companies, Resp. to SUF, ¶¶ 6, 7; Johnston Decl., ¶ 13—cannot establish injury in fact.

Even assuming the zero-emission vehicle sales commitments would limit supply of certain combustion-engine trucks in California, AmFree's faulty factual assumptions and oversimplified

---

[7] AmFree points to the legacy caps incorporated into the CTP as another supply constraint, Opp'n 13:13-15, but even crediting the point, such constraints only applied within California and only through model year 2026. *See* CTP, App. A & App. D.

[8] AmFree's sources also do not bear the weight they are given. As explained, the memo reveals that any "bundl[ing]" practices, Opp'n 12:11-13, were driven by manufacturers' own sales strategies and not the ACT rule (let alone the CTP), while the CTP aimed to *address* certain Omnibus-related product shortages. *Supra* 5:16-21. AmFree also does not establish that these issues extended beyond California, or were caused by the CTP and likely to recur. The *Daimler* declarations are likewise inapt, *supra* 6:24-28, and in fact confirm that products and prices vary across States. Int'l Decl., ¶ 12 (describing pricing *for California customers*); Volvo Decl., ¶ 13 (wanting to know which vehicles can be offered based on which emissions regulations).

8

economic theory do not establish that the same effect will be felt elsewhere. *See Reno*, 93 F.3d at 1130 ("Where injury is alleged to occur within a market context, the concepts of causation and redressability become particularly nebulous." (citation omitted)). Contrary to AmFree's portrayal, Opp'n 14:20-23, there is no uniform, national truck market; manufacturers routinely alter product availability and pricing based on localized market trends and applicable emissions targets. Jacobsen Decl., ¶¶ 17-20. Accordingly, CTP signatories could choose to continue selling significant quantities of combustion-engine trucks outside of California—meaning there would be no CTP-induced supply constraint driving up those trucks' prices. *Id*. Indeed, a decrease in supply of combustion-engine trucks in California is likely to create *excess* supply in other States, *decreasing* their price in those separate markets. *Id.*

AmFree pivots to the CTP's nitrogen oxide ($NO_x$) targets, asserting that consumer demand and fixed costs will compel signatories to make a uniform—and higher-cost—product nationwide. Opp'n 14:11-17. Not so. Under AmFree's own theory, about 75% of the market is not covered by the CTP in any way. Johnston Decl., ¶ 17. And assuming AmFree is correct that the CTP would increase the price of combustion-engine trucks in California and the 177 States, economic theory (and logic) provides that consumers *outside* those States would continue demanding the cheaper products. Jacobsen Decl., ¶¶ 32; *see also id.*, ¶¶ 23-27 (rebutting Dr. Johnston's supply-side argument). Manufacturers, in turn, would seek to capitalize on that significant demand, even as they also sell cleaner engines. Jacobsen Decl., ¶¶ 28, 32-33. Their flexible production lines allow them to do so. *Id.*, ¶¶ 29-31; *contra* Johnston Decl., ¶ 19.

### C.    AmFree Lacks Standing for the Relief It Seeks

Defendant Cliff explained the mismatch between AmFree's purported injuries and the relief it seeks—i.e., injuries stemming from the signatory manufacturers' performance of commitments *they made*, but declaratory and injunctive relief against Defendant Cliff. Cross-Mot. 16:2-17:19. Because a federal court cannot redress "injury that results from the independent action of some third party not before the court," AmFree is not entitled to relief voiding the manufacturers' commitments under the CTP or otherwise vindicating their rights. *Murthy*, 603 U.S. at 57.

AmFree responds by emphasizing its cause of action under the Clean Air Act. Opp'n 15:7-

9

22. But AmFree still ignores the *posture* of the suit. The signatories voluntarily entered into the CTP, and AmFree nowhere identifies a case in which a non-party to an agreement had standing to sue Party A to have *Party B*'s promises to Party A declared preempted. Cross-Mot. 16:10-16; Opp'n 15:19 (attempting to shift burden to Defendant Cliff). Instead, AmFree relies on preemption cases in which the plaintiffs' injuries were traceable to government conduct and not any promises made by third parties. *Barnum Timber Co. v. EPA*, 633 F.3d 894, 900 (9th Cir. 2011); *Ray v. Atl. Richfield Co.*, 435 U.S. 151, 155-56 (1978).

