ROB BONTA
Attorney General of California
MYUNG J. PARK, State Bar No. 210866
Supervising Deputy Attorney General
BENJAMIN P. LEMPERT, State Bar No. 344239
M. ELAINE MECKENSTOCK, State Bar No. 268861
DAVID M. MEEKER, State Bar No. 273814
CECILIA D. SEGAL, State Bar No. 310935
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3545
Fax: (415) 703-1107
E-mail: cecilia.segal@doj.ca.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

**AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE**,

Plaintiff,

**THE UNITED STATES OF AMERICA**; and **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**,

Plaintiff-Intervenors,

**v.**

**STEVEN S. CLIFF,** in his official capacity as the Executive Officer of the California Air Resources Board,

Defendant.

2:25-cv-03255-DC-AC

**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS THE UNITED STATES' COMPLAINT IN INTERVENTION**

Judge: Hon. Dena Coggins
Courtroom: 10, 13th Floor
Date: November 6, 2026
Time: 1:30 p.m.
Action Filed: December 16, 2024

**TO ALL PARTIES AND ATTORNEYS OF RECORD:**

YOU ARE HEREBY GIVEN NOTICE that on November 6, 2026, at 1:30 p.m., or as soon thereafter as this matter may be heard, Steven S. Cliff, in his official capacity as Executive Officer of the California Air Resources Board, will and hereby does respectfully move to dismiss the United States' claims challenging the Clean Truck Partnership and the 2036 Sales Requirement in the California Air Resources Board's Advanced Clean Fleets regulation.

This Motion to Dismiss is brought under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and Local Rule 230, and is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the United States' Complaint in Intervention and the documents incorporated by reference therein, the concurrently filed Request for Judicial Notice and attached papers, any reply brief that Defendant Cliff may file, all documents in the Court's file, and other such written and oral argument as may be presented to the Court.

Consistent with this Court's Standing Order in Civil Cases, Defendant Cliff certifies that all meet and confer efforts have been exhausted. On August 31, 2026, counsel for the parties met and conferred via videoconference to discuss the substance of the Motion to Dismiss and were unable to reach a resolution.

Dated: September 4, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General

*/s/ Cecilia D. Segal*
CECILIA D. SEGAL
Deputy Attorney General
*Attorneys for Defendant*

ROB BONTA
Attorney General of California
MYUNG J. PARK, State Bar No. 210866
Supervising Deputy Attorney General
BENJAMIN P. LEMPERT, State Bar No. 344239
M. ELAINE MECKENSTOCK, State Bar No. 268861
DAVID M. MEEKER, State Bar No. 273814
CECILIA D. SEGAL, State Bar No. 310935
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3545
Fax: (415) 703-1107
E-mail: cecilia.segal@doj.ca.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE**,<br><br>Plaintiff,<br><br>**THE UNITED STATES OF AMERICA**; and **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**,<br><br>Plaintiff-Intervenors,<br><br>**v.**<br><br>**STEVEN S. CLIFF,** in his official capacity as the Executive Officer of the California Air Resources Board,<br><br>Defendant. | 2:25-cv-03255-DC-AC<br><br>**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE MOTION TO DISMISS THE UNITED STATES' COMPLAINT IN INTERVENTION**<br><br>Judge: Hon. Dena Coggins<br>Courtroom: 10, 13th Floor<br>Date: November 6, 2026<br>Time: 1:30 p.m.<br>Action Filed: December 16, 2024 |

## TABLE OF CONTENTS


**Page**

INTRODUCTION ..... 1

BACKGROUND ..... 1

I. California Has a Long History of Reducing Vehicular Pollution ..... 2

II. California and Several Heavy-Duty Truck Manufacturers Sign the CTP ..... 3

III. The Federal Government Mounts an Unprecedented Assault on California's Program, and California Responds ..... 3

IV. Four Signatory Manufacturers Disavow the CTP ..... 4

PROCEDURAL HISTORY ..... 4

STANDARD OF REVIEW ..... 5

ARGUMENT ..... 6

I. The United States' Preemption Challenge to the CTP Should Be Dismissed for Lack of Jurisdiction and Failure to State a Claim ..... 6

A. The United States Lacks Standing to Challenge the CTP ..... 6

B. The United States Fails to State a Claim Against the CTP ..... 8

1. Section 209(a) Does Not Preempt Voluntary Agreements ..... 9

2. The United States Alleges No Facts that Could Support a Conclusion that the CTP Was Involuntary and Thus Could Be Preempted ..... 10

3. The United States' remaining efforts to bring the CTP within the scope of Section 209(a) fail ..... 13

II. The United States' Preemption Challenge to the Advanced Clean Fleets Regulation Should Be Dismissed for Lack of Jurisdiction ..... 16

CONCLUSION ..... 19

# TABLE OF AUTHORITIES

Page

**CASES**

*Airlines for Am. v. City and County of San Francisco*
78 F.4th 1146 (9th Cir. 2023) ........ *passim*

*Am. Airlines, Inc. v. Wolens*
513 U.S. 219 (1995) ........ *passim*

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*
569 U.S. 641 (2013) ........ 9, 10, 11, 15

*Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot. (AIAM)*
208 F.3d 1 (1st Cir. 2000) ........ 10, 16

*Black Diamond Asphalt, Inc. v. Superior Ct.*
109 Cal. App. 4th 166 (Cal. Ct. App. 2003) ........ 14

*Buscemi v. Bell*
964 F.3d 252 (4th Cir. 2020) ........ 17

*Chandler v. State Farm Mut. Auto. Ins. Co.*
598 F.3d 1115 (9th Cir. 2010) ........ 5

*Cipollone v. Liggett Grp., Inc.*
505 U.S. 504 (1992) ........ 9

*Engine Mfrs. Ass'n v. EPA*
88 F.3d 1075 (D.C. Cir. 1996) ........ 2

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*
541 U.S. 246 (2004) ........ 9

*Food & Drug Admin. v. All. for Hippocratic Med.*
602 U.S. 367 (2024) ........ 6

*GECCMC 2005-C1 Plummer St. Off. Ltd. P'ship v. JP Morgan Chase Bank, Nat'l Ass'n*
671 F.3d 1027 (9th Cir. 2012) ........ 11

*Griffin & Griffin Expl., LLC v. United States*
116 Fed. Cl. 163 (2014) ........ 14