Next, AmFree baldly asserts that the Eleventh Amendment is no bar to relief, Opp'n 16:10-16, but depriving the State of the right to seek monetary damages from the manufacturers is a windfall for the manufacturers "tantamount to an award of damages" from the State. *Papasan v. Allain*, 478 U.S. 265, 278 (1986). AmFree also cannot use § 1983 to evade the Anti-Injunction Act, Opp'n 16:16-17:4, because AmFree has no cognizable § 1983 claim. Federal statutes "create individual rights" for purposes of § 1983 only in "atypical" cases. *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 367 (2025). "To prove that a statute secures an enforceable right" under § 1983 "and does not just provide a benefit or protect an interest, a plaintiff must show that the law in question clearly and unambiguously uses rights-creating terms." *Id.* at 368 (cleaned up); *see also FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, 146 S. Ct. 1546, 1553 (2026) (statutes create such rights when they focus on "the individuals protected," not "the person regulated" (cleaned up)). AmFree has not made that showing. Section 209(a) is a typical preemption provision that, if anything, focuses on the persons regulated—i.e., motor vehicle manufacturers. *Cf. Murphy v. NCAA*, 584 U.S. 453, 477 (2018) (preemption provisions must be exercises of Congress's "power to regulate individuals, not States" (cleaned up)). It therefore does not establish any right that AmFree can enforce under § 1983, and so the Anti-Injunction Act applies and precludes relief that would interfere with, at least, CARB's existing breach-of-contract suit. *See* Cross-Mot. 17:11-19.[9] Moreover, even if AmFree had demonstrated a right

---

[9] *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.* describes an exception to the Act that applies where, unlike here, the state court has already issued judgment, 204 F.3d 867, 879 (9th Cir. 2000). And contrary to *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203, 1217 (C.D. Cal. 2002), the weight of authority confirms that "[s]o
(continued…)

under § 1983, *Mitchum v. Foster* "decide[d] only" that the district court erred by holding that it categorically *must* apply the Anti-Injunction Act to a § 1983 action, 407 U.S. 225, 243 (1972), and has since emphasized that a court's authority to issue an injunction is a discretionary one, *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 151 (1988). The equities here—where AmFree seeks to deprive a contracting party (CARB), who detrimentally relied on promises from others (manufacturers), of any and all remedies—weigh heavily against the requested relief. Cross-Mot. 17:1-7; *contra* Opp'n 16:6-9.

## II.   AMFREE'S PREEMPTION CHALLENGE TO THE CTP IS MERITLESS

To prevail on the merits, AmFree must establish that the challenged terms of the CTP are "standards" within the meaning of Section 209(a) of the Clean Air Act or "attempt[s] to enforce" such "standards." 42 U.S.C. § 7543(a). AmFree cannot do either.

### A.   Contract Terms are not Standards Within the Meaning of Section 209(a)

An "emission standard" is a "requirement *established by*" a government entity (a State or EPA). 42 U.S.C. § 7602(k) (emphasis added); Opp'n 20:12-13. But contract terms are not established by the State; they are reached through voluntary multi-party negotiations. *Gunter v. Janes*, 9 Cal. 643, 659 (1858) (contracts are the "joint creation" of all parties, not the "single act of one"); *contra* Opp'n 20:13-15 (contending Defendant Cliff could act unilaterally "through contract"). As such, they fall outside the scope of Section 209(a) preemption. Cross-Mot. 20:5-11. Were there any doubt, Congress resolved it by expressly describing Section 209(a) as "preempting certain State *regulation* of moving sources." 42 U.S.C. § 7416 (emphasis added).[10]

AmFree argues Section 209(a) has a broader reach than "emission standards" because Congress did not put the word "emission" *in front of* "standards." Opp'n 20:16-18. But where Congress "uses nearly identical terms in different places," courts "give those terms similar meanings." *In re Stevens*, 15 F.4th 1214, 1218 (9th Cir. 2021). AmFree fails to articulate how a

long as the state court proceeding is ongoing, the Act applies"; the state suit need not have predated the federal suit. *Easterday Dairy, LLC v. Fall Line Capital, LLC*, No. 22-cv-01000, 2022 WL 17104572, at *8 & n.7 (D. Or. Nov. 22, 2022).