*Gunter v. Janes*
9 Cal. 643 (1858) ........ 9

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*In re Gilead Scis. Sec. Litig.*
536 F.3d 1049 (9th Cir. 2008) ........ 6

*Missouri ex rel. Koster v. Harris*
847 F.3d 646 (9th Cir. 2017) ........ 7, 16

*Mobil Oil Expl. & Producing Se., Inc. v. United States*
530 U.S. 604 (2000) ........ 13, 14, 16

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA (MEMA I)*
627 F.2d 1095 (D.C. Cir. 1979) ........ 2

*Murphy v. Nat'l Collegiate Athletic Ass'n*
584 U.S. 453 (2018) ........ 18

*Murthy v. Missouri*
603 U.S. 43 (2024) ........ 8

*Nutt v. United States*
12 Cl. Ct. 345 (1987) ........ 14

*Ohio v. EPA*
98 F.4th 288 (D.C. Cir. 2024) ........ 6

*Platinum Sports Ltd. v. Snyder*
715 F.3d 615 (6th Cir. 2013) ........ 17

*Powell v. SEC*
149 F.4th 1029 (9th Cir. 2025) ........ 11

*Reddy v. Foster*
845 F.3d 493 (1st Cir. 2017) ........ 17

*S.D. Cnty. Gun Rts. Comm. v. Reno*
98 F.3d 1121 (9th Cir. 1996) ........ 8

*Safe Air for Everyone v. Meyer*
373 F.3d 1035 (9th Cir. 2004) ........ 5

*Stavrianoudakis v. U.S. Fish & Wildlife Serv.*
108 F.4th 1128 (9th Cir. 2024) ........ 17

*Stockton v. Brown*
152 F.4th 1124 (9th Cir. 2025) ........ 17

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


*Table Bluff Rsrv. (Wiyot Tribe) v. Philip Morris, Inc.*
256 F.3d 879 (9th Cir. 2001)........................................ 16

*TransUnion LLC v. Ramirez*
594 U.S. 413 (2021)........................................ 16

*United States v. California*
824 F.Supp.3d 1079 (C.D. Cal. 2026)........................................ 7, 8

*United States v. City of Bos.*
833 F.Supp.3d. 30 (D. Mass. 2026)........................................ 7

*United States v. Hawaii*
830 F.Supp.3d 1028 (D. Haw. 2026)........................................ 7, 8

*United States v. Mattson*
600 F.2d 1295 (9th Cir. 1979)........................................ 6

*Warth v. Seldin*
422 U.S. 490 (1975)........................................ 17

*Wilson v. Craver*
994 F.3d 1085 (9th Cir. 2021)........................................ 6

*Woods v. U.S. Bank N.A.*
831 F.3d 1159 (9th Cir. 2016)........................................ 5

**STATUTES AND REGULATIONS**

42 U.S.C.
§ 7416........................................ 9
§ 7543(a)........................................ *passim*
§ 7543(b)(1)........................................ 2
§ 7602(k)........................................ 9, 15

Cal. Health & Safety Code
§ 43013(a)........................................ 2
§ 43016(a)........................................ 12
§ 43017........................................ 2
§ 43105........................................ 2
§ 43151(a)........................................ 12

## TABLE OF AUTHORITIES
## (continued)

**Page**

Pub. L. No. 90-148, 81 Stat. 485 (1967) .......... 2

Pub. L. No. 119-15, 139 Stat. 65 (2025) .......... 4

Pub. L. No. 119-17, 139 Stat. 67 (2025) .......... 4

Cal. Code Regs., tit. 13
§ 1956.8(a)(2)(C) .......... 3
§ 1956.8(a)(2)(D) .......... 3
§ 1963.1(b) .......... 2
§ 2016 .......... 3

**Other Authorities**

H.R.J. Res. 87, 89, 119th Cong. (2025) .......... 3

88 Fed. Reg. 20,688 (Apr. 6, 2023) .......... 3

89 Fed. Reg. 29,440 (Apr. 22, 2024) .......... 7

90 Fed. Reg. 36,288 (Aug. 1, 2025) .......... 7

90 Fed. Reg. 643 (Jan. 6, 2025) .......... 3

91 Fed. Reg. 28,463 (May 18, 2026) .......... 7

91 Fed. Reg. 7686 (Feb. 18, 2026) .......... 7

11 Williston on Contracts § 30:19 (4th ed. 2025) .......... 13, 14

## INTRODUCTION

Plaintiff-Intervenors the United States and the U.S. Environmental Protection Agency (EPA) (collectively the "United States") bring suit against Defendant Cliff in his official capacity as the Executive Officer of the California Air Resources Board (CARB). The United States alleges that multiple CARB regulations and the Clean Truck Partnership (CTP)—a voluntary agreement between CARB and private parties—are all preempted under Section 209(a) of the Clean Air Act, 42 U.S.C. § 7543(a).

The Court should dismiss the United States' claim against the CTP. The United States lacks standing to challenge this agreement; its vague and conclusory allegations of sovereign harm and economic injury do not establish otherwise. The United States has also failed to state a claim against the CTP. Section 209(a) preempts emission standards that have the force of law—regulations imposed unilaterally by the State and backed up by regulatory penalties or other government-only enforcement mechanisms. Section 209(a) does not reach voluntary agreements reflecting exchanges of bargained-for consideration. And the United States cannot allege any facts that could plausibly support the conclusion that the CTP is anything other than a voluntary agreement. The CTP is outside the scope of Section 209(a) preemption, and the United States' challenge to this agreement should be dismissed.

This Court should also dismiss the challenge to the 2036 Sales Requirement in CARB's Advanced Clean Fleets regulation because the United States lacks standing for any relief as to that requirement. Indeed, there is *no* possibility that the United States will be injured by a preempted sales requirement because CARB has stipulated in signed court orders in other cases that it will not enforce this requirement unless and until EPA waives preemption. And any allegation of cognizable injury from the mere codification of this requirement in the California Code of Regulations is belied by decades of EPA's prior practice as well as the Constitution.

## BACKGROUND

This Court is familiar with the background of this case and the related case, *Daimler Truck North America, LLC v. CARB*, No. 2:25-cv-02255-DC (E.D. Cal.) (*Daimler*). To reduce duplication across filings, Defendant Cliff offers a more condensed overview of the relevant facts

here, and respectfully directs the Court to Defendants' Memorandum in Support of their Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motions for Summary Judgment in *Daimler*, ECF No. 147-1 at 2-17, for additional detail if needed.