[10] This is consistent with Congress's use of the word "standard" in other preemption provisions where the term keeps company with "law, rule [or] regulation," confirming that "standard" generally refers to a "provision having the force and effect of law." Cross-Mot. 19:21-20:4 (quoting preemption provision at issue in *Wolens*, 513 U.S. 219).

11

"standard relating to the control of emissions," 42 U.S.C. § 7543(a), is not an "emission standard," *id.* § 7602(k). Indeed, AmFree itself refers to the conduct it challenges as attempts to enforce "emissions standards." *E.g.*, Mot. 1:4, 1:10, 3:7, 22:10-12.

AmFree's reliance on *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.* does not help it. *(EMA)* 541 U.S. 246, 255 (2004). For one, the Court was deciding the case before it, and that case involved rules "enacted" by a government, not voluntary agreements. Cross-Mot. 21:5-13. For another, AmFree is wrong that a holding limiting "standards" in Section 209(a) to the congressional definition, 42 U.S.C. § 7602(k), or even the plain meaning, would read "attempt to enforce" out of the statute. Opp'n 20:8-10. "Attempt to enforce any standard" would still have the same meaning it always has—"steps preliminary" to the enforcement of *standards*. *EMA*, 541 U.S. at 257. It is AmFree who would read text out of the statute by advancing an interpretation that reads "standards" to mean any obligation "no matter how imposed." Opp'n 20:4.

The incorporation of "standards" as terms of an agreement does not render those voluntarily assumed terms preempted. *Contra* Opp'n 18:5-6. As explained, it is black-letter law that such incorporation renders the "enactment … part of the contract." Cross-Mot. 25:12-25. AmFree has no response. And in fact, the Supreme Court recently reiterated this distinction, drawing a contrast between when the government exercises "regulatory authority" and when the government "rel[ies] on consent" by asking for and obtaining agreement. *Landor v. La. Dep't of Corr. & Pub. Safety*, 146 S.Ct. 1931, 1940-41 (2026) (employing "contract analogy" to "safeguard against conflating Congress's spending power with a regulatory power"). Here, the CTP's terms—arrived at through negotiation—reflect the parties' "business judgments," and in particular, the manufacturers' decisions that they were willing to agree to produce and sell certain vehicles in light of the consideration offered by CARB. *See Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 229 (1995). Such terms are not "standards" under Section 209(a), however the terms are defined.

The understanding that "standards" are requirements unilaterally imposed by the State is also consistent with precedent, all of which distinguish between actual agreements (containing voluntarily assumed obligations enforceable through contract remedies) and regulations disguised as agreements (with government-imposed obligations enforceable through penalties or other

12

government-only means). Cross-Mot. 18:6-16. AmFree effectively signs on to this distinction, observing that "[t]he contract in *Wolens* was *not* preempted because" the terms were not enacted by the State or enforced in the way state laws would be—i.e., the terms did not have the "force and effect of law." Opp'n 17:22-26.[11] These principles dictate the outcome here. Indeed, the First Circuit has held, in a case squarely on point, that Section 209(a) is meant to govern "formal regulations adopted by the states, rather than voluntary and cooperative agreements between the states and automakers." *Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot. (AIAM)*, 208 F.3d 1, 7 (1st Cir. 2000). Cross-Mot. 19:11-16, 20:12-21:2. AmFree attempts to distinguish *AIAM* by claiming that "standards" has a different meaning in Section 177 than in 209(a). Opp'n 21:7-12. But the First Circuit read the word as having the same meaning, *AIAM*, 208 F.3d at 6-7, and AmFree offers no textual or other basis on which to disagree, *see In re Stevens*, 15 F.4th at 1218. In fact, Sections 209(a) and 209(b) have the same scope, *MEMA I*, 627 F.2d at 1107; Cross-Mot. 20:20-23, and anything "for which a waiver has been granted" under Section 209(b) is definitionally eligible for enforcement under Section 177, 42 U.S. Code § 7507. There is no different meaning to "standards." Cross-Mot. 20:23-21:2.