## I. California Has a Long History of Reducing Vehicular Pollution

California has been setting emission standards for new motor vehicles since the 1950s, in response to severe air pollution challenges in the State. *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA (MEMA I)*, 627 F.2d 1095, 1109-10 (D.C. Cir. 1979); *see also* Req. for Judicial Notice (RJN) (filed concurrently), Ex. 1 at 1-2, 14, 23-27; RJN, Ex. 2 at 15-16; RJN, Ex. 3 at 15, 18. CARB) is tasked with promulgating and enforcing the State's motor vehicle pollution control program, *e.g.*, Cal. Health & Safety Code §§ 43013(a), 43017, and must certify that vehicles and engines meet applicable emission standards before they can be sold in California, *id.* § 43105.

When Congress ultimately entered this field in the late 1960s, it generally preempted States from setting emission standards for new motor vehicles while requiring that EPA waive that preemption for California upon request, unless the record establishes one of three limited bases that permit denying a waiver. *See* Pub. L. No. 90-148, § 208(a), (b), 81 Stat. 485, 501 (1967); 42 U.S.C. § 7543(a), (b)(1). By congressional design, then, manufacturers must comply with two, but only two, sets of emission standards, producing "either 'federal cars' designed to meet the EPA's standards or 'California cars' designed to meet California's standards." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1080 (D.C. Cir. 1996). California has since requested and received more than 75 preemption waivers, *see* RJN, Ex. 4; RJN, Ex. 5 at 13-14, continuing to benefit its residents and the Nation by "act[ing] as a kind of laboratory for innovation" for vehicle standards and emission control technologies—precisely as Congress intended, *MEMA I*, 627 F.2d at 1111.

The United States (but not Plaintiff) challenges CARB's most recent standards regulating emissions of new heavy-duty vehicles sold in California: Advanced Clean Trucks (ACT), Heavy-Duty Low NOx (Omnibus), and Advanced Clean Fleets (ACF). ECF No. 186 (Compl.), ¶¶ 96-107. The ACT rule requires gradual increases in sales of medium- and heavy-duty zero-emission vehicles beginning with model year 2024. Cal. Code Regs., tit. 13, § 1963.1(b). Omnibus primarily requires substantial reductions in exhaust emissions of smog-forming oxides of nitrogen

from medium- and heavy-duty internal-combustion engines. *Id.* § 1956.8(a)(2)(C), (a)(2)(D). The 2036 Sales Requirement component of ACF—the only one at issue here—requires that all medium- and heavy-duty vehicles sold in the State be zero emission beginning with model year 2036. *Id.* § 2016. EPA granted a preemption waiver for the ACT rule in 2023, 88 Fed. Reg. 20,688, 20,725 (Apr. 6, 2023), and for the Omnibus rule in 2024, 90 Fed. Reg. 643, 645 (Jan. 6, 2025). CARB withdrew its request for a waiver for the ACF rule in 2025, Compl., ¶ 41, and has undertaken a rulemaking to repeal certain parts of the rule not at issue here, RJN, Ex. 6 at 1-2. In court orders in other cases, CARB stipulated that it will not enforce the 2036 Sales Requirement unless and until it obtains a preemption waiver. RJN, ¶ 7.

## II. California and Several Heavy-Duty Truck Manufacturers Sign the CTP

In 2023, several manufacturers of medium- or heavy-duty engines and vehicles and the Engine Manufacturers Association (EMA) negotiated and signed an agreement with CARB: the CTP. RJN, ¶ 9; ECF No. 181-5 (CTP) at 4-6. All parties to the CTP agreed to take (or not take) certain actions in exchange for certain benefits. CTP at 1-2. Among other things, the manufacturers obtained a commitment from CARB that it would consider particular amendments to the Omnibus and ACT rules. *Id.* at App. B. In exchange, the manufacturers agreed, *inter alia*, to sell vehicles in California consistent with the ACT and Omnibus rules and with the 2036 Sales Requirement as contract terms, regardless of CARB's authority to enforce those requirements as regulations. *Id.* at App. D, ¶ B. Upon signing, EMA and several manufacturers described the agreement as reflecting a "cooperative effort[]" with CARB, one that provided them with "regulatory certainty" and other bargained-for benefits. RJN, Ex. 7 at 1-3.

## III. The Federal Government Mounts an Unprecedented Assault on California's Program, and California Responds

In 2025, Congress took the unprecedented and unlawful step of adopting resolutions purporting to invoke the Congressional Review Act (CRA) and disapprove the ACT and Omnibus waivers. H.R.J. Res. 87, 89, 119th Cong. (2025) (enacted) (the Resolutions). The Resolutions hinged on EPA's mistaken view—contrary to the agency's own longstanding interpretation, which the Government Accountability Office (GAO) still holds—that the preemption waivers are

"rules" within the meaning of the CRA. *See* RJN, Ex. 8 at 6-9. The President signed the Resolutions on June 12, 2025. Pub. L. No. 119-15, 139 Stat. 65 (2025); Pub. L. No. 119-17, 139 Stat. 67 (2025). California and ten other States promptly sued the United States, seeking, *inter alia*, to have the Resolutions declared unconstitutional for violation of separation of powers and federalism principles. *California v. United States*, No. 3:25-cv-04966-HSG (N.D. Cal. filed June 12, 2025) (hereafter *California*), ECF No. 1 at 27-40. The Federal Government subsequently moved to dismiss for lack of jurisdiction and failure to state a claim. *California*, ECF No. 172. The *California* court heard the motion and deemed it submitted on February 19, 2026. *California*, ECF No. 234.