AmFree's efforts to distinguish other cases also fail. Opp'n 17:18-18:12. For one, AmFree makes much of the fact that CARB is a state agency and not a private party. Opp'n 17:21-18:2, 18:22-19:1. But whether "two private parties" are involved, or whether it is the "government [that] enters into a contract," the "same reasoning [from *Wolens*] holds": voluntary agreements, bargained for with consideration, are not preempted. *Am. Trucking*, 569 U.S. at 649-50. Indeed, if agreements were preempted by virtue of one contracting party being a public entity, then *American Trucking* and *Airlines for America* could have been decided with a single paragraph.

Likewise, although some cases have contrasted "a government's exercise of regulatory authority and its own contract-based participation in a market," *Am. Trucking*, 569 U.S. at 649, their reasoning makes clear that the dispositive consideration is whether the requirements are

---

[11] These cases do not suspend "normal operation of preemption principles," whatever AmFree means by that phrase. Opp'n 17:21. They interpret the text of preemption provisions to determine whether a given statute encompasses the challenged conduct. And they do so against a background assumption that preemption "concerns a clash between a constitutional exercise of Congress's legislative power and conflicting *state law*." *Murphy* 584 U.S. at 479 (2018).

"government-imposed" or "contractual commitments voluntarily undertaken." *Id.* (cleaned up); *contra* Opp'n 17:22-18:2. The former is the "State acting in a regulatory … mode." *Am. Trucking*, 569 U.S. at 649. The latter is not. In other words, when the government genuinely *bargains* for a private party's voluntary commitments, the government "enters into a contract just as a private party would," *id*. at 649-50—negotiating with the consideration it can offer to obtain the benefits it desires. On the other hand, when the government utilizes tools "available to no private party," *Airlines for Am.*, 78 F.4th at 1152 (cleaned up), and obtains "[c]ontractual commitments resulting not from ordinary bargaining," *that* "manifest[s] the government *qua* government, performing its prototypical regulatory role," *Am. Trucking*, 569 U.S. at 651.

These precedents are fatal to AmFree's claim, and *Olympic Pipe Line*, 437 F.3d 872 (9th Cir. 2006), cannot save it. Opp'n 18:13-19:25. As a threshold point, no other Ninth Circuit panel has relied on the decision to resolve preemption challenges to alleged agreements. Cross-Mot. 22 n.9. That alone counsels against this Court extending *Olympic Pipe Line* beyond its facts. AmFree's reliance on the part of *Olympic Pipe Line*'s reasoning "undercut" by later Supreme Court precedent, Cross-Mot 22:1-6, counsels in the same direction. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003); *contra* Opp'n 18 n.7. Preemption provisions "confer[] on private entities … a federal right to engage in certain conduct subject only to certain (federal) constraints." *Murphy*, 584 U.S. at 478-79; *contra Olympic Pipe Line*, 437 F.3d at 883. And it is irrelevant that neither Section 209(a) nor *Murphy* expressly says "waiver," *contra* Opp'n 19:20-25, given that courts generally *presume* the availability of waiver absent affirmative indication of congressional intent to preclude it. *New York v. Hill*, 528 U.S. 110, 114 (2000); *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 957 (9th Cir. 2013).[12] In any event, *Olympic Pipe Line* is inapposite. There, the City of Seattle threatened criminal sanctions to try to force a pipeline operator to agree to City oversight as a condition of renewing a franchise "agreement." 437 F.3d at 875-76, 879 n.20. That such threats can fall within the scope of preemption is irrelevant here, where CARB made no such threat; at most, the case confirms that

---

[12] AmFree has also conceded the point, accounting for the outcome in *Wolens* by the fact that private parties were involved, Opp'n 17:21-18:2, and thus implying that individual truck makers could sign agreements to exceed EPA emissions standards. *See also* Cross-Mot. 22:7-12.

14

preemption applies to actions that carry the force of law. Cross-Mot. 21:24-27.