## IV. FOUR SIGNATORY MANUFACTURERS DISAVOW THE CTP

In August 2025, four manufacturers who had signed the CTP each submitted a letter to the Federal Trade Commission acknowledging that they had signed the CTP but disavowing any intention of honoring their side of the bargain. RJN, Exs. 9-12. Instead, they "affirm[ed] and commit[ted]" to "independently mak[ing] decisions about the type and quantity of vehicles [they] sell[] without regard" to the CTP. *Id.*; *see also* RJN, Ex. 13. These manufacturers similarly disclaimed the CTP as "void[]" in a court-filed stipulation dismissing a lawsuit that challenged the CTP on antitrust grounds. *See* RJN, Ex. 14 at 2. The manufacturers, later joined by the United States, also filed the *Daimler* action against Defendant Cliff, CARB, and the Governor of California, alleging, *inter alia*, that the CTP is preempted by the Clean Air Act. *Daimler*, ECF No. 1, ¶¶ 87-94; *id.*, ECF No. 56, ¶¶ 110-14. As this Court is aware, on October 31, 2025, the Court largely denied the *Daimler* plaintiffs' motion for a preliminary injunction, except that it preliminarily enjoined enforcement of the CTP—including by seeking specific performance as a remedy in a separate breach-of-contract lawsuit filed by CARB against the same four manufacturers in California state court. *Id.*, ECF No. 94 at 34 & n.22.

## PROCEDURAL HISTORY

Plaintiff American Free Enterprise Chamber of Commerce (AmFree) filed this suit in the U.S. District Court for the Northern District of Illinois in December 2024, challenging the CTP as preempted. ECF No. 1, ¶¶ 140-57. In addition to Defendant Cliff, AmFree also named as

defendants the manufacturers and trade association who signed the CTP. *Id.*, ¶¶ 27-37. AmFree later amended its complaint to remove the private-party defendants, following an undisclosed out-of-court settlement with them. ECF No. 142-1 at 2.

On November 7, 2025, the Northern District of Illinois resolved Defendant Cliff's motion to dismiss. ECF No. 145. After "briefly" and *sua sponte* discussing standing, *id*. at 3-4, the court concluded that it had personal jurisdiction over Defendant Cliff; that venue would be proper in that forum; but that transfer to the Eastern District of California was appropriate, *id.* at 12-15.

On June 18, 2026, this Court granted the United States' motion to intervene as plaintiffs. ECF No. 180. The United States' Complaint in Intervention alleges that the ACT, Omnibus, and ACF rules and the CTP are preempted, Compl., ¶¶ 96-112, and is narrower than the United States' Amended Complaint in Intervention in *Daimler*, ECF No. 119, ¶¶ 97-124.

AmFree moved for judgment on the pleadings or, in the alternative, summary judgment on April 1, 2026, and Defendant Cliff cross-moved; briefing on those motions was completed on July 22, 2026. ECF Nos. 166, 174, 182, 192. The United States moved for summary judgment on both its claims on June 22, 2026; briefing on that motion was completed on August 6, 2026. ECF Nos. 181, 194, 200.

## STANDARD OF REVIEW

"The party asserting federal subject matter jurisdiction bears the burden of proving its existence." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack" under Rule 12(b)(1), "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.*

Under Rule 12(b)(6), a complaint fails "to state a claim to relief" when it lacks either "a cognizable legal theory or … sufficient facts alleged under a cognizable legal theory." *Woods v. U.S. Bank N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016). Courts must generally "accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs," but need not "accept as true allegations that contradict matters properly subject to judicial notice" or "that

are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (cleaned up). Courts also "need not accept as true legal conclusions couched as factual allegations." *Wilson v. Craver*, 994 F.3d 1085, 1090 (9th Cir. 2021).

## ARGUMENT

### I. THE UNITED STATES' PREEMPTION CHALLENGE TO THE CTP SHOULD BE DISMISSED FOR LACK OF JURISDICTION AND FAILURE TO STATE A CLAIM

The United States' vague and conclusory allegations of harm are inadequate to establish standing for its CTP claim. Even assuming the United States had plausibly alleged a concrete injury-in-fact, it fails to state a preemption claim against the CTP. The CTP is a voluntary agreement and so lies well outside the scope of Section 209(a) of the Clean Air Act.

#### A. The United States Lacks Standing to Challenge the CTP

To establish Article III standing, a plaintiff must demonstrate "(i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). These requirements apply equally to the federal government as they do to any other private or government plaintiff. *See United States v. Mattson*, 600 F.2d 1295, 1300 (9th Cir. 1979). "[F]ederal courts do not issue advisory opinions about the law—even when requested by the President." *Food & Drug Admin.*, 602 U.S. at 378-79.

The United States alleges sovereign harm from the CTP's purported intrusion on federal authority to enforce "national uniform standards" under the Clean Air Act. Compl., ¶¶ 4, 10.a-b. But by congressional design, there have *never been* uniform federal emission standards in the history of this country. *Supra* 2:4-22; *see also Ohio v. EPA*, 98 F.4th 288, 295-96 (D.C. Cir. 2024), *rev'd and remanded in part sub nom. Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100 (2025). The United States cannot manufacture a sovereign interest in a state of affairs that has never existed. Regardless, the United States fails to allege any concrete facts to support this theory of standing. *See Food & Drug Admin.*, 602 U.S. at 381 (injury must be "'concrete,'

meaning that it must be real and not abstract”). EPA has been proposing and finalizing changes to its vehicle emission standards without any hint of difficulty, belying the United States’ allegation that the CTP—even before this Court enjoined its implementation—has somehow “interfere[d]” with EPA’s ability to do so. Compl., ¶ 10.a. *See* 89 Fed. Reg. 29,440 (Apr. 22, 2024); 90 Fed. Reg. 36,288 (Aug. 1, 2025); 91 Fed. Reg. 7686 (Feb. 18, 2026); 91 Fed. Reg. 28,463 (May 18, 2026). And while the United States may argue that Defendant Cliff’s alleged preemption violation gives rise to a per se sovereign injury, several courts have rejected that proposition. *See United States v. California*, 824 F. Supp. 3d 1079, 1083 (C.D. Cal. 2026) (faulting United States for offering only “undisguised legal conclusions in search of substantiating facts” in support of sovereign injury theory); *United States v. Hawaii*, 830 F. Supp. 3d 1028, 1040 (D. Haw. 2026) (similar); *United States v. City of Bos.*, 833 F. Supp. 3d. 30, 45 (D. Mass. 2026) (rejecting standing theory based on “essentially limitless view of sovereign injury” not based on actual “frustration of” government “operations”).