**B.      Efforts to Enforce the CTP's Contractual Terms are not "Attempts to Enforce" Standards**

Unable to establish that contract terms are "standards" within the meaning of Section 209(a), AmFree turns to arguing the CTP is an attempt to enforce the regulations incorporated by reference therein, even going so far as to argue that "Cliff does not dispute" the point. Opp'n 17:8-9. AmFree is wrong on both counts, as previously demonstrated. Cross-Mot. 22:13-22.

For one, AmFree does not explain how the CTP could be an "attempt to enforce" cross-referenced regulations, Opp'n 20:19, when, as AmFree itself emphasizes, the CTP also includes sales commitments that are *not* so incorporated, specifically, the "best efforts" provision, Opp'n 14:8. That term cannot possibly reflect an effort to enforce codified regulations. Regardless, AmFree cannot save its claim by advancing an expansive reading of the phrase "attempt to enforce," given that the object of that verb remains "standard." 42 U.S.C. § 7543(a). Because the CTP's terms are not standards, an attempt to enforce those terms cannot be an "attempt to enforce any standard[s]." 42 U.S.C. § 7543(a). Enforcement of the CTP's terms—whether attempted or actualized—is just that: enforcement of "separate animals" that "emanate from contract." *Black Diamond Asphalt v. Super. Ct.*, 109 Cal. App. 4th 166, 171 (2003).

*EMA*'s treatment of the "attempt to enforce" language in Section 209(a) confirms the point. AmFree cannot establish that the CTP is a "step[] preliminary to" the "imposition of penalties"—which is how the Supreme Court understands "attempt to enforce" in Section 209(a). *EMA*, 541 U.S. at 257. It is not the CTP, but California statute, that requires CARB certification before vehicles can be sold in the State. Cal. Health & Saf. Code § 43105.[13] Nothing in the CTP establishes any other "condition precedent" to sale. *See* 42 U.S.C. § 7543(a). Thus, a signatory manufacturer could obtain CARB certification for a vehicle that meets State regulatory requirements but does not meet the manufacturer's CTP obligations, and sell that vehicle in California—in fact, some are doing exactly that. Jacobsen Decl., ¶ 30. The manufacturer might

---

[13] The CTP does not "preserve" CARB's certification authority, Opp'n 18:9, nor does it allow civil penalties, *id.* at 20:24-26, as Defendant Cliff already explained in arguments to which AmFree does not respond. Cross-Mot. 24:17-25:6.

15

well be subject to a breach-of-contract suit, but it would not be subject to "imposition of penalties for violation" of any state law. *EMA*, 541 U.S. at 257. In short, the CTP is no more an attempt to enforce a standard than it is a standard; it is a voluntary agreement not subject to preemption.

**III. EVEN IF THE CTP WERE AN ATTEMPT TO ENFORCE PREEMPTED STANDARDS, THE OMNIBUS AND ACT RULES ARE NOT PREEMPTED AND THE CTP IS SEVERABLE**

**A. THE ACT AND OMNIBUS RULES ARE NOT PREEMPTED BECAUSE THEIR WAIVERS REMAIN VALID**

AmFree's argument that Section 209 of the Clean Air Act preempts the ACT or Omnibus standards fails. EPA "waive[d]" preemption, 42 U.S.C. § 7543(b)(1), and the waivers remain in effect because the Resolutions purporting to nullify them are invalid.

**1. The Court Has Jurisdiction Over the Constitutional Arguments**

Defendant Cliff explained why the CRA's preclusion-of-review provision, 5 U.S.C. § 805, does not bar review of the Resolutions' constitutionality. Cross-Mot. 27:1-28:2. Under Ninth Circuit precedent, "courts may consider colorable constitutional claims that arise out of actions taken under the CRA." Opp'n 24:26-28 (cleaned up) (citing *Ctr. for Biological Diversity v. Bernhardt* (*CBD*), 946 F.3d 553, 561 (9th Cir. 2019)). Defendant Cliff's constitutional arguments against the Resolutions are more than colorable. Even setting aside the carveout for constitutional questions, this Court could not find that Section 805 applied without addressing (and rejecting) Defendant Cliff's argument that waivers are not rules—and thus, that the Resolutions are not "under" the CRA at all. Cross-Mot. 27:7-17.[14]