The United States also attempts to establish *parens patriae* standing, but likewise fails to allege any facts in support of its conclusory assertions that the CTP “harms ordinary citizens from coast to coast,” Compl., ¶ 4, and the “national market for trucks,” *id.*, ¶ 10.d. *See Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 653-55 (9th Cir. 2017) (rejecting *parens patriae* standing where alleged economic effects to consumers were too “remote, speculative, and contingent upon the decisions of many independent actors in the causal chain”). The United States’ assertion appears to be based on both the assumption that consumers do not want to buy zero-emission vehicles *and* on the assumption that the CTP’s zero-emission vehicle sales commitments—which apply only in California—will increase the price of *all* trucks nationwide. Compl., ¶ 10.d. Neither premise is plausibly supported by any factual allegations. And the first premise is contradicted by judicially noticeable facts. Nationwide sales of zero-emission trucks saw a 31% year-over-year increase in the last half of 2025. RJN, Ex. 15 at 3, 6; *see also* RJN, Ex. 16 at 1 (observing that deployment of electric buses has risen more than tenfold in the last five years); RJN, Ex. 17 (Tesla’s semi truck announcement); RJN, Ex. 18 at 1 (Volvo’s announcement of fully electric Class 8 vehicle); RJN,

Ex. 19 at 8 (Daimler subsidiary's announcement of fully electric medium-duty truck "[s]uitable for a variety of body configurations and applications").

Furthermore, as to the second premise, the United States overlooks that the CTP's zero-emission vehicle sales commitments apply only to vehicle sales by CTP signatory manufacturers and only to sales *within California*. CTP, App. D. The United States alleges no facts to support the inference that the CTP's California-only sales commitments would increase the price of internal-combustion engine trucks in California, let alone in any other state. Compl., ¶ 10.d. The United States further presupposes the existence of a uniform national truck market, but alleges no facts that could support that supposition. In fact, the United States ignores the allegations of the Plaintiff whose case it intervened in: AmFree's truck-purchasing members claim they shop nationwide for the best prices, effectively conceding that prices vary nationwide. *See* RJN, ¶ 23. Even assuming the United States alleged facts in support of the CTP's purported "market-distorting effects," Compl., ¶ 10.d—and it has not—courts are "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (cleaned up); *see also S.D. Cnty. Gun Rts. Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) ("[W]here injury is alleged to occur within a market context, the concepts of causation and redressability become particularly nebulous…." (quoting *Common Cause v. Dep't of Energy*, 702 F.2d 245, 251 (D.C. Cir. 1983))), *abrogated in part on other grounds by District of Columbia v. Heller*, 554 U.S. 570 (2008). Simply put, the United States offers nothing but speculation and hyperbole in support of its *parens patriae* standing argument. Those threadbare allegations of standing are insufficient. *Hawaii*, 830 F. Supp. 3d at 1040 (citing *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011)); *United States v. California*, 824 F. Supp. 3d at 1085.

**B. The United States Fails to State a Claim Against the CTP**

The United States has not stated a preemption claim against the CTP. Section 209(a) of the Clean Air Act—on which the United States exclusively relies, Compl., ¶¶ 108-12—preempts regulatory requirements imposed unilaterally by the State, but not commitments made voluntarily as part of bilateral or multilateral bargaining. The United States alleges no facts that could

plausibly establish that the CTP is anything other than a voluntary agreement, placing it outside the scope of Section 209(a).

**1. Section 209(a) Does Not Preempt Voluntary Agreements**

Section 209(a) preempts "standard[s] relating to the control of emissions," 42 U.S.C. § 7543(a), and the Act defines "emission standard" as a "requirement established *by the State*," *id.* § 7602(k) (emphasis added). The obligations undertaken in a voluntary agreement do not fit that mold; rather, they are established through bargaining among *multiple parties*. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 526 (1992) ("[A] common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a 'requirement … *imposed under State law*.'"); *Gunter v. Janes*, 9 Cal. 643, 659 (1858) (contracts are the "joint creation" of all parties, not the "single act of one"). Congress itself underscored this distinction when it described Section 209 as "preempting certain State *regulation* of moving sources," not voluntary agreements. 42 U.S.C. § 7416 (emphasis added).

Precedent is in accord. The Supreme Court has held that rules "enacted" by the government are "standards" within the meaning of Section 209. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 248, 254-55 (2004). Interpreting other preemption provisions, the Supreme Court has indicated that "the word series 'law, rule, regulation, *standard*, or other provision,' … connotes official, government-imposed policies." *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 229 n.5 (1995) (emphasis added, internal quotation marks omitted); *see also Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 569 U.S. 641, 649 (2013) (distinguishing between "quintessential regulatory action" and "contractual commitment[s] voluntarily undertaken"). And evaluating whether ostensible agreements are in fact preempted regulations, the Supreme Court has asked whether the supposed contractual "commitments result[ed] not from ordinary bargaining …, but instead from the threat of criminal sanctions." *Am. Trucking Ass'ns*, 569 U.S. at 651; *see also Airlines for Am. v. City and County of San Francisco*, 78 F.4th 1146, 1152 (9th Cir. 2023) (contrasting "government-imposed policies … with contractual commitments voluntarily undertaken" (cleaned up)); *id.* ("When the government employs a coercive mechanism, available to no private party, it acts with the force and effect of the law."

(cleaned up)). In short, the law distinguishes "what the State dictates" from "what the [party] itself undertakes." *Wolens*, 513 U.S. at 233.

Consistent with these principles, the only appellate court to address Clean Air Act preemption and "voluntary contractual agreements" between CARB and vehicle manufacturers held that such agreements "are not standards." *Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot. (AIAM)*, 208 F.3d 1, 7 (1st Cir. 2000). Section 209(a), this court explained, does not preempt bargained-for exchanges like one in which "manufacturers agreed to … develop [zero-emission vehicle] technology" and sell specified "number[s] of [such vehicles]" in California during particular years, and in exchange for CARB "agree[ing] to provide infrastructural support" for zero-emission vehicle implementation. *Id.* at 3.