The Ninth Circuit did not confront a "similar" dispute in *CBD*. *Contra* Opp'n 24:12-15. The court there held that Section 805 barred review of a nonconstitutional claim contesting an agency's "rescission of [a rule] solely on the ground that Congress did not validly enact" a resolution disapproving of the agency's original rule. *CBD*, 946 F.3d at 564. The plaintiff contended that the congressional resolution—and thus the agency's rescission rule—was invalid

---

[14] AmFree claims "the Resolutions' *text*," Opp'n 24:9 (emphasis added), settles for good that Section 805 applies. But it quotes not from the text but from the Resolutions' prefatory language, which lacks legal effect, *see* 1 U.S.C. §§ 102-103, and so cannot "expand the scope of the operative clause[s]," *Heller*, 554 U.S. at 578. The operative text, in turn does not expand the CRA's definition of "rule" to cover EPA waivers. And the definition that Congress enacted governs "notwithstanding any other provision of law." 5 U.S.C. § 806(a).

16

because the agency did not report the original rule to Congress before it took effect; and, the plaintiff continued, the receipt of the report before a rule's effective date is a precondition for Congress to act under the CRA. *Id.* at 562-63. The court disagreed. *Id.* at 563; *see McIntosh v. United States*, 601 U.S. 330, 339 (2024) (reciting "a line of cases recognizing that certain deadlines, if missed, do not deprive a public official of the power to take the action to which the deadline applies"). The court then found that this claim, which unquestionably involved a "rule" (and alleged a legislative "violation" only of the CRA itself), did not survive Section 805.

AmFree's political-question argument fails too. Opp'n 24:16-25:18. None of the constitutional principles Defendant Cliff invokes are areas of law involving "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." *Nixon v. United States*, 506 U.S. 224, 228 (1993) (cleaned up). In particular, whereas the Rules Clause commits Congress's "compl[iance] with its own procedural rules" to Congress rather than the Judiciary, *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1171-72 (9th Cir. 2007), courts intervene when Congress "ignore[s] constitutional restraints," *NLRB v. Noel Canning*, 573 U.S. 513, 551 (2014), like separation of powers. Defendant Cliff argues the Resolutions are invalid not because Congress violated its own rules, but because it violated, *inter alia*, the Rules Clause itself—by impermissibly delegating its authority under that Clause.

### 2. The Congressional Resolutions Are Unconstitutional

The Resolutions breached the separation of powers and violated the Tenth Amendment and federalism principles. Cross-Mot. 28:3-34:6. AmFree's responses are meritless.

#### a. Waivers Are Adjudications, Not Rules

AmFree tries to argue that EPA's waivers meet the CRA's definition of a "rule." Opp'n 26:1-17. AmFree relies on *Yesler Terrace Community Council v. Cisneros*, which concerned a discretionary determination by the Secretary of Housing and Urban Development (HUD) that the State of Washington's eviction procedures satisfied the elements of due process, as set forth in HUD regulations. 37 F.3d 442 (9th Cir. 1994). In rejecting the United States' position that HUD's action was an adjudicatory order rather than a rule, the Ninth Circuit emphasized that "[n]othing

17

in the statute requires HUD to make a due process determination in the first place." *Id.* at 449. Since HUD did not have "to take any action at all," the very decision to act was itself a discretionary policy choice, belying HUD's characterization as an adjudication. *Id.* Plus, HUD's action "had no effect on the State"; its "sole effect … was to deprive" tenants in Washington public housing of a federal "right to an informal grievance hearing prior to eviction." *Id.* That deprivation operated "only prospectively" upon a "broad category of individuals not yet identified." *Id.* at 448-49. These features rendered HUD's due-process determination a rule.

EPA waivers lack those features. First, the agency has no discretion but to act upon every request California makes. 42 U.S.C. § 7543(b)(1). [15] Second, EPA's action has immediate effect on a narrow, identifiable class of manufacturers that become subject to State standards. Plus, waivers do not announce California rules that are "subsequently … applied." *Yesler Terrace*, 37 F.3d at 448. Rather, they have immediate retrospective (as well as prospective) effect: they waive preemption for actions California has already taken to adopt its standards, *see* 42 U.S.C. § 7543(a), (b)(1), as well as for covered standards that apply to vehicles sold before EPA took action on the waivers. And AmFree is simply wrong that EPA's waiver decisions rest on "policy-laden considerations," Opp'n 26:15, as opposed to a highly deferential application of law to fact, *see Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1121-23 (D.C. Cir. 1979).