### 2. The United States Alleges No Facts that Could Support a Conclusion that the CTP Was Involuntary and Thus Could Be Preempted

Because Section 209(a) covers government-imposed standards (and attempts to enforce them) but not voluntarily assumed obligations (nor attempts to enforce them), the United States must plausibly allege that the CTP is the former—i.e., a regulation with the force and effect of law. It cannot do so. Precedent identifies two, and only two, factors relevant to this question: (1) how the obligations were imposed, and (2) how the obligations would be enforced—i.e., whether through means available to private parties, rather than means available only to governments, such as civil or criminal penalties. For example, in *American Trucking Associations*, 569 U.S. at 650, the challenged contract term was preempted because it was imposed not through "the parties' voluntary commitments" but unilaterally through "a form of municipal ordinance," and because violations were "punishable by a fine or a prison sentence." *See also id.* at 651 ("commitments result[ed] not from ordinary bargaining …, but instead from the threat of criminal sanctions"); *see also Airlines for Am.*, 78 F.4th at 1152 ("civil penalty provisions alone may amount to the force and effect of law").

First, the United States cannot plausibly allege that the CTP's signatory manufacturers were coerced into the agreement. The signatories themselves have repeatedly indicated that they entered the CTP voluntarily. At signing, their trade association, EMA, stated that the CTP

"demonstrate[d] how EMA and CARB can work together," and individual manufacturers praised the "cooperative effort[]" that produced the agreement. RJN, Ex. 7 at 1, 2, 3. EMA later described the CTP as a "*consensual* path forward." RJN, Ex. 20 at 2 (emphasis added). And in letters sent to the Federal Trade Commission last year, two signatories said that "through the CTP, [the manufacturer] was able to obtain benefits for its dealers and for customers of its trucks." RJN, Ex. 9 at 2; RJN, Ex. 11 at 2. Two others explained that they signed the CTP to gain promises from CARB "[i]n exchange" for promises they offered. RJN, Ex. 10 at 1; RJN, Ex. 12 at 1.

In addition, the CTP signatories were (and are) "sophisticated players who are represented by counsel"—making them precisely the type of parties courts assume enter agreements voluntarily. *See Powell v. SEC*, 149 F.4th 1029, 1042 (9th Cir. 2025). The CTP's terms also make clear there was a true bargain and exchange of consideration. CTP at 1-3 (setting forth commitments by all signatories). Nothing about this bargained-for exchange resembles the unilateral imposition of obligations in *American Trucking Associations*, where a city-operated port forced private parties into agreement not with "ordinary bargaining (as in *Wolens*), but instead [by] the threat of criminal sanctions." 569 U.S. at 651.

As for the second factor, the United States cannot plausibly allege that the CTP is itself enforceable via a regulatory "mechanism[] available to no private party," such as regulatory penalties. *Airlines for Am.*, 78 F.4th at 1150. As a threshold point, the United States' allegations on this point fail because the United States lacks standing to "interpret the terms" of the CTP, given that it is a non-party and has no third-party rights under the agreement. *See GECCMC 2005-C1 Plummer St. Off. Ltd. P'ship v. JP Morgan Chase Bank, Nat'l Ass'n*, 671 F.3d 1027, 1029, 1033 (9th Cir. 2012) (granting motion to dismiss for lack of standing). The United States' assertions that the CTP's terms are supposedly "regulatory in nature" should be disregarded. Compl., ¶ 69.

These allegations and contentions are also implausible and wrong. CARB has *only* sought to enforce the CTP though "breach of contract" remedies. *See* RJN, ¶ 25; ECF No. 176-46. The United States does not allege otherwise. Nor can it, as there are no provisions of law allowing regulatory penalties for CTP breaches. The only colorably relevant code provision authorizes

penalties for violating "any provision of [Health & Safety Code Division 26, Part 5], or any *order, rule, or regulation* of the state board"—not for breaching an agreement. Cal. Health & Safety Code § 43016(a) (emphasis added). Moreover, the CTP's signatories promised to sell cleaner vehicles in California, *even if CARB could not enforce regulations requiring them to do so*, CTP at 2, ¶ 2—meaning this obligation would only be enforceable via non-regulatory (i.e., contract) remedies. And if the CTP *did* allow regulatory penalties, the implausible implication is that the CTP's signatories—sophisticated corporations—voluntarily entered an agreement with a one-sided enforcement mechanism available to CARB but not to them (i.e., regulatory penalties). Notably, the signatory manufacturers have made no such claim in the related *Daimler* litigation.

The United States purports to locate penalties in specific terms of the CTP, but these efforts fail. That CARB will continue to operate its "certification" program does not amount to a regulatory penalty. Compl., ¶ 69. The CTP simply makes clear that CARB will "maintain its certification program … *independently*" of the CTP. CTP, App. B at i, ¶ 1 (emphasis added). In other words, it is pre-existing California law, not the CTP, that requires manufacturers to obtain CARB certification before sale in the State. *E.g.*, Cal. Health & Safety Code § 43151(a). No term in the CTP provides a mechanism for CARB to prevent manufacturers from selling uncertified vehicles or otherwise establishes a basis for denying certification. Indeed, nothing in the CTP would permit CARB to deny certification for a vehicle that complies with applicable California emission standards, even if the vehicle is inconsistent with the commitments the manufacturer made in the agreement.

Nor can the United States plausibly allege that Appendices A, B, and C to the CTP consist of "regulatory standards" or create "penalties for failing to follow" the CTP. Compl., ¶¶ 68-71; *see also id.*, ¶ 70 (alleging that the CTP can be used to deem some sales "non-complaint"). By the CTP's plain terms, the relevant text of "Appendices A, B, and C" describe "the actions" CARB "commit[ed] to initiate" as part of the exchange of consideration. CTP at 1, ¶ 1. For example, Appendix A "set[s] forth," *id.*, the regulatory amendments to the Omnibus regulation that CARB agreed to consider, *id.*, App. A, which would, by definition, establish what sales would be compliant or non-compliant with those amendments. Likewise, the relevant part of Appendix C

indicates that CARB agreed that its Executive Officer "will objectively evaluate" specified information "in assessing whether a recall is required" (rather than imposing automatic recall triggers). *Id.*, App. C, § A. Far from establishing regulatory penalties for manufacturers, these Appendices describe actions the manufacturers voluntarily *bargained for CARB to take*.

**3. The United States' remaining efforts to bring the CTP within the scope of Section 209(a) fail**

The United States fails to plausibly allege that that CTP's signatories were coerced into executing the agreement, or that the CTP was imposed or could be enforced using tools only available to a government. None of the United States' remaining allegations alter this analysis.