AmFree is also wrong to characterize the Resolutions as "changes to substantive law," rather than bare nullification of past Executive Branch adjudications. Opp'n 26:20. When the *CBD* court said that the disapproval resolution at issue there "amended the law," 946 F.3d at 562, it referred to a resolution whose object was a discretionary rule by which the agency had changed the law first, *id.* at 558; Congress's disapproval changed the law back. *CBD* says nothing about a case in which Congress nullifies an agency's adjudicatory order. *See United States v. Kirilyuk*, 29 F.4th 1128, 1134 (9th Cir. 2022) ("Cases are not precedential for propositions not considered."). An adjudication (and the legislation disapproving it) does not "effectuate a new legal standard," Opp'n 26:26; it executes *existing* legal standards. Cross-Mot. 29:20-22. That is executive power.

---

[15] The statute itself limits EPA's enforcement authority where California standards apply. 42 U.S.C. § 7543(b)(3). There is no discretion there either. *Contra* Opp'n 26:11-12.

18

*See Trump v. Slaughter*, No. 25-332, 2026 WL 1855612, at *17 (U.S. June 29, 2026).

**b.    Congress Cannot Nullify Completed Adjudications By The Executive Branch**

The Resolutions are unconstitutional adjudications performed by Congress. Cross-Mot. 28:3-29:25. AmFree responds that congressional nullification of adjudicatory orders is acceptable where "public rights" or executive power is concerned. Opp'n 27:4-10. But *United States v. Klein*, the canonical case in which the Supreme Court invalidated a statute for usurping adjudicatory power, undercuts that assertion. 80 U.S. 128 (1871). Congress there erred by overriding adjudication of a public right (to monetary compensation from the government) by the then-Court of Claims, *see id.* at 147-48—a "non-judicial agenc[y]," *United States v. Sherwood*, 312 U.S. 584, 587 (1941), thus exercising what was, in all salient respects, executive power, *see Slaughter*, 2026 WL 1855612 at *18; *Freytag v. C.I.R.*, 501 U.S. 868, 912 (1991) (Scalia, J., concurring in part and concurring in the judgment).

AmFree's authorities are inapposite because in each case the statute passed constitutional muster where it prospectively *superseded*—rather than nullified, or "disapproved"—a past adjudication. In *Hodges v. Snyder*, the Supreme Court upheld a "curative act" that had prospectively "legaliz[ed] and validat[ed]" the organization of a school district that a court had declared illegal. 261 U.S. 600, 602 (1923). In *Pennsylvania v. Wheeling & Belmont Bridge Co.*, Congress had prospectively "modified" a bridge's status "in the contemplation of the law," 59 U.S. 421, 430 (1855), such that the bridge "ceased to be"—not *never was*—the nuisance a court had declared it. *See Klein*, 80 U.S. at 146. In *Mount Graham Coalition v. Thomas*, the Ninth Circuit found the statute "reasonably susceptible to [a] prospective interpretation" under which it had changed the law without "undoing past [court] judgments" regarding an agency adjudication. 89 F.3d 554, 557 (9th Cir. 1996). In *Paramino Lumber Co. v. Marshall*, the Supreme Court found lawful a statute directing an agency to reopen its adjudication of a worker's compensation so that new information could be considered; the statute did not "set aside [the agency's] judgment … or direct the entry of an award." 309 U.S. 370, 378 (1940). The Court did not silently overrule *Klein* in a one-sentence footnote distinguishing "statutes affecting judicial judgments." *Id.* at 381 n.25.