**a.** The United States leans heavily on the fact that the CTP incorporates certain CARB regulations by reference, alleging such incorporation means the CTP is not, in fact, an agreement. As a threshold point, the United States identifies no precedent that make such incorporation by reference relevant to the preemption analysis. Compl., ¶¶ 65, 68, 76, 110-11. And there is a good reason for this failure: the fact that the agreement's terms reference regulatory provisions (as a convenience) does not convert the CTP into a regulation, any more than the incorporation of "statutes and regulations" transforms the federal government's contracts into laws. *Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 609 (2000). Rather, as in *Mobil Oil*, these terms are *contractual promises*, with independent and distinct effect. That is, "[w]hen a contract expressly incorporates a statutory enactment by reference, that enactment *becomes part of the contract* for the indicated purposes just as though the words of that enactment were set out in full in the contract." 11 Williston on Contracts § 30:19 (4th ed. 2025) (emphasis added). Notably, in *Mobil Oil*, the United States *agreed* that the incorporation of statutes and regulations into a contract made them terms of that contract. *See Mobil Oil*, 530 U.S. at 615. The dispute there was only over *which* provisions had, in fact, been incorporated. *Id.* (explaining the government's "'no breach' arguments" depended on incorporation of "not only the OCSLA provisions …, but also certain other statutory provisions and regulations ….").

Nothing in the United States' complaint provides a basis to depart from its position in *Mobil Oil* or the black-letter law that parties to a contract may agree to use existing legal

requirement language to define a term of the contract, thereby providing a shorthand and readily understood description of what one or more parties committed to do. Those terms then "emanate from contract" and are "separate animals" from "obligations created by statute [or regulation]." *Black Diamond Asphalt, Inc. v. Superior Ct.*, 109 Cal. App. 4th 166, 171 (Cal. Ct. App. 2003). And this principle applies with equal force when the federal or state government is a party to the agreement. Specifically, when the government "exact[s] promises from a party with whom it contracts that he will comply with [certain] regulations," those promises are independent of the referenced regulation and are enforceable through a "breach of the contract" suit. *Nutt v. United States*, 12 Cl. Ct. 345, 351 (1987), *aff'd sub nom. Smithson v. United States*, 847 F.2d 791 (Fed. Cir. 1988). And, thus, when the federal government failed to abide by statutory provisions "incorporated" into contracts, *Mobil Oil*, 530 U.S. at 609, the Supreme Court held that the Government broke *its promise* in the contracts—not that it violated the incorporated statute, *id.* at 624. Likewise, when one of the "regulations incorporated into the terms of" federal lease agreements provided that "[l]eases shall be subject to cancellation if improperly issued," the Court of Federal Claims held that the cancellation of the leases was proper, not under the incorporated regulations, but as consistent with *the lease terms*. *Griffin & Griffin Expl., LLC v. United States*, 116 Fed. Cl. 163, 176-77 (2014).

The CTP is no different. In exchange for promises from CARB, certain manufacturers promised to sell cleaner vehicles in California, with the terms (i.e., the agreed-upon vehicles) defined in a way all the parties could easily understand—by reference to particular CARB regulations. These same requirements could have been restated in full in the agreement and would have had the same meaning; that the parties chose the simpler shorthand of cross-referencing regulatory provisions does not change the nature of the commitment. 11 Williston on Contracts § 30:19 (4th ed. 2025). The manufacturers' promises are thus terms of the contract, and any action to enforce them is just that—an effort to enforce the terms of a contract, not an "attempt to enforce" the incorporated regulations.

**b.** The United States alleges that the CTP is not an actual agreement because it purportedly lacks "typical contractual provisions." Compl., ¶ 66. But precedent does not look to

the *absence* of particular contract terms. To the contrary, it is the *presence* of certain terms—such as terms that impose regulatory penalties for non-compliance—that can lead to a conclusion that an agreement has the force of law and can be preempted. *E.g.*, *Airlines for Am.*, 78 F.4th at 1153 ("[W]e find that two penalty provisions of the [contracts] … are unique governmental functions that carry the 'force and effect of law.'"). Contracting parties' choices to omit certain terms that the United States (a non-party) believes would otherwise be "typical" is simply irrelevant to this preemption claim.

**c.** The allegation that "a key goal" of the CTP is to "ensur[e] current and future *CARB regulations*" reduce air pollution likewise cannot save this preemption claim. Compl., ¶ 66. The "goals" the United States identifies are in fact just statements "recognizing the importance" of certain broad principles. CTP at 1. Regardless, the Supreme Court has expressly held that "intentions are not what matters" when determining whether a purported agreement is a regulation subject to preemption. *Am. Trucking*, 569 U.S. at 651. What *does* matter is whether the "tool" employed for imposing or enforcing the obligations is one "only a government can wield"—for example, "the hammer of the criminal law." *Id.* That holding follows directly from the Court's earlier decision in *Wolens*, which rejected preemption even though the parties had clearly *intended* to affect airline rates and services (the preempted domain). 513 U.S. at 226-27, 232-33. The United States cannot evade these controlling precedents any more than the United States can establish that the CTP was imposed or could be enforced through the use of government-only tools.

**d.** Finally, the United States resorts to a conclusory allegation that CARB signed the CTP "in its capacity as an industry regulator—not in its capacity as a market participant." Compl., ¶ 77. Neither conclusory assertions nor legal arguments state a claim. All the more so here because Section 209(a), the preemption provision in question, is expressly defined and limited by the term "standards," 42 U.S.C. § 7543(a); *supra* Sec. I.B.1. Congress used the word "standards" to divide "requirement[s] *established by the State*," 42 U.S.C. § 7602(k) (emphasis added), from all other requirements and state actions. The capacity in which the State entered into an agreement is thus irrelevant to the inquiry because this is not a case where the State needs an

exception to preemption. *All* voluntary agreements simply fall outside Section 209(b)'s preemptive scope. *See AIAM*, 208 F.3d at 3, 7 (voluntary agreement *not* involving market participation was not preempted under Section 209(a) because it was not a "standard"). *Wolens* involved a different preemption provision also containing the word "standard" and demonstrates the point: there, the Supreme Court held that a state court could enforce agreement terms that easily fell within the preempted domain *because the agreement was voluntary*, even though state-court enforcement is far from a form of market participation. 513 U.S. at 222. In other words, it is only when the government acts with "the force and effect of law" that it acts as "a regulator rather than a market participant," as courts use that term in this context. *Airlines for Am.*, 78 F.4th at 1152 (cleaned up). When a government bargains with other parties, it is engaging in contracting activities—like private parties do—not engaging in regulation. *See Mobil Oil*, 530 U.S. at 607 (applying "the law applicable to contracts between private individuals" although United States was a party and agreed to carry out its regulatory responsibilities in a particular way).