19

### c.    The Resolutions Violate the Tenth Amendment and Structural Federalism

The Resolutions resulted from extraordinary and unconstitutional defects in the political process. Cross-Mot. 29:26-33:11. AmFree states that there is no "constitutional right to particular Senate procedures, much less the filibuster." Opp'n 27:15-17. True enough, but the question is whether the procedure used in this case—by *both* political branches of the federal government— "operate[d] in a defective manner" relative to what California (and other States) agreed to under the Constitution. *South Carolina v. Baker*, 485 U.S. 505, 513 (1988). AmFree contends that the Resolutions "vindicated federalism principles … by subjecting California to the same preemption as every other state." Opp'n 27:19-21. Not only is that incorrect as a matter of substantive constitutional law, *see Ohio v. EPA*, 98 F.4th 288, 306-14 (D.C. Cir. 2024), *overruled in part on other grounds sub nom. Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100 (2024), but also Defendant Cliff's argument here addresses an entirely different "federalism principle": vindicating the "special and specific position [that the States occupy] in our constitutional system." *Garcia v. San Antonio Metro. Transp. Auth.*, 469 U.S. 528, 556 (1985).

### d.    The Senate Impermissibly Delegated Its Rules-Clause Power

The Senate abdicated its exclusive and preclusive power over its internal procedural rules by keying them to whatever the Executive Branch says about whether an agency action meets the CRA's definition of a federal-agency "rule." Cross-Mot. 33:12-34:6. It is AmFree, not Defendant Cliff, that "mischaracterizes what occurred" on the Senate floor. Opp'n 27:24. Senators did not merely forswear "defer[rence] to GAO's determination that an action does not qualify as a rule," *id.* at 27:27-28; they affirmatively chose deference to the Executive Branch's determination that its action does so qualify. While "the Constitution does not forbid Congress from agreeing with the Executive Branch in determining how it should proceed," *id.* at 28:6-8, the agreement cannot be that the Executive decides. Congress may "obtain[] *the assistance of* its coordinate Branches" on matters of legislative procedure, *id.* at 28:10 (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (emphasis added)), but Congress cannot obtain *direction from* another Branch.

AmFree's protest that "the Senate remained … in full control," Opp'n 28:4, misses the

20

point. The Senate was in full control of its decision to delegate authority to the Executive, but it delegated authority nonetheless. And if control over the delegation decision were key, there would be no nondelegation doctrine. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 (2010) ("[T]he separation of powers does not depend on whether the encroached-upon branch approves the encroachment." (cleaned up)). The Resolutions are the product of an illegal legislative process and must be set aside when considering AmFree's claims in this case.

### B.   The 2036 Sales Requirement is Severable

CTP signatories' commitment to sell vehicles consistent with the 2036 Sales Requirement is severable. Cross-Mot. 26:11-18. That is true whether contract- or regulation-based severability principles apply. *Contra* Opp'n 22:26-23:3 (faulting Defendant Cliff for citing the latter); *but see, e.g.*, Mot. 1 (repeatedly referring to the CTP as "regulatory"). In arguing otherwise, AmFree characterizes the CTP's "main purpose," Opp'n 22:9-10, but that argument focuses on a single term and ignores several other important and bargained-for gains for both sides. Heroy-Rogalski Decl., ¶¶ 16, 22-25, 30, 35; ECF No. 176-4 at 1. AmFree also claims to know what the parties to the CTP "understood," without rebutting Defendant Cliff's evidence or offering any of its own. *Id.* at 22:16-18. Finally, AmFree's textual argument fails to persuade, Opp'n 22:19-25, particularly given the "inequitable windfall" that would result from relieving the manufacturers of their commitments after CARB has mostly completed its own, Cross-Mot. 35:1-9.

\* \* \*

AmFree ends with a request for injunctive relief (one not made in its opening motion). *Compare* Mot. 1:22-25, *with* Opp'n 28:11-19. But it is AmFree's burden to establish such relief is warranted, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 784 (9th Cir. 2019), and it makes no attempt to do so. For these and other reasons, and in the event AmFree prevails on the merits, supplemental briefing is warranted to ensure any relief is appropriately tailored. Cross-Mot. Sec. IV.

### CONCLUSION

For the foregoing reasons, Defendant Cliff respectfully requests that the Court deny AmFree's motion for judgment on the pleadings and grant Defendant Cliff's cross-motion.

Dated:  July 22, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General


*/s/ Cecilia D. Segal*
CECILIA D. SEGAL
Deputy Attorney General
*Attorneys for Defendant*

22