## II. The United States' Preemption Challenge to the Advanced Clean Fleets Regulation Should Be Dismissed for Lack of Jurisdiction

The United States' claim against the 2036 Sales Requirement in the ACF regulation, Compl., ¶¶ 104-05, should also be dismissed because the United States lacks standing "for each form of relief that [it] seek[s]" as to that regulation. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). To begin, the United States' vaguely asserted harms are inadequate for the same reasons discussed above in connection with the CTP. *Supra* Sec. I.A. In fact, if anything, the United States' standing arguments are even weaker for this claim (and associated relief) because unenforceable state laws cannot give rise to any sovereign interest of the United States and cannot plausibly be understood to have impacts of the sort that could support *parens patriae* standing. *See Missouri ex rel. Koster*, 847 F.3d at 651-54 (explanation and application of test for *parens patriae* standing); *Table Bluff Rsrv. (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d 879, 885 (9th Cir. 2001) (before proving they could satisfy additional elements of *parens patriae* standing, plaintiffs "still must allege injury in fact to the citizens they purport to represent as *parens patriae*").

As the United States recognizes, Compl., ¶ 44, CARB has stipulated, in signed court orders in other cases, that it will not enforce the 2036 Sales Requirement unless and until it has a preemption waiver from EPA. RJN, ¶ 7; *see Buscemi v. Bell*, 964 F.3d 252, 260 (4th Cir. 2020) (no standing where state agency "has stipulated that it … will not" engage in challenged conduct); *Reddy v. Foster*, 845 F.3d 493, 501-02 (1st Cir. 2017) ("plaintiffs lack standing, at this time" where "the government has affirmatively disavowed prosecution" unless or until specified conditions occur). Stated differently, CARB will only enforce this challenged regulation *if Plaintiff-Intervenor EPA* takes action allowing CARB to do so. The United States cannot allege facts to establish that it "would benefit in a tangible way from the court's intervention." *Warth v. Seldin*, 422 U.S. 490, 508 (1975); *see also Platinum Sports Ltd. v. Snyder*, 715 F.3d 615, 616-17 (6th Cir. 2013) ("stipulated final judgment" entered in earlier case and enjoining enforcement of challenged laws made clear "the federal courts have no authority to resolve this 'dispute'").

To the extent the United States claims it is entitled to a declaratory judgment that the codification of the 2036 Sales Requirement into the California Code of Regulations was preempted absent a waiver, Compl., ¶ 105; *id.*, at 23, ¶ A, it lacks standing for relief as to that, as well. *See Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1142 (9th Cir. 2024) ("[T]he mere existence of [the regulation], which may or may not ever be applied to [anyone], is not sufficient to create a case or controversy within the meaning of Article III." (quoting *Cal. Tow Truck Ass'n v. City and County of San Francisco*, 693 F.3d 847, 866 (9th Cir. 2012))). A declaration that this regulatory provision is "unenforceable," Compl. at 23, ¶ A, would provide no tangible benefit to the United States, *Warth*, 422 U.S. at 508, given the stipulated orders precluding enforcement without a waiver—i.e., precluding the alleged injury of enforcement of a preempted regulation.

Moreover, to credit an injury for the mere existence of this provision in the California Code of Regulations, this Court would have to conclude that Section 209(a) of the Clean Air Act establishes a legally protected interest in preventing state legislatures and agencies from codifying emission control standards for new motor vehicles. *Stockton v. Brown*, 152 F.4th 1124, 1142 (9th Cir. 2025) ("Whether framed as an issue of standing or ripeness, an injury must involve an

invasion of a legally protected interest…." (cleaned up)). But that would interpret Section 209(a) as a direct order to States as to what laws they may or may not codify, in violation of the anti-commandeering doctrine. *Murphy*, 584 U.S. at 470 ("The anticommandeering doctrine … is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.,* the decision to withhold from Congress the power to issue orders directly to the States."). Congress cannot "dictate[] what a state legislature may and may not do," *id.* at 474, so Section 209(a) cannot be understood as establishing that the United States (or anyone) has a legally cognizable interest in the mere codification of any particular state law. *See* Compl., ¶ 4 (alleging injury based on intrusion on "the exclusive authority of the federal government to regulate motor vehicle and engine emissions under the Clean Air Act").

Finally, the United States asserts a "direct proprietary interest" in *other* parts of ACF, but that is inadequate, too. *See id.*, ¶ 10.c (purporting to characterize ACF provisions applicable to federal fleets, not the 2036 Sales Requirement). The relevant fleet requirements of ACF are not being enforced, RJN, ¶ 8, and CARB has undertaken a rulemaking to repeal them, which is now with the California Office of Administrative Law for final consideration, RJN, Ex. 6; RJN, Ex. 21 at 5. The United States alleges no facts indicating that these fleet requirements ever had any effect on the federal government, much less that they are doing so now. Regardless, any injury from these provisions would not support standing to challenge the 2036 Sales Requirement, which would only apply to the federal government if EPA waived preempted and if the United States opted to purchase vehicles in California (rather than elsewhere) in model year 2036 or later.

The United States cannot establish standing for any relief concerning the 2036 Sales Requirement, and its challenge to the requirement should be dismissed.[1]

[1] In addition to lacking standing for this claim, the United States also fails to establish, on the merits, that mere promulgation of the 2036 Sales Requirement is preempted, as Defendant Cliff explains in his opposition to the United States' motion for summary judgment, ECF No. 194 at Sec. II.B. That brief also explains why the United States' preemption claims against the ACT and Omnibus regulations likewise fail on the merits. *Id.* at Sec. I.

**CONCLUSION**

For the foregoing reasons, Defendant Cliff respectfully requests that the Court dismiss the United States' claim against the CTP for lack of jurisdiction and failure to state a claim and dismiss the United States' claim against the ACF regulation for lack of jurisdiction.

Dated: September 4, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General

*/s/ Cecilia D. Segal*
CECILIA D. SEGAL
Deputy Attorney General
*Attorneys for Defendant